**Case No. 13-55700**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

Nyoka Lee and Talala Mshuja

*Plaintiffs-Appellants,*

v.

Corinthian Colleges, Inc., et al.

*Defendants-Appellees.*

---

*On Appeal from the United States District Court
for the Central District of California, Case No. 07-1984
The Honorable Philip S. Gutierrez, Presiding*

---

**Answering Brief of Defendants-Appellees Corinthian Colleges, Inc., David Moore, and Jack D. Massimino**

---

MUNGER, TOLLES & OLSON LLP
Blanca F. Young
Achyut J. Phadke
Hannah E. Shearer
560 Mission Street, 27th Floor
San Francisco, California 94105-2907
Telephone:   (415) 512-4000
Facsimile:   (415) 512-4077

Attorneys for Defendants-Appellees Corinthian Colleges, Inc., David Moore, and
Jack D. Massimino

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Corinthian Colleges, Inc. states that it has no parent corporation and that the only publicly held corporation that owns ten percent or more of Corinthian Colleges, Inc. is Wells Fargo & Company.

The determination of Wells Fargo & Company's ownership share is based solely on a Schedule 13G, Amendment No. 6, filed with the U.S. Securities and Exchange Commission on April 11, 2013 concerning holdings of Corinthian Colleges, Inc. common stock. Wells Fargo & Company reported on this Schedule 13G that (i) it has sole voting and dispositive power with respect to 1 share of common stock, and has shared voting and dispositive power with respect to 10,296,248 shares; (ii) its subsidiary, Wells Capital Management Incorporated, has shared voting power with respect to 2,663,480 of such shares and shared dispositive power with respect to 10,217,275 of such shares; and (iii) its subsidiary, Wells Fargo Funds Management, LLC has shared voting and dispositive power with respect to 7,632,173 of such shares.

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

JURISDICTIONAL STATEMENT .........................................................7

STATEMENT OF ISSUES ................................................................7

STATUTORY AND REGULATORY ADDENDUM ...........................................8

STATEMENT OF THE CASE..............................................................8

    I.     Relators' Original Complaint, Filed in March 2007, Alleged that Corinthian Violated the Incentive Compensation Ban .................8

    II.    Corinthian's Alleged Violation of the Incentive Compensation Ban Was Repeatedly Disclosed Before March 2007 ...........................9

        A.    The 2005 Congressional Hearing................................................9

        B.    The Securities Action.............................................................10

    III.   Similar Allegations Were Made Against Other Institutions ...............12

    IV.   Relators' First Amended Complaint Repeated Publicly Disclosed Allegations........................................................................13

    V.    This Case Was Not Based on Any Information Known to Relators.................................................................................15

        A.    Lee Had No Knowledge of Information Supporting Relators' Allegations ...............................................................15

        B.    Mshuja Had No Knowledge of Information Supporting Relators' Allegations ...............................................................20

        C.    This Lawsuit Was Manufactured by Counsel...........................21

    VI.   The District Court's Dismissal and Sanctions Orders .......................22

STANDARD OF REVIEW .................................................................24

ii

ARGUMENT ..................................................................................25

I.     The Public Disclosure Bar..................................................25

II.    Relators' Allegations Were Publicly Disclosed..................27

       A.     The Bar is Triggered When Similar Allegations or
              Transactions Are Publicly Disclosed........................27

       B.     Relators' Allegations Were Publicly Disclosed ......................28

       C.     The Use of the Word "Quota" Does Not Change the Fact
              that Prior Disclosures Alleged The Same Fraud as
              Relators ...................................................................31

       D.     *Leveski* Does Not Support Relators ..........................................34

       E.     Relators Cannot Distinguish Their Allegations From the
              Public Disclosures.....................................................37

              1.     The Disclosures Did Not Merely Allege Past
                     Misconduct, but "Continuing" Violations.....................37

              2.     Industry-wide Disclosures Support, but Are Not
                     Necessary to, the Conclusion That There Was a
                     Public Disclosure ..........................................40

              3.     The Confidentiality of Internal Reports Does Not
                     Alter the Public Disclosure Analysis............................42

III.   Relators Are Not "Original Sources"...................................42

       A.     The District Court's Original Source Analysis Was
              Legally Correct and Its Factual Findings Were Not
              Clearly Erroneous .....................................................43

       B.     The District Court's Procedural Rulings Provide No
              Basis for Reversal .....................................................45

              1.     The District Court Did Not Abuse Its Discretion by
                     Holding One Hearing....................................................45

              2.     The District Court Did Not Abuse its Discretion In
                     Rejecting Lee's Sham Affidavit ....................................46

3.    The Handling of Flash and Activity Reports Did Not Prejudice Relators and Was Not an Abuse of Discretion ......................................................................48

4.    Relators Were Not Entitled to Additional Discovery ......................................................................50

C.    Relators Also Failed to Establish the Other Requirements to be Original Sources ...............................................51

1.    The Pre-Filing Disclosure Requirement Was Not Met ......................................................................................52

2.    Relators Had No Hand in the Public Disclosures...........53

IV.    The District Court's Statute of Limitations Ruling Does Not Affect the Outcome and Was Correct in Any Event...........................53

CONCLUSION ...........................................................................................55

STATEMENT OF RELATED CASES .........................................................57

CERTIFICATE OF COMPLIANCE ............................................................58

iv

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A-1 Ambulance Serv., Inc. v. California*,
 202 F.3d 1238 (9th Cir. 2000) ..............................................................26, 30, 33

*A-1 Ambulance Serv., Inc. v. Cnty of Monterey*,
 90 F.3d 333 (9th Cir. 1996) ................................................................37

*Alaska Cargo Transport, Inc. v. Alaska Ry. Corp.*,
 5 F.3d 378 (9th Cir. 1993) ................................................................51

*Arakaki v. Lingle*,
 477 F.3d 1048 (9th Cir. 2007) ....................................................24, 45

*Campbell v. Redding Med. Ctr.*,
 421 F.3d 817 (9th Cir. 2005) .............................................................40

*Cooper v. Blue Cross & Blue Shield of Fla., Inc.*,
 19 F.3d 562 (11th Cir. 1994) ............................................................36

*Glaser v. Wound Care Consultants, Inc.*,
 570 F.3d 907 (7th Cir. 2009) .............................................................46

*Graham Cnty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*,
 559 U.S. 280 (2010)................................................................1, 25, 37

*Hagood v. Sonoma Cnty. Water Agency*,
 81 F.3d 1465 (9th Cir. 1996) ......................................................27, 36

*In re Markus*,
 313 F.3d 1146 (9th Cir. 2002) .........................................................55

*In re Nat'l Gas Royalties Qui Tam Litig.*,
 562 F.3d 1032 (10th Cir. 2009) ...................................................41, 49

*Indep. Towers of Wash. v. Washington*,
 350 F.3d 925 (9th Cir. 2003) .............................................................48

*Jones v. Blanas*,
  393 F.3d 918 (9th Cir. 2004) ................................................................25

*Kinney v. Stoltz*,
  327 F.3d 671 (8th Cir. 2003) ................................................................51

*Leveski v. ITT Educational Services Corp.*,
  719 F.3d 818 (7th Cir. 2013) ........................................................passim

*Makro Capital of America, Inc. v. UBS AG*,
  543 F.3d 1254 (11th Cir. 2008) ...........................................................53

*Martell v. Trilogy, Ltd.*,
  872 F.2d 322 (9th Cir. 1989) ................................................................54

*Michelman v. Lincoln Nat'l Life Ins. Co.*,
  685 F.3d 887 (9th Cir. 2012) ................................................................25

*Morongo Band of Mission Indians v. Cal. St. Bd. of Equal.*,
  858 F.2d 1376 (9th Cir. 1988) ..............................................................29

*Patterson v. Gen. Motors Corp.*,
  631 F.2d 476 (7th Cir. 1980) ................................................................54

*Quaak v. Dexia, S.A.*,
  445 F. Supp. 2d 130 (D. Mass. 2006) ...................................................54

*Rockwell Int'l Corp. v. United States*,
  549 U.S. 457 (2007) ....................................................4, 29, 36, 44

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
  131 S.Ct. 1885 (2011) ...........................................................26, 27, 31

*U.S. ex rel. Biddle v. Bd. of Trustees of Leland Stanford, Jr. Univ.*,
  161 F.3d 533 (9th Cir. 1998) ........................................................passim

*U.S. ex rel. Boothe v. Sun Healthcare Group, Inc.*,
  496 F.3d 1169 (10th Cir. 2007) ...........................................................39

*U.S. ex rel. Duxbury v. Ortho Biotech Prods. L.P.*,
  2010 WL 3810858 (D. Mass. Sept. 27, 2010) ....................................44

*U.S. ex rel. Glaser v. Wound Care Consultants, Inc.*
2007 WL 2934885 (S.D. Ind. Oct. 5, 2007) .......................................................51

*U.S. ex rel. Harshman v. Alcan Elec. Eng'g*,
197 F.3d 1014 (9th Cir. 1999) ....................................................................passim

*U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
498 F. Supp. 2d 25 (D.D.C. 2007)..............................................................28, 44

*U.S. ex rel. Hoggett v. University of Phoenix*,
2012 WL 2681817 (E.D. Cal. July 6, 2012)......................................................39

*U.S. ex rel. Hyatt v. Northrop Corp.*,
91 F.3d 1211 (9th Cir. 1996) ............................................................................54

*U.S. ex rel. Jamison v. McKesson Corp.*,
649 F.3d 322 (5th Cir. 2011) ............................................................................29

*U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.*,
469 F. App'x 244 (4th Cir. 2012)................................................................41, 42

*U.S. ex rel. Lee v. Corinthian Colleges Inc.*,
655 F.3d 984 (9th Cir. 2011) ......................................................................passim

*U.S. ex rel. Meyer v. Horizon Health Corp.*,
565 F.3d 1195 (9th Cir. 2009) ....................................................................passim

*U.S. ex rel. Newsham v. Lockheed Martin*,
190 F.3d 963 (9th Cir. 1999) ......................................................................26, 29

*U.S. ex rel. Precision Co. v. Koch Indus., Inc.*,
971 F.2d 548 (10th Cir. 1992) ..........................................................................36

*U.S. ex rel. Reagan v. East Texas Med. Ctr. Reg. Healthcare Sys.*,
384 F.3d 168 (5th Cir. 2004) ............................................................................41

*U.S. ex rel. Rosales v. S.F. Hous. Auth.*,
173 F. Supp. 2d 987 (N.D. Cal. 2011).........................................................30, 40

*U. S. ex rel. Smith v. Yale Univ.*,
415 F. Supp. 2d 58 (D. Conn. 2006)..................................................................45

*U.S. ex rel. Springfield Terminal Ry. v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1994) ................................................................28, 33, 34

*U.S. ex rel. Vuyyuru v. Jadhav*,
  555 F.3d 337 (4th Cir. 2009) ................................................................44

*U.S. ex rel. Washington v. Education Mgmt. Corp.*,
  871 F.Supp.2d 433 (W.D. Pa. 2012)......................................................45

*United States v. Catholic Healthcare West*,
  445 F.3d 1147 (9th Cir. 2006) ..............................................................41

*United States v. Hughes Aircraft Co.*,
  162 F.3d 1027 (9th Cir. 1998) ..............................................................24, 39

*United States v. Kent*,
  649 F.3d 906 (9th Cir. 2011) ................................................................25

*United States v. Lemus*,
  582 F.3d 958 (9th Cir. 2009) ................................................................43

*Wang v. FMC Corp*,
  975 F.2d 1412 (9th Cir. 1992) ..............................................................passim

*Williams v. Boeing Co.*,
  517 F.3d 1120 (9th Cir. 2008) ..............................................................54, 55

*Yeager v. Bowlin*,
  693 F.3d 1076 (9th Cir. 2012) ..............................................................24, 47

**FEDERAL STATUTES**

20 U.S.C. § 1094(a)(20)........................................................................8

28 U.S.C. § 1291 ..................................................................................7

28 U.S.C. § 1331 ..................................................................................7

28 U.S.C. § 1927 ..................................................................................23

31 U.S.C. § 3730(b) ..............................................................................25

31 U.S.C. § 3730(d)(2)..........................................................................25

31 U.S.C. § 3730(e)(4)(1994) ..........................................................passim

31 U.S.C. § 3731(b) ..................................................................................54

**FEDERAL RULES OF CIVIL PROCEDURE**

Rule 8 .......................................................................................................33

Rule 9(b)....................................................................................................33

Rule 12(b)(1).................................................................................46, 47, 50

Rule 12(b)(6)..............................................................................................33

Rule 26 ......................................................................................................52

Rule 56(d)...........................................................................................25, 50

**LOCAL RULES**

C.D. Cal. L.R. 56-1 ..................................................................................46

C.D. Cal. L.R. 79-5.1 ...............................................................................46

**FEDERAL REGULATIONS**

34 C.F.R. § 668.14(b)(22)(ii)(A)(2008) ....................................................9

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's ruling that there is no subject matter jurisdiction over this action should be affirmed. The "public disclosure bar" of the False Claims Act ("FCA") jurisdictionally bars *qui tam* actions if (1) the allegations or transactions identified in the complaint have been publicly disclosed, and (2) the relators are not "original sources" of the information on which their allegations are based. 31 U.S.C. § 3730(e)(4); *U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 (9th Cir. 2009). This rule is designed to cull "parasitic lawsuits by those who . . . seek remuneration although they contributed nothing to the exposure of the fraud.'" *Graham Cnty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 296 n.16 (2010). This case, in which the government has declined to intervene, is a classic example of a jurisdictionally infirm, parasitic lawsuit. As the district court found based on an extensive factual record, the allegations made by Relators were publicly disclosed, and Relators utterly lacked the "direct and independent" knowledge required to qualify as "original sources." 31 U.S.C. § 3730(e)(4).[1]

***Relators' allegations were publicly disclosed.*** A relator's allegations are "publicly disclosed" when they are "substantially similar" to "allegations" in public sources. *Meyer,* 565 F.3d at 1199. That test—which Relators studiously

---

[1] Defendants Corinthian Colleges, Inc., Jack Massimino, and David Moore are collectively referred to as "Corinthian." "ER" and "SER" refer to Appellants' Excerpts of Record and Defendant-Appellees' Joint Supplemental Excerpts of Record, respectively. "AOB" refers to Appellants' Opening Brief. "Rule(s)" refers to the Federal Rules of Civil Procedure.

avoid mentioning—is easily satisfied here.  Relators filed suit in 2007, alleging that Corinthian violated a prohibition in the Higher Education Act ("HEA") against compensating admissions personnel based solely on the number of students they enrolled (the "incentive compensation ban").  But, by 2007, such allegations were old news.  In 2005 and 2006, filings in a civil lawsuit against Corinthian alleged that Corinthian gave raises and bonuses to admissions staff based on enrollment quotas in violation of the incentive compensation ban.  And in 2005, Corinthian was accused in a Senate hearing of violating the ban.  These are textbook "public disclosures" under the FCA.

In addition, the public record was rife with allegations of rampant incentive compensation violations throughout the industry.  Nearly a dozen similar lawsuits had been filed against career institutions prior to Relators' complaint, including *five* failed FCA actions by Relators' counsel.  Further, incentive compensation violations were the subject of numerous government reports and hearings, and even led to a Department of Education ("DoE") rulemaking that revamped the pertinent regulations.  Although the Corinthian-specific disclosures by themselves trigger the jurisdictional bar, the intense industry-wide attention on this issue also made Corinthian a prominent target for government investigation—and parasitic lawsuits.

In the face of this record, Relators' challenges to the district court's public disclosure ruling all fail.

*First,* Relators argue that the many public disclosures asserting that Corinthian tied compensation to enrollment quotas do not count because in the

2

prior appeal in this case, *U.S. ex rel. Lee v. Corinthian Colleges Inc.*, 655 F.3d 984 (9th Cir. 2011) ("*Lee I*"), the court purportedly held that "enrollment quotas are legal." (AOB 30.) But *Lee I* held the opposite: it found that Relators *could* state a claim under the FCA if they amended their complaint to allege that meeting quotas was the sole basis for salary increases at Corinthian. Moreover, nothing in *Lee I* changes the fact that Relators' complaints merely repeated allegations already in the public domain. The public disclosure bar exists precisely to exclude such copycat lawsuits.

*Second,* betraying that their position finds no support in Ninth Circuit law, Relators rely on the Seventh Circuit's inapposite decision in *Leveski v. ITT Educational Services Corp.* But the public disclosures here are far more extensive and similar in scope to relators' allegations than the single disclosure in *Leveski*. Further, the *Leveski* court applied a more exacting test for "public disclosure" than required by the statute or the law in the Ninth Circuit (and other circuits).

*Third,* Relators argue that the Corinthian-specific disclosures identified only "past misconduct" and therefore do not count for alleged violations occurring after their publication. But, in fact, those disclosures alleged "ongoing" fraud that would continue if unchecked by government action. Moreover, courts have found that even allegations limited to prior time periods qualify as "public disclosures."

*Fourth,* Relators and the United States in its amicus brief argue that the many publicly aired claims of industry-wide abuses of the incentive compensation ban were insufficient to identify Corinthian as a potential wrongdoer and therefore do not constitute public disclosures. This argument (while wrong) is irrelevant: it

ignores the dispositive fact that the public record contained numerous allegations that *Corinthian specifically* violated the ban.

*Fifth,* Relators argue that the alleged fraud was not publicly disclosed because certain internal company reports were kept confidential. But a public disclosure happens when "allegations" of misconduct are disclosed, "whether or not the information on which those allegations are based has been made public." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 471 (2007). Further, the reports *were* described in prior civil complaints.

**Relators are not original sources.** The district court's conclusion that Relators are not original sources is similarly unassailable. To be original sources, Relators had to establish that (1) they had "direct and independent knowledge of the information upon which the[ir] allegations are based;" (2) they voluntarily disclosed that information to the government *before* filing suit; and (3) they "had a hand" in the public disclosures. 31 U.S.C. § 3730(e)(4); *Meyer*, 565 F.3d at 1201. Relators failed on all three counts.

As the district court concluded from the voluminous factual record, Relators lacked the requisite direct, "firsthand" knowledge of information supporting their allegations. *Meyer,* 565 F.3d at 1202.

Relator Nyoka Lee—who worked for Corinthian from 1999 to 2005 as a test proctor, admissions representative, and briefly as a director of admissions—did not witness a single instance of improper incentive compensation. As Lee testified:

- Her only promotions or raises were during the time period barred by the statute of limitations (*i.e.*, before January 1, 2005);

4

- She received only three raises at Corinthian and does not know the basis for the raises, other than documentation showing that many factors *besides* enrollment numbers were considered; and

- She never discussed with anyone else how they were compensated; she never evaluated anyone for a promotion or raise; and she does not know what factors were considered in compensation decisions.

Indeed, Lee's testimony contradicted the allegation that Corinthian employed "sham" written policies to hide payments and evaluations based "solely" on enrollments:

- Lee testified that she understood that "part of" her evaluation and compensation depended on qualitative criteria, such as prompt and accurate communications with prospective students, compliance with applicable regulations, and accurate recordkeeping;

- Lee testified that she and other admissions staff followed the HEA-compliant written compensation policies.

Relator Talala Mshuja was equally candid about his lack of personal knowledge. A former test proctor at Corinthian who was paid by the hour, Mshuja conceded that his "only source" of information about how Corinthian compensated admissions staff was his sister, co-Relator Lee. Relators, in fact, did not think of suing Corinthian until they were recruited through a client of Relators' counsel who had previously served as a relator in two of his similar failed FCA cases against other schools.

5

Given this record, the district court's conclusion that Relators lacked direct and independent knowledge of any fraud is far from clearly erroneous, and must be upheld. The only substantive challenge Relators make to this ruling is unaccompanied by any citation to record evidence and premised on inapposite and overruled legal authority. Relators' various procedural challenges are equally unfounded. Relators contend that the district court erred by not holding separate hearings on the public disclosure and original source issues, but nothing in the FCA, let alone the Due Process Clause, requires separate hearings. Relators try to revive a sham affidavit submitted in Lee's name, but the district court was well supported in disregarding this last-ditch attempt to undo Lee's deposition testimony. Finally, Relators argue they were unable to present evidence of "Flash" and "Activity" reports, but those reports could not have proven Relators' knowledge of the alleged fraud (moreover, their absence from the record is because of Relators' failure to file them).

Indeed, Relators' position could hardly be worse. Not only did the evidence conclusively demonstrate that they lacked direct and independent knowledge of any fraud, Relators completely failed to establish—and do not even attempt to argue on appeal—that they met the other two requirements to be original sources. The district court's decision can, and should, be affirmed on all of these grounds.

***Statute of Limitations***. Relators also appeal from the district court's ruling that pre-2005 claims are time-barred. Their appeal of this issue is futile because jurisdiction is lacking over all of Relators' allegations—even the time-barred ones. The district court, in any event, correctly found that the FCA's six-year statute of

limitations barred the pre-2005 claims that Relators asserted, for the first time, in the First Amended Complaint ("FAC") filed in 2011.

For all of these reasons, and those discussed below, the order of dismissal should be affirmed.

## JURISDICTIONAL STATEMENT

There is no subject matter jurisdiction over this action, for the reasons stated herein. *See* 31 U.S.C. § 3730(e)(4)(A). Jurisdiction was otherwise proper under 28 U.S.C. § 1331. The order of dismissal was entered on April 12, 2013, and Relators timely appealed on April 25, 2013. (1ER 1-5.) This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Were Relators' allegations publicly disclosed under 31 U.S.C. § 3730(e)(4)(A), where, *inter alia*, Corinthian was accused in court filings and Congressional hearings of violating the incentive compensation ban?

2.     Did Relators fail to prove they are original sources under 31 U.S.C. § 3730(e)(4)(B), where Relators submitted no evidence that they (a) had direct and independent knowledge of information supporting their claims, (b) made a timely pre-filing disclosure to the government, or (c) had a hand in bringing about the public disclosures?

3.     Is reversal required based on the district court's ruling that the FCA's six-year statute of limitations barred Relators' pre-2005 claims, where Relators'

claims for all time periods are jurisdictionally infirm, and where, in any event, pre-2005 allegations were first raised in an amended pleading filed in 2011?

## STATUTORY AND REGULATORY ADDENDUM

Pursuant to Circuit Rule 28-2.7, pertinent statutory and regulatory provisions are included in the Addendum attached to this brief.

## STATEMENT OF THE CASE

### I. Relators' Original Complaint, Filed in March 2007, Alleged that Corinthian Violated the Incentive Compensation Ban

Corinthian provides post-secondary career education to thousands of students, many of whom receive financial aid from the federal government under Title IV of the HEA.  (1ER 113 ¶ 14, 114-15 ¶¶ 22-23.)[2]  As a condition of receiving Title IV funds, Corinthian enters into Program Participation Agreements ("PPAs") with DoE in which it certifies compliance with a number of HEA requirements.  (*See* 1ER 115-16 ¶ 26.)  One such requirement is that Corinthian "not provide any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments" to any person "engaged in any student recruiting or admission activities."  20 U.S.C. § 1094(a)(20).  From 2003 until July 2011, DoE regulations provided a "safe harbor" permitting schools to pay "a fixed annual salary . . . as long as that compensation is not adjusted up or

---

[2] Citations to the ER and SER include the volume, page numbers, and (where appropriate) paragraph or line numbers referenced.  For example, this citation is to ER volume 1, page 113 at paragraph 14, and pages 114-115 at paragraphs 22 and 23.

down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A)(2008).

Relators filed suit on March 26, 2007, alleging that "[f]or a period of years, but particularly in 2005 and subsequently, Corinthian made false certifications" in PPAs that it complied with the HEA and "did not pay commissions and other incentive compensation to its recruiters." (1ER 113 ¶ 13, 115-117 ¶¶ 25-31, 120 ¶ 42.) According to Relators, this purported fraud occurred at each of the approximately 100 campuses Corinthian operates in the United States. (1ER 113 ¶ 13, 115 ¶ 24.)

## II. Corinthian's Alleged Violation of the Incentive Compensation Ban Was Repeatedly Disclosed Before March 2007

### A. The 2005 Congressional Hearing

Relators were far from the first to make these allegations. In March 2005, Corinthian was accused in a Congressional hearing (the "2005 Congressional Hearing") of implementing an incentive compensation system focused exclusively on enrollment numbers. At the hearing, Representative Maxine Waters testified that career schools used the safe harbor to employ a "thinly disguised incentive compensation or quota system which violates the spirit and intent of the prohibition," and singled out Corinthian as an example. (5SER 1392.) Paula Dorsey, a former Corinthian employee, similarly testified that Corinthian focused

9

on "mere admission enrollment numbers and quotas," and "urge[d]" DoE to "further investigate" Corinthian.  (5SER 1399-1400.)

Contrary to Relators' suggestion (AOB 17), Waters did not merely comment that the safe harbor was too lenient, but accused Corinthian of violating *existing* law.  Waters complained that DoE failed to "enforce existing law," effectively "remov[ing] the few safeguards currently in place" against HEA abuses.  (5SER 1393, 1397 (prohibitions against incentive compensation and other abuses "may as well not exist for all the (non-existent) enforcement").)  She specifically complained that DoE failed to "investigate[] the complaints of multiple Corinthian students" (5SER 1393) and "d[id] not appropriately follow up even when others . . . have uncovered fraud and violation of the law." (5SER 1389-90; *see also* 5SER 1394 ("why has the Department not investigated claims made in whistleblower or shareholder lawsuits against . . . Corinthian . . .?").)

## B.     The Securities Action

Similar allegations were made in a securities class action against Corinthian (the "Securities Action").  A complaint filed in October 2005 alleged that Corinthian "falsely represented that they were in compliance with Title IV regulations regarding the payment of bonuses, commissions, and other incentives." (6SER 1514 ¶ 224, 1515 ¶¶ 226-27.)  The complaint cited statements from Corinthian employees across the country, including the same San Francisco campus where Relators worked, (6SER 1516 ¶ 231), to the effect that:

- "hitting target numbers was a condition of employment and determined whether a representative would receive the annual raise of 20% or not."  (6SER 1516 ¶ 232.)

- "bonuses were given to . . . department heads and individual representatives in both the admissions and financial aid departments who met their quotas, in violation of the HEA's prohibition against incentive compensation."  (6SER 1515 ¶ 228.)

- "Directors of Admissions. . . received quarterly bonuses contingent upon meeting target numbers set by corporate. . ."  (6SER 1516 ¶ 231.)

- "Corinthian awarded . . . directors of admissions and admissions representatives and officers bonuses ranging from $2,000 to $100,000 per employee based on their ability to meet the Company's goals . . ." (6SER 1516 ¶ 233.)

- "yearly raises were based on whether [the employee] met his/her enrollment goals." (6SER 1519 ¶ 241.)

The 2005 complaint, moreover, alleged that Corinthian hid its allegedly improper practices behind facially compliant policies.  For example, it alleged: "'They were too smart to put it in writing,' [Confidential Witness] 11 said, but everyone understood that 'if you didn't play the game, you were out'" (5SER 1443-44 ¶ 80); "The president told [Confidential Witness] 29 'incentives are against the rules but when you call them training items, it is okay'" (6SER 1515

¶ 229); and "[a]lthough defendants claim to have a stated corporate policy of 'no lying, stealing, or cheating,' the reality belies their claim. Numerous former employees describe a corporate culture in which rules were meant to be broken and this stated 'policy' was known to be a joke." (6SER 1521 ¶ 246.)

These allegations were repeated verbatim in an amended complaint filed in in March 2006. (*See* 6SER 1701-04 ¶¶ 234-44.) And they were repeated in an appellate brief filed in October 2006, which asserted that Corinthian "falsely represent[ed] that [it] complied with Title IV's prohibition against incentive compensation for securing enrollments or financial aid," (6SER 1772) and "bas[ed] bonuses and other compensation on success in securing enrollments or financial aid (in violation of Title IV)." (6SER 1788.) The brief emphasized that that the alleged fraud "was not confined to [particular campuses] but was widespread," "endemic," and "pervasive." (6SER 1787-88, 1771-72.)

## III.    Similar Allegations Were Made Against Other Institutions

Corinthian was not the only institution accused of violating the incentive compensation ban. Before Relators filed their action, a raft of *qui tam* lawsuits had been filed against similar institutions alleging false certification of compliance with the same ban.[3] Indeed, counsel for Relators unsuccessfully filed five essentially identical *qui tam* actions against other schools before suing Corinthian.[4]

---

[3] Between 2003 and 2006, lawsuits alleging incentive compensation violations were filed against at least ten other career schools. 4SER 1001- 5SER 1357.

[4] *See* 4SER 1005, 1064, 1082, 1138, 1176. In each of these cases, government declined to intervene and the action was ultimately dismissed with prejudice.

Given the many public disclosures specifically accusing Corinthian of violating the ban, Corinthian was an easy target for a copycat FCA action.

## IV. Relators' First Amended Complaint Repeated Publicly Disclosed Allegations

The Original Complaint was dismissed because it did not identify conduct falling outside the safe harbor. (8SER 2115-16.) The Ninth Circuit affirmed the dismissal but found that leave to amend should have been granted, suggesting that Relators could allege that Corinthian did not follow its written policies, or that elements of the written policy that did not directly address enrollment numbers were merely a proxy for enrollment quotas. *Lee I*, 655 F.3d at 996.

Relators filed the FAC on December 15, 2011. The FAC alleged that Corinthian's written plan was a "smoke screen used to disguise the fact that its recruiters are compensated solely based on recruitment, admission, and enrollment numbers." (1ER 72-73 ¶ 14; *see also* 1ER 87 ¶¶ 48-49.) It also alleged that "in practice," Corinthian considered only enrollment numbers in awarding the "Good" or "Excellent" performance ratings required to obtain a raise under the written compensation plan. (1ER 72-73 ¶¶ 14-15, 91 ¶ 60.) Based on these allegations, the district court held that the FAC stated a claim. The district court also found that pre-2005 claims were time-barred by the statute of limitations. (1ER 192-96.)

As with the Original Complaint, the "new" allegations in the FAC had already been publicly disclosed. Public filings in the Securities Action alleged in 2005 that Corinthian was "too smart to put [its non-compliant practices] in

13

writing," and fostered a "corporate culture in which rules were meant to be broken" and stated policies were "known to be a joke." (5SER 1443-44 ¶ 80; 6SER 1521 ¶ 246.) Similarly, Representative Waters alleged in 2005 that Corinthian used the safe harbor to "disguise[]" non-compliant activities. (5SER 1392.)

Moreover, between the filing of the Original Complaint in March 2007, and the filing of the FAC in December 2011, a slew of allegations were made public that entirely anticipated those added to the FAC. Industry abuses of the incentive compensation ban were discussed at length in a 2010 Government Accountability Office report (7SER 1804-19), and in Congressional hearings in 2009 and 2010 (7SER 1821-42.) And in June 2010, DoE issued a Notice of Proposed Rulemaking to revoke the safe harbor because it "has led institutions to establish, *on paper*, other factors that are purportedly used to evaluate student recruiters other than the sheer number of students enrolled. However, *in practice*, consideration of these factors has been minimal at best, or otherwise indiscernible." (7SER 1847.) Allegations about "sham" and "smoke and mirror" compensation policies also proliferated in lawsuits against career schools. (*See, e.g.*, 5SER 1257-58 ¶ 58-59(a); *see also* 5SER 1254-55 ¶¶ 41, 43-45.)[5] Thus, the alleged use of policies to create a "window-dressing" of compliance had been widely publicized before Relators filed the FAC.

---

[5] Such allegations were made against at least six different career schools before Relators filed the FAC. (5SER 1254-55, 1257-58; 7SER 1856 ¶ 23; 7SER 1877 ¶¶ 26-27; 7SER 1903 ¶¶ 22-23; 7SER 1933-34 ¶¶ 43-46; 7SER 1968-69 ¶¶ 30-34.)

## V.    This Case Was Not Based on Any Information Known to Relators

That Relators parroted publicly available information is no surprise, given that they had no inside information of any fraud.  Indeed, Relators not only admitted they were unaware of any improper compensation practices at Corinthian, they routinely contradicted the allegations in the complaint.[6]

### A.    Lee Had No Knowledge of Information Supporting Relators' Allegations

Relator Nyoka Lee worked for Corinthian from November 1999 to May 2005.  Starting in 1999, Lee proctored tests at the San Francisco campus, where she was paid by the hour.  (1SER 20:21-24:12.)  From 2000 until May 2005, Lee worked as a salaried admissions representative at Corinthian's San Francisco and San Jose campuses, except for a brief two-and-a-half month period in 2004 when she was a salaried director of admissions at Corinthian's Hayward campus. (1SER 24:14-27:18, 30:8-32:22, 33:11-34:9, 72:5-74:19, 83:25-87:1, 99:10-102:4, 111:4-6, 111:19-24, 113:3-23.))  In her entire career at Corinthian, Lee received three salary increases, all before May 2004.  (1SER 72:4-75:7, 75:15-76:22, 83:3-10, 83:25-84:11, 99:10-16, 105:10-24, 111:7-13; 9SER 2181, 2187.)

*Lee had no knowledge that Corinthian violated the incentive compensation ban.*  Lee could point to nothing in her personal experience to show that she—or anyone else—was compensated on the basis of enrollments alone.

---

[6] A chart comparing the allegations in the Original Complaint and FAC against Relators' deposition testimony was provided to the district court and appears at 7SER 2077–8SER 2106.

Contrary to Relators' allegation that Corinthian's written policies were a "sham" and enrollment numbers were all that mattered, Lee testified that over a dozen non-enrollment related criteria described in Corinthian's written compensation guidelines (9SER 2170-71, 2190-91) accurately described her job responsibilities as an admissions representative, (1SER 53:3-59:12, 103:18-104:11), and that she understood that "part of [her] performance" evaluation and "part of [her] raise" depended on meeting those criteria. (1SER 221:21-223:24.)

Further, Lee conceded that "in [her] experience the directors of admissions, the other people that were responsible for determining promotions and salary raises . . . just did what the written policy told them to do" and that "the written policy is what [she] followed." (1SER 95:2-96:11; *see* 1SER 95:20-24 ("Q: . . . So if we want to figure out what the practices were like, we should look at the written policies? A: Yeah, that or the brochures or whatever corporate sends you or whatever").) Lee did not recall anyone at Corinthian ever saying that the school did not follow its written policy, (1SER 51:13-53:1), nor was she ever told not to follow Corinthian's written policies. (1SER 146:16-23.)

Lee also contradicted the allegation that non-numerical criteria were a "proxy" for enrollment numbers. (1ER 91 ¶ 60.) As noted, the FAC alleged that performance ratings of "Good" or "Excellent"—prerequisites to a salary increase under the plan—were based exclusively on enrollment numbers. (*Id.*) All the performance evaluations for Lee, however, show that she earned "Excellent" ratings based on points awarded for non-numerical criteria plus a narrative write-up addressing only her qualitative performance. (*See* 9SER 2176-77, 2181-84.)

16

Lee repeatedly admitted that she did not know what factors her supervisors considered when scoring these evaluation forms, or the extent to which those scores determined whether she got a promotion or raise.  (1SER 59:19-60:7, 63:10-67:24, 82:2-21.)  If anything, Lee believed her qualitative scores reflected an "honest" evaluation—a far cry from the sham evaluations alleged in the FAC. (1SER 66:22-67:20 (testifying that a 2003 evaluation recommending her for a promotion—which mentioned Lee's "outstanding work ethic," "attention to detail," and "excellent customer service," but said nothing about enrollment numbers—was something Lee's supervisor was "feeling honest about"); 1SER 76:2-77:4 (identifying no other basis for 2002 raise besides the documented reason that she was "hired in at a very low wage and new employees with less experience are hired in at [higher] wages . . . due to high cost of Bay Area."); 8SER 2187 (paperwork showing same).)

In her brief stint as a director of admissions (the only supervisory position she held) Lee never filled out an evaluation form or recommended anyone for a promotion or raise, (1SER 28:23-29:2, 88:19-89:7), nor did she learn what criteria were considered in that process.  (1SER 89:8-90:3.)  Lee also had no involvement with developing any compensation plans or evaluation forms.  (1SER 131:19-135:21.)  As a director of admissions, Lee received a salary and never got a bonus or raise (1SER 85:12-21, 115:8-21); additionally, she was unaware of any document explaining how directors of admissions were compensated (1SER 126:4-7.)

17

In short, Lee herself never received improper incentive compensation, and she was never in a position to witness or participate in the alleged fraudulent scheme.

***Lee's testimony that "it was all about the numbers" referred to termination, not compensation.***  Despite her admitted lack of insight into the performance evaluation and compensation process, Lee stated that her eligibility for raises and promotions depended on meeting her "numbers."  (1SER 38:6-39:17, 77:11-17.)  When pressed, however, she could not provide any details of any conversation in which anyone told her raises or promotions were based on enrollment numbers alone.  (1SER 41:3-43:2, 69:2-70:8, 77:5-78:7.)  Nor could she identify any document indicating that her compensation (or anyone else's) was tied exclusively to numbers.  (1SER 124:23-126:7; *see also* 1SER 10:11-15, 53:3-59:18; 64:19-67:20, 75:10-77:4, 102:7-104:11; 9SER 2166-2196.)

In the end, the only *factual* basis Lee identified for her statement that raises and promotions depended on "numbers" was that she had heard employees could be fired for not meeting enrollment targets, and was herself terminated for that reason.  (1SER 45:11-16 ("Q: . . . [W]ho told you you have to enroll students to get a raise.  A: Well, they didn't say, 'You have to enroll students to get a raise.'  They said, 'You have enroll students to keep your job.'  Now, if you kept your job, you could get a raise."); 1SER 46:5-49:17 (she arrived at the "bottom line" that raises depended on enrollment numbers because "if you don't meet your numbers . . . you get fired").)  But terminating employees for failing to meet admissions targets is not prohibited under the HEA.  *Lee I*, 655 F.3d at 992-93.

18

*Lee had no knowledge of the School's compensation practices during any time period not excluded by the statute of limitations.*  Lee also admitted that she had no information whatsoever from the time period relevant to this case.  As the district court correctly held, only post-2005 allegations are timely under the statute of limitations.  In contrast, every promotion and salary increase Lee received occurred *before* 2005.  (1SER 122:6-20.)  Moreover, Lee left Corinthian in May 2005, and could not identify a single person in admissions who received a promotion or raise after January 1, 2005.  (1SER 129:17-130:2.)

*Lee had no knowledge of the School's compensation practices across the country.*  Despite accusing Corinthian of rampant incentive compensation violations at campuses across the country, Lee never discussed compensation with another admissions representative, never visited a Corinthian campus where she did not work, and never held a supervisory position other than her brief stint as a director of admissions (in which her oversight was limited to a single campus).  (1SER 119:20-121:18, 121:19-23; 28:23-29:2; *see also* 1SER 135:22-138:2.)

*Lee had no knowledge of any statement or claim to the government.*  Lee also knew nothing about the allegations that Corinthian made false certifications in PPAs with the government, resulting in false claims.  (1ER 113 ¶ 13; 1ER 115-20 ¶¶ 25-30, 39-43; 1ER 82-87 ¶¶ 32-36, 47.)  Lee had no idea what a PPA was (1SER 140:10-141:2), and was not aware of any agreement or communication of any kind between Corinthian and the government (1SER 141:3-142:5, 142:24-143:11).  Similarly, Lee had never submitted or even seen a claim for payment by

19

Corinthian to the government, and was unaware of any regulatory requirements relating to recruiter compensation. (1SER 142:5-143:11, 146:24-147:18.)

*Lee had no knowledge regarding the Individual Defendants.* Lee is similarly ignorant as to Corinthian executives Jack Massimino and David Moore. These defendants were alleged to have signed Corinthian's PPAs and "monitored and approved" of the purportedly illegal compensation practices, (1ER 113 ¶ 15; 1ER 69-70 ¶¶ 6,7; 1ER 90 ¶ 56; 1ER 103-104 ¶ 89), but Lee could even not say who they were. (1SER 138:3-140:10.)

## B. Mshuja Had No Knowledge of Information Supporting Relators' Allegations

Relator Talala Mshuja likewise had no relevant firsthand knowledge. Mshuja, who is Lee's brother, worked as a test proctor (on an independent contractor basis) for three stints from 2000 to 2009 at three Corinthian campuses. (1ER 67 ¶ 3; 1SER 252:11-253:6, 254:23-255:19.) This work provided him with no information about the allegations in this case. He was never a Corinthian employee; he never worked as (or was paid as) an admissions representative or director of admissions; he never received a performance review or bonus; and his pay never depended on how many students he enrolled. (1SER 255:11-256:11, 1SER 263:20-266:2, 266:16-18.) Rather, he was paid an hourly wage. (1SER 255:20-21.)

Mshuja openly acknowledged that Lee was his "only source" of information about how admissions staff were compensated at Corinthian, (2SER 316:4-

318:11), supplemented only by materials he received from his lawyer that he had never seen before, and his own research on the Internet.  (1SER 250:15-251:22, 2SER 318:12-20; *see also* 1SER 234:6-245:16.)

### C.    This Lawsuit Was Manufactured by Counsel

Relators not only failed to witness any unlawful practices, they had no intention of suing Corinthian until they were recruited for this lawsuit.

In 2006—after Corinthian had been publicly accused of incentive compensation violations—a co-worker of Mshuja's named Susan Newman invited Mshuja to a dinner meeting where she introduced him to the attorneys who would become Relators' counsel.  (1SER 289:18-21.)  Newman had been a relator with one of the lawyers in at least two prior FCA cases against career schools.  (4SER 1174–5SER 1223; 4SER 1005-1062.)  When Newman approached him, Mshuja was not looking for legal counsel and, in fact, "didn't know what was going on." (1SER 273:15-16, 274:23-275:1.)  During the dinner, Mshuja learned about allegations regarding admissions representatives, (SER 276:1-17) and offered to contact his sister.  (1SER 277:24-278:20.)  Lee met the lawyers a few days later. (1SER 285:13-286:3; 1SER 153:18-23; 1SER 161:2-163:12.)

Before being recruited, neither Lee nor Mshuja had considered whether Corinthian had done anything improper in compensating admissions staff.  (1SER 154:24-156:5, 287:14-20; 2SER 307:16-308:7; *see also* 1SER 290:10-18.)  Mshuja explained that he was "spur[red]" to file suit by information he learned through his attorneys and on the Internet.  (1SER 246:14-247:17.)  Lee similarly decided to file

suit after meeting her future counsel, because the attorney "felt at that particular time that Corinthian Colleges was involved in some default . . . and that he wanted to defend [sic] this case right now[.]"  (1SER 168:8-21; *see* 1SER 149:6-23 (noting that counsel "put this lawsuit together" and Lee is "just involved in it").)

## VI.    The District Court's Dismissal and Sanctions Orders

After reviewing this extensive record, the district court concluded it lacked jurisdiction under the public disclosure bar.

First, the court found that Relators' allegations were "substantially similar" to, and therefore "based upon," allegations made in sources that qualified as "public disclosures."  (1ER 52-56, 58-60.)   The court held that the Original Complaint was the relevant complaint for evaluating jurisdiction (1ER 58-59), and found that the public disclosure bar was triggered for three reasons: "[f]irst, the allegations in the original complaint are nearly identical to those made one to two years earlier in the [Corinthian] securities litigation in 2005 and 2006"; "[s]econd, the testimony that was the subject of the 2005 Congressional Hearing echoes the allegations" made in the securities litigation and later by Relators; and "[t]hird, the other *qui tam* complaints against other major career schools on the basis of violating the incentive compensation ban was enough to put the government on notice of Relators' allegations."  (1ER 54-55.)   The court further noted that even if the FAC were relevant, "the end result would be the same" because "there are plainly public disclosures as to [Corinthian's] implementation of the policies," as

22

distinguished from the policies themselves.  (1ER 59 (citing the 2005 Securities Complaint).)

Next, the district court found that Relators were not original sources.  Citing extensively to Lee's deposition, the court concluded that Lee "lacks direct and independent knowledge of the information upon which the allegations are based" because "she was unable to show that she, or anyone else at the school, was compensated solely based on the number of students recruited to Corinthian." (1ER 61.)  The court rejected Relators' attempt to revise Lee's deposition testimony with an affidavit, finding that "the substance of the affidavit directly contradicts Lee's testimony."  (1ER 62-63.)

As to Mshuja, the court found that he "similarly has no direct knowledge of the information regarding the allegations at issue," having been paid exclusively on an hourly basis, and having admitted that his allegations were based entirely on intermediate sources (Lee and the Internet).  (1ER 63.)

The court also rejected Relators' bid for additional discovery, holding that the "Flash Reports" sought by Relators were "not relevant to the jurisdictional question."  (1ER 64.)

So far-fetched was Relators' assertion of jurisdiction that the district court sanctioned Relators' counsel under 28 U.S.C. § 1927 and its inherent powers.  The court found that Relators' counsel pursued the case "reckless[ly]" and "in bad faith," because he "knew of numerous prior disclosures in the public record prior to filing this case," including the Securities Action complaints, and nonetheless "recruit[ed] Relators who he knew lacked the requisite knowledge of the conduct

23

at issue." (1ER 150-51, 153.)  The court also found that Relators' counsel "engaged in vexatious conduct."  (1ER 153.)  The court entered judgment in Defendants' favor and sanctioned Relators' counsel in the amount of Defendants' attorneys' fees.  (1ER 138-40.)  Relators appealed the judgment, and Relators' counsel appealed the sanctions award.[7]

## STANDARD OF REVIEW

Whether the public disclosure bar applies is a mixed question of fact and law.  The conclusion that jurisdiction is lacking is reviewed *de novo.  United States v. Hughes Aircraft Co.*, 162 F.3d 1027, 1030 (9th Cir. 1998).  However, factual findings supporting the ruling—including the similarity of the public record to relators' allegations, and whether relators have direct and independent knowledge supporting their allegations—"must be accepted unless clearly erroneous."  *Id.* at 1030, 1032; *U.S. ex rel. Biddle v. Bd. of Trustees of Leland Stanford, Jr. Univ.*, 161 F.3d 533, 535 (9th Cir. 1998); *Meyer*, 565 F.3d at 1203.  So must factual determinations underlying evidentiary rulings, such as a determination that an affidavit contradicts deposition testimony.  *Yeager v. Bowlin*, 693 F.3d 1076, 1081 (9th Cir. 2012).

Procedural rulings are reviewed for abuse of discretion, including rulings on the management of pretrial proceedings, *Arakaki v. Lingle*, 477 F.3d 1048, 1069 (9th Cir. 2007); rulings excluding sham affidavits, *Yeager*, 693 F.3d at1079-80; application of local rules and "decisions [such] as accepting the filing of a

---

[7] Counsel's appeal of the sanctions award is docketed as case number 13-56121.

document," *United States v. Kent*, 649 F.3d 906, 911 (9th Cir. 2011); and denials of Rule 56(d) discovery requests, *Michelman v. Lincoln Nat'l Life Ins. Co.*, 685 F.3d 887, 899 (9th Cir. 2012).

A determination that a statute of limitations has run is reviewed *de novo*. *Jones v. Blanas*, 393 F.3d 918, 926 (9th Cir. 2004).

## ARGUMENT

### I.    The Public Disclosure Bar

The False Claims Act ("FCA") allows private parties ("relators") to pursue *qui tam* actions to help the government recover monies paid because of fraud. 31 U.S.C. § 3730(b). A prevailing relator may collect a bounty of up to 30% of any government recovery. *Id.* § 3730(d)(2). Accordingly, the FCA imposes strict jurisdictional limits on such actions, to "strike a balance between encouraging private persons to root out fraud" while "stifling parasitic lawsuits" by individuals who seek a cut of the government's award but have nothing substantial to contribute to exposure of fraud. *Graham Cnty*, 559 U.S. at 295. One such limitation is the public disclosure bar, 31 U.S.C. § 3730(e)(4), which provides:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is

25

brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A)-(B)(1994).[8]

The statute calls for a two-step analysis. *First*, the Court "must determine whether there has been a prior 'public disclosure' of the 'allegations or transactions' underlying the qui tam suit.'" *Meyer*, 565 F.3d at 1199. This requires both that (1) the disclosure take place in a manner specified by section 3730(e)(4)(A)—*i.e.*, in a hearing (including filings in civil lawsuits), government report or investigation, or in the news media, *id.*; and (2) Relators' allegations are "based upon" the allegations or transactions that were publicly disclosed. 31 U.S.C. § 3730(e)(4)(A); *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1243 (9th Cir. 2000).

---

[8] 31 U.S.C. § 3730(e)(4) was amended in 2010, but the amendment is not retroactive. *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S.Ct. 1885, 1889 n.1 (2011). The district court correctly applied the prior version of the statute, (ER 51 n.2); *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 969 (9th Cir. 1999), and Relators do not challenge this aspect of the decision on appeal. The prior version of the statute is provided in the Addendum to this brief and quoted here and elsewhere in this brief.

*Second*, if there has been a public disclosure, the Court "next must inquire whether the relator is an 'original source'" of the information on which the allegations in the complaint are based. *Meyer*, 565 F.3d at 1199. The Court lacks jurisdiction if the relator is not an original source. *Id.* at 1198-99.

"Relators, as the qui tam plaintiffs, bear the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Id.* at 1199.

## II.    Relators' Allegations Were Publicly Disclosed

The district court's conclusion that Relators' allegations were "publicly disclosed" is amply supported and should be affirmed. Relators do not dispute that the many disclosures in the record took place in a manner specified by the statute. Rather, they contend that the substance of the disclosures was not sufficient to trigger the jurisdictional bar. Relators' arguments, however, fundamentally misunderstand what qualifies as a "public disclosure" under the FCA.

### A.    The Bar is Triggered When Similar Allegations or Transactions Are Publicly Disclosed

The first prong of the public disclosure bar is "wide-reaching," *Schindler*, 131 S.Ct. at 1892, and operates as a "quick trigger" to get to the "more exacting" original source question. *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1476 n.18 (9th Cir. 1996). A public disclosure occurs when the relator's action is "based upon" "allegations" that have been publicly disclosed. 31 U.S.C. §3730(e)(4)(A). For a *qui tam* suit to be "based upon" a public disclosure, it need not be derived from that disclosure. *Biddle*, 161 F.3d at 536-40. Nor must the

publicly disclosed allegations be identical to the relator's. *Meyer*, 565 F.3d at 1199. The bar applies when allegations in the public disclosure are "substantially similar" to those in the *qui tam* action. *Id.*

The FCA, moreover, does not require specific facts to be disclosed publicly for the bar to operate. The statute "bars suits based on publicly disclosed 'allegations or transaction,' not information." *Wang v. FMC Corp*, 975 F.2d 1412, 1418 (9th Cir. 1992). The term "allegations" "connotes a conclusory statement implying the existence of provable supporting facts." *U.S. ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 653-54 (D.C. Cir. 1994). Thus, "allegations divorced from the information on which they are based can constitute public disclosure." *U.S. ex rel. Harshman v. Alcan Elec. Eng'g*, 197 F.3d 1014, 1020 (9th Cir. 1999).

In short, "[t]he level of public disclosure necessary to trigger the bar is relatively low, may be general in nature, and a relator's ability to provide more specific information than that relayed by the public disclosure is irrelevant." *U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 46 (D.D.C. 2007) (citations omitted).

**B.    Relators' Allegations Were Publicly Disclosed**

A comparison of the public disclosures to Relators' allegations confirms that they easily fall within the "wide reach" of the jurisdictional bar.

Relators do not take issue with the district court's conclusion that it should look to the Original Complaint rather than the FAC to determine whether Relators'

allegations were "substantially similar" to the public disclosures. (ER 53, 59.)
Rightly so: under well-settled law, "[s]ubject matter jurisdiction must exist as of
the time the action is commenced," and a court that lacks jurisdiction over the
initial pleading "has no power to do anything, other than to dismiss the action."
*Morongo Band of Mission Indians v. Cal. St. Bd. of Equal.*, 858 F.2d 1376, 1380
(9th Cir. 1988) (citations omitted). In the FCA context, courts thus look to the
"original complaint" to define the scope of the qui tam action and determine
whether it was based on public disclosures. *Newsham*, 190 F.3d at 969; *U.S. ex
rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 328 (5th Cir. 2011).[9]

Looking to the Original Complaint, the district court correctly found that its
allegations were substantially similar to prior public disclosures. The Original
Complaint alleged that Corinthian "falsely represented that [it] complied with
HEA's prohibitions against using incentive payments for recruiters" and violated
the HEA by awarding raises to admissions staff "based on the number of students
they recruit." (1ER 111-12 ¶¶ 8-9.) The Securities plaintiffs made the same
allegation, accusing Corinthian of making "false representation[s] that [Corinthian]
complied with Title IV's prohibition against incentive compensation," (6SER
1772; 6SER 1514-15 ¶¶ 224, 226, 227), and violating the HEA by paying raises
and bonuses and based on enrollment targets, (6SER 1515-16 ¶¶ 228-33). *Supra* at

---

[9] Courts will "reevaluat[e]" jurisdiction under an amended complaint if jurisdiction
existed initially, and the amendment alleges a new theory not identified in the
original complaint. *Rockwell*, 549 U.S. at 473. But where jurisdiction does not
exist at the outset, an amended pleading cannot create it. *Jamison*, 649 F.3d at
328.

29

10-12.  Likewise, at the 2005 Congressional Hearing, Corinthian was accused of using a "thinly disguised incentive compensation or quota system" to pay admissions employees.  *Supra* at 9-10.

The identity of these allegations more than satisfies the "substantial similarity" test.  Indeed, the Ninth Circuit has found the jurisdictional bar to be triggered where the similarity of the public disclosure to the relator's allegations was far less exact.  *See, e.g., Alcan*, 197 F.3d at 1019 (complaint against a *different* party that generally described the fraudulent conduct without identifying the defendant was sufficient); *A-1 Ambulance Serv.*, 202 F.3d at 1245 (disclosure of underlying transactions at public hearing enough without any allegation of fraudulent scheme).

Relators' focus on allegations about hiding illegal compensation practices behind facially compliant policies is therefore misplaced.  Those allegations were made for the first time in the FAC, which is irrelevant to the jurisdictional analysis.  In any case, the gravamen of the FAC—that Corinthian violated the incentive compensation ban—did not change.  *See U.S. ex rel. Rosales v. S.F. Hous. Auth.*, 173 F. Supp. 2d 987, 996 (N.D. Cal. 2011) ("Although all of the purported *means* by which the . . . fraud was perpetrated may not have been commonly known," the jurisdictional bar is triggered where the "gravamen" of the relator's claims was publicly disclosed); *Alcan*, 197 F.3d at 1019 ("details of the violations" need not be publicly disclosed for the bar to apply).  And even the "new" allegations in the FAC were previously disclosed.  The Securities plaintiffs alleged that Corinthian was "too smart" to put non-compliant practices "in writing" and fostered a

30

"corporate culture in which rules were meant to be broken"—and that the rules *were* allegedly broken with respect to incentive compensation. (5SER 1443-44 ¶ 80; 6SER 1521 ¶ 246.) Other disclosures accused Corinthian of being at the forefront of industry abuses of the safe harbor, *supra* at 9-12, and alleged that the safe harbor was routinely circumvented by using policies that looked compliant "on paper" and thus covered up unlawful compensation practices. *Supra* at 14. It was simple enough for Relators to repeat these allegations and attribute the same conduct to Corinthian. *Schindler,* 131 S.Ct. at 1894 (cautioning that "anyone could identify a few regulatory filing and certification requirements" and then try to "reap a windfall" by opportunistically copying public information). Indeed, the language of the FAC is strikingly similar to many of these public disclosures. *See supra* at 13-14.[10]

Because the Original Complaint's (and the FAC's) allegations were substantially similar (if not identical) to allegations in the public record, the district court correctly found that there was a public disclosure.

### C.    The Use of the Word "Quota" Does Not Change the Fact that Prior Disclosures Alleged The Same Fraud as Relators

Relators' principal argument is that publicly disclosed allegations that Corinthian gave raises and bonuses based on quotas "cannot rise to a disclosure of

---

[10] Although Relators' allegations need not derive from the public disclosures, it is notable that before the FAC was filed, Relators cited (and therefore knew of) the DoE rulemaking that revoked the safe harbor, and a *qui tam* action alleging sham compensation policies. *See Lee v. Corinthian Colls., Inc.*, No. 10-55027, 2010 WL 6201265, at *21, 26-27 (9th Cir. June 30, 2010).

[fraud]" because, in the prior appeal, the Ninth Circuit "categorically eliminated enrollment quotas as a basis for liability" under the FCA.  (AOB 28-30.)  This misconstrues *Lee I* and the public record, as well as the FCA standard for public disclosure.

In *Lee I*, the court held that an allegation that employees were "disciplined, demoted, or terminated" for failing to meet enrollment quotas "does not . . . state a violation of the HEA incentive compensation ban."  *Lee I*, 655 F.3d at 992-93 (referenced at AOB 30).  The court, however, expressly distinguished such "adverse employment actions" from the compensation practices to which the incentive compensation ban is addressed.  *Id.*  The court made clear that if "meet[ing] enrollment quotas was . . . the basis" for a salary increase, that *would* violate the HEA.  *Id.* at 995-96.  Indeed, the court found that it was "certainly *possible*" that the use of quotas in Corinthian's compensation plan "falls outside the Safe Harbor Provision (thereby rendering false Corinthian's certification of HEA compliance)"; it even explained how Relators could amend their complaint to state a claim accordingly.   *Id.* at 994.  But because the Original Complaint did not specify facts showing that quotas were the "sole" basis for salary increases, it "f[ell] short of stating a *plausible* claim for relief."  *Id.* at 994-95.  Relators' assertion that "[e]nrollment quotas are legal" (AOB 30) completely misreads *Lee I*.

Relators also misrepresent the public disclosures, which were not merely "[p]ublications about Corinthian's facially valid recruiter compensation program." (AOB 29.)  The disclosures did not refer to Corinthian's official written plan, but instead alleged—with more detail than the Original Complaint—that Corinthian's

*practices* violated the incentive compensation ban.  *See supra* at 9-12.  But even if Relators were correct that the public disclosures, like the Original Complaint, merely identified a facially compliant quota system and otherwise made only a generic allegation of fraud, that would not help them.  It would turn the public disclosure bar on its head to hold that a copycat complaint unable even to survive a Rule 12(b)(6) motion is insulated from the jurisdictional bar, when it alerted the government to precisely nothing different than existing disclosures.

More fundamentally, Relators' argument, yet again, reflects a basic misunderstanding of the public disclosure inquiry.  The test is not, as Relators argue, whether the public disclosures would survive a motion to dismiss analysis (AOB 28-29), but whether they allege a substantially similar fraud.  Whereas Rules 8 and 9(b) require fraud complaints to state *facts* raising a plausible inference of fraud, the public disclosure analysis looks to whether there were similar *allegations* in the public record.  *Wang*, 975 F.2d at 1418.  This Court has repeatedly rejected the argument that public allegations do not qualify as "public disclosures" because they "did not include details of the violations" or "plead facts alleging FCA liability."  *Alcan,* 197 F.3d at 1014; *A-1 Ambulance Serv.*, 202 F.3d at 1244-45.  The allegation of fraudulent conduct—"divorced from the information upon which [it is] based"—triggers the bar.  *Alcan,* 197 F.3d at 1020.

Relators' reliance on *United States ex rel. Springfield Terminal Ry v. Quinn,* 14 F.3d 645 (D.C. Cir. 1994) (*see* AOB 29) confirms their misunderstanding.  In *Quinn,* the court held that the publication of "facially valid" pay vouchers and telephone records did not constitute a public disclosure because the documents by

33

themselves did not "suggest any misrepresentation" by the defendant.  *Id.* at 655-56.  But the court emphasized that a public disclosure *would* exist if "the conclusion that fraud has been committed" were publicly disclosed.  *Id.* at 654.  Here, "the conclusion that fraud has been committed" was stated—clearly, and repeatedly—in prior disclosures.  (*See, e.g.*, SER 1770-71 (2006 brief accusing Corinthian of  "pervasive" "fraudulent practices includ[ing]. . . falsely representing that Corinthian complied with Title IV's prohibition against incentive compensation . . ."); *supra* at 9-12.)

For all of these reasons,  *Lee I* is not dispositive of any issue on appeal, and principles of "law of the case" and "estoppel" are inapplicable.  (AOB 47-49.)

### D.  *Leveski* Does Not Support Relators

Unable to explain how their lawsuit survives the jurisdictional analysis required by the Ninth Circuit, Relators instead rely on an out-of-circuit case, *Leveski v. ITT Education Services, Inc.*, 719 F.3d 818 (7th Cir. 2013).  Not only is *Leveski* distinguishable, it applied a standard for "public disclosure" that departs from the statutory text and this Court's (and Supreme Court) precedent.

In *Leveski*, the Seventh Circuit found that an earlier lawsuit against the defendant, ITT, did not qualify as a "public disclosure" because, among other things, the lawsuit alleged that ITT had an "outright quota system" as its official policy for compensating recruiters, whereas the relator alleged that ITT's official policy complied with the HEA but "did not match ITT's actual practices."  *See* 719

F.3d at 830-31.  Here, both Relators' allegations and the substance of the prior disclosures are distinct.

Unlike the complaint in *Leveski,* Relators' Original Complaint did not allege a sham compensation policy.  Instead, it attempted (and failed) to allege fraud based on Corinthian's official written policy, and otherwise made only the generic allegation that Corinthian violated the incentive compensation ban.  That identical allegation had already been made in the earlier public disclosures about Corinthian. *Leveski* is therefore inapposite.

The FAC added allegations that Corinthian's written policy was a sham, but the FAC is irrelevant to the jurisdictional inquiry.  *Supra* at 28-29.  In any event, unlike in *Leveski*, multiple public disclosures here alleged that Corinthian was "too smart to put it in writing," and focused on Corinthian's practices rather than its official policies.  *Supra* at 9-14.

Relators' reliance on *Leveski* is also misplaced because that decision applied a far more restrictive standard for "public disclosure" than required under the statute or Ninth Circuit law.  In assessing whether a public disclosure had occurred, the *Leveski* court reviewed the relator's testimony in detail and found she "provide[d] evidence to support her allegations that ITT's claimed practices in its recruitment and financial aid offices did not match ITT's actual practices."  719 F.3d at 831.  Stating that "[a]ll we care about at this stage is whether Leveski's allegations 'rest on genuinely new and material information,'" the court found that the relator's allegations had not been publicly disclosed.  *Id.* at 835 (citation omitted); *see also id.* at 833-34 (distinguishing cases where relators could not

"produce any evidence of specific people, statements, and incidents" or other "relevant details").

This approach conflates the two-step analysis dictated by the statute. The first step is a "quick trigger" that requires only "allegations or transactions" to be publicly disclosed, not factual information underlying the allegations. *Hagood*, 81 F.3d at 1476 n.18; 31 U.S.C. § 3730(e)(4)(A); *Rockwell*, 549 U.S. at 471 ("Section 3730(e)(4)(A) bars actions based on publicly disclosed allegations *whether or not the information on which those allegations are based has been made public*.") (emphasis added); *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 568 n.10 (11th Cir. 1994) (applying "quick trigger" analysis); *U.S. ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir. 1992) (same). Only at the second step—the "more exacting original source inquiry," *Hagood*, 81 F.3d at 1476 n.18 —does the "information" and "knowledge" of the relator become relevant. *See* 31 U.S.C. § 3730(e)(4)(B) (defining 'original source' as "an individual who has direct and independent *knowledge* of the *information* on which the allegations are based") (emphasis added); *Wang,* 975 F.2d at 1418 (separate public disclosure and original source requirements "invok[e] the common logical distinction between an assertion and its proof").

By focusing on the *information* provided by the relator, rather than the *allegations* in the disclosures, the court in *Leveski* effectively smuggled the "original source" inquiry into the public disclosure prong of the analysis. This was incorrect as a matter of law, and unnecessary. The concern to preserve lawsuits by relators who possess "genuinely new and material information," *Leveski,* 719 F.3d

at 831, is already addressed in the "original source" prong. *See Graham Cnty.*, 559 U.S. at 301 (rejecting proposed limitation on "public disclosure" prong because "Congress carefully preserved the rights of the most deserving *qui tam* plaintiffs: those whistle-blowers who qualify as original sources."); *accord Biddle*, 161 F.3d at 540 n.2.

That said, even under *Leveski's* more exacting standard, Relators' argument fails. As discussed below, Relators have no information of relevance beyond what was publicly disclosed. In fact, the information they possess actually rebuts their allegations of fraud.

Thus, for multiple reasons, *Leveski* cannot aid Relators.

### E. Relators Cannot Distinguish Their Allegations From the Public Disclosures

Relators' other attempts to distinguish their allegations from the public disclosures all fail as well.

#### 1. The Disclosures Did Not Merely Allege Past Misconduct, but "Continuing" Violations

Relators argue that the Securities Action and 2005 Congressional Hearing do not count because they alleged "past misconduct" and therefore "would not bar the claims [premised on] violations that occurred after those public disclosures." (AOB 32.)[11]

---

[11] Relators did not raise this issue below, so it is waived. *See* 2SER 385-431. Because this issue presents a mixed question of fact and law, the exception to waiver where the issue is "purely one of law" does not apply. *A-1 Ambulance Serv*, 90 F.3d at 339.

But those disclosures did not merely reference past misconduct. They alleged *ongoing* violations. Representative Waters, for instance, testified: "The statement of Mr. Moore, CEO of Corinthian . . . that 'this problem [abuse and fraud] has been effectively addressed,' is far from accurate." (5SER 1389 (brackets in original).) Waters characterized the "abuses" she identified as "an ongoing problem" that would persist if the government failed to act. (5SER 1393 ("rampant fraud . . . continues"); 5SER 1389 ("Fraud, abuse, and violation of the law still persist").) The Securities plaintiffs likewise alleged, in 2006, that "Corinthian—with its history of . . . affirmative misrepresentations and active concealment of these violations—continues to operate with little consequence or interruption," (6SER 1580 ¶ 2), and described Corinthian's "misconduct" as "continuing and pervasive [in] nature." (6SER 1769 n.2.)[12]  Relators also ignore that the relevant public disclosures are not limited to the 2005 Congressional Hearing and the Securities Action, but continued long afterward through when the FAC was filed. *See supra* at 14.

Relators' reliance on *Leveski* is therefore, again, misplaced. Unlike the ongoing fraud alleged in the disclosures here, *Leveski* involved a single prior disclosure that alleged misconduct during a discrete period from "1993 to 1997." *Leveski*, 719 F.3d at 829-30. That time period had "no temporal overlap"—and instead a four-year gap—with the 2001-2006 time period addressed by the relator's

---

[12] Although the Securities Action alleged a class period from 2003-2004 (5SER 1409 ¶ 2), its allegations about incentive compensation violations were based on statements from Corinthian employees about practices before, during, and after that time period. (*See* 6SER 1515-16, 1519-20; 5SER 1427-34.)

38

allegations. *Id.* Moreover, the court in *Leveski* reasoned that "because Leveski worked at ITT for so much longer than [the relators in the prior lawsuit], she has greater potential [than the prior relators] to possess relevant evidence." *Id.* at 829. As discussed, however, the relator's "potential to possess relevant evidence" has no relation to the public disclosure analysis, which is concerned only with whether the "allegations" were disclosed. In any event, Relators here had no "greater potential" to have relevant information, because the only Relator employed in admissions (Lee) left Corinthian in May 2005—two months after the 2005 Congressional Hearing, and *before* the 2005 Securities Complaint was filed.

Relators also point to *U.S. ex rel. Hoggett v. University of Phoenix*, 2012 WL 2681817 (E.D. Cal. July 6, 2012) (AOB 31), but *Hoggett contradicts* Relators' position. The *Hoggett* court confined its analysis to the original source question, recognizing that "the government may be aware of previous fraud" by the defendants because of a lawsuit concerning an earlier time period. 2012 WL 2681817 at *4-5. The court "would not have had to reach the original source issue unless it had already found that the relator's claim was based upon public disclosures of the allegations." *Biddle*, 161 F.3d at 537. Thus, even a disclosure limited to an earlier time period can trigger the jurisdictional bar. *See, e.g.*, *Hughes Aircraft Co.*, 162 F.3d at 1032-33 (complaint alleging fraudulent conduct from 1982 through 1984 publicly disclosed *qui tam* allegations relating to similar conduct after 1986); *U.S. ex rel. Boothe v. Sun Healthcare Group, Inc*., 496 F.3d 1169, 1174 (10th Cir. 2007) ("we reject the contention that a 'time, place, and manner' distinction is sufficient to escape the force of the public disclosure bar");

39

*Rosales*, 173 F. Supp. 2d at 996-997 (where prior disclosures alleged the same fraud occurring in an earlier time period, relators' complaint "cannot be reanimated simply by complaining that defendants performed the same fraudulent acts in succeeding years"). Here, the disclosures went further and expressly alleged that the fraud continued.

Relators' argument, moreover, runs directly counter to the goals of the FCA. A relator's lawsuit is *always* filed after a prior public disclosure. If a relator could circumvent the jurisdictional bar simply by alleging (as Relators did) that the conduct occurred "through the present," there would be no end to parasitic litigation. No purpose is served by protecting copycat relators who allege that "the fraud continued," but lack personal knowledge of anything.[13]

### 2. Industry-wide Disclosures Support, but Are Not Necessary to, the Conclusion That There Was a Public Disclosure

Relators next contend that allegations of "endemic fraud" in the industry or "serial litigation" by Relators' counsel do not constitute public disclosures. (AOB 36-43.) Relatedly, the United States, as *amicus curiae* "in partial support" of Relators, argues that eleven prior *qui tam* complaints making identical allegations against other career schools were insufficient to inform the government of the need to investigate Corinthian. (Amicus Br. of United States in Partial Support at 17-23.)

---

[13] Indeed, insulating such lawsuits from the jurisdictional bar would displace other, deserving relators because of a separate FCA provision allowing only the *first* jurisdictionally-sound *qui tam* lawsuit to proceed. *Campbell v. Redding Med. Ctr.*, 421 F.3d 817, 825 (9th Cir. 2005).

These arguments fail because multiple disclosures alleged that *Corinthian specifically* violated the incentive compensation ban.  Relators have no good response to the Corinthian-specific disclosures.  And the United States fails to even mention them, let alone challenge the district court's conclusion that they qualified as public disclosures.[14]  Unlike the defendants in the cases cited by Relators and the United States, Corinthian was publicly accused *by name* of being front and center in the alleged industry-wide abuses.  (*See, e.g.*, 5SER 1392-93; 6SER 1514-16 ¶¶ 224-33.)

To the extent Relators and the United States suggest that the Court should view the industry-wide disclosures in isolation, without considering that Corinthian was specifically named, they are wrong.  The law is clear that "[t]he elements of the fraud allegation need not have been made public in a single document."  *United States v. Catholic Healthcare West*, 445 F.3d 1147, 1151 n.1 (9th Cir. 2006). Rather, the disclosures are considered "as a whole."  *U.S. ex rel. Reagan v. East Texas Med. Ctr. Reg. Healthcare Sys.*, 384 F.3d 168, 174 n.8 (5th Cir. 2004). Corinthian was an "easily identif[iable]" target for investigation because it was singled out for violating the incentive compensation ban.  *Alcan*, 197 F.3d at 1019; *see also In re Nat'l Gas Royalties Qui Tam Litig.*, 562 F.3d 1032, 1042-43 (10th Cir. 2009) (industry-wide disclosures put government "on the trail of fraud" as to hundreds of industry participants); *U.S. ex rel. Jones v. Collegiate Funding Servs.,*

---

[14] Indeed, the United States limits its comments to whether *qui tam* lawsuits against other schools qualify as public disclosures, leaving unaddressed both the Corinthian-specific disclosures, and the many government hearings and reports about industry-wide abuses.  *Supra* at 9-12, 14.

*Inc.*, 469 F. App'x 244, 255 (4th Cir. 2012) (bar triggered where " publically-available information underlying this case . . . does not establish merely an industry-wide set of allegations" but also named the defendant among potential wrongdoers).

### 3.    The Confidentiality of Internal Reports Does Not Alter the Public Disclosure Analysis

Finally, Relators argue that the confidentiality of internal "Flash" and "Activity" reports means "there cannot be a public disclosure."  (*See* AOB 11, 26.) Relators again ignore the distinction "between 'allegations' and the 'information on which the allegations are based.'"  *Wang*, 975 F.2d at 1418 (citation omitted). "An allegation can be made public"—and thus establish the first prong of the bar—"even if its proof remains hidden."  *Id*.  The information in these reports need not have been publicly disclosed for the jurisdictional bar to apply.  In any case, the Securities Action described "weekly flash reports to corporate managers summarizing whether [admissions representatives] had met their enrollment quotas," so Relators cannot claim they were first to bring the existence of such reports to light.  (6SER 1519-20 ¶ 241.)

## III.    Relators Are Not "Original Sources"

Because Relators' allegations were publicly disclosed, there is no subject matter jurisdiction unless Relators are "original sources."  To qualify as original sources, Relators must:  (1) have "direct" *and* "independent" knowledge of the information on which their allegations are based; (2) voluntarily disclose that

information to the government before filing the complaint; and (3) have a hand in the prior public disclosures. *Meyer*, 565 F.3d at 1201; 31 U.S.C. § 3730(e)(4)(B).

The district court did not reach the final two requirements because it concluded that Relators lacked the requisite direct and independent knowledge. (1ER 64.) Nonetheless, the record makes clear that Relators fail on all three grounds, and the Court may therefore affirm on any of those grounds. *See United States v. Lemus*, 582 F.3d 958, 961 (9th Cir. 2009) (court may affirm "on any basis supported in the record").

### A.    The District Court's Original Source Analysis Was Legally Correct and Its Factual Findings Were Not Clearly Erroneous

"To show *direct* knowledge, 'the relator must show that he had firsthand knowledge of the alleged fraud, and that he obtained this knowledge through his own labor unmediated by anything else.'" *Meyer,* 565 F.3d at 1202 (citation omitted). To have *independent* knowledge, the relator must know "about the allegations before that information is publicly disclosed." *Id.* Relators do not seriously challenge the district court's factual finding that they had no such knowledge. Although Relators call the finding "evidentiarily unsustainable," they provide *no* record citations to support their description of the "evidence." (AOB 19-21.) In fact, the hundreds of pages of testimony before the district court provided incontrovertible proof that Relators lacked firsthand knowledge of any fraud, and were unaware of any alleged incentive compensation irregularities at Corinthian until after those allegations became public and Relators were recruited to lend their names to this lawsuit. *See supra* at 15-22. Reviewed deferentially for

43

clear error, the district court's finding that Relators lacked direct and independent knowledge of the alleged fraud must be sustained.

Relators' legal arguments about the direct and independent knowledge requirement also fail. *First*, Relators' suggestion that their employment status alone is enough to establish firsthand knowledge of fraud (AOB 19) is logically and legally unsound. *See Alcan*, 197 F.3d at 1020-21 (rejecting argument that relator became aware of a fraud "due to his status as a member of [a] union" because relator had no direct involvement with union's alleged fraudulent scheme).

*Second,* Relators' assertion that Lee's employment at three campuses until 2005 makes her an original source for all 100 Corinthian campuses for all time, (AOB 20), fails because Lee is not an original source even for the time periods and locations where she did work. It also is wrong as a matter of law. The notion that a relator can have direct knowledge of conduct occurring after her employment, or at a location where she did not work, has been repeatedly rejected, including by the Supreme Court. *Rockwell,* 549 U.S. at 475-76 ("Because [relator] was no longer employed by Rockwell at the time, he did not know" about regulatory violations or fraud); *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 352-53 (4th Cir. 2009) (relator "cannot be a direct and independent source" for time periods after his affiliation with the defendant ended); *U.S. ex rel. Duxbury v. Ortho Biotech Prods. L.P.*, 2010 WL 3810858, at *2 (D. Mass. Sept. 27, 2010) (relator had no direct knowledge outside geographic region over which he was district manager and time period of his employment); *Hockett*, 498 F. Supp. 2d at 54 (relator not original

source of institution-wide allegations where he did not know "anything that happened at any other [location]—let alone that fraud was committed").[15]

## B.   The District Court's Procedural Rulings Provide No Basis for Reversal

Unable to identify any error in the district court's substantive analysis, Relators offer a series of procedural quibbles. These challenges, which are reviewed for abuse of discretion, all fail.

### 1.   The District Court Did Not Abuse Its Discretion by Holding One Hearing

Essentially acknowledging their failure of proof, Relators argue that the district court should have held a second hearing on the original source issue after it decided the public disclosure question. (AOB 25, 43-47.) Relators fail to identify any prejudice from this supposed error. They do not point to any evidence they would have presented at a separate hearing, let alone show how that evidence would have changed anything.

Moreover, the district court did not err in exercising its broad discretion to manage the pretrial proceedings. *Arakaki*, 477 F.3d at 1069. *Wang v. FMC Corp*,

---

[15] Relators cite *U.S. ex rel. Smith v. Yale University*, 415 F. Supp. 2d 58, 73-74 (D. Conn. 2006), but *Smith*'s analysis was based on the Tenth Circuit's ruling in *Rockwell* that was later reversed by the Supreme Court. Further, in *Smith*, "only a small number of [the] allegations" involved conduct post-dating the relator's employment, *id.* at 73, but here, Lee's claims extend years beyond her employment. *U.S. ex rel. Washington v. Education Management Corp.*, 871 F. Supp. 2d 433 (W.D. Pa. 2012) is also inapposite; it addressed pleading standards, not whether the relator was an original source.

on which Relators rely, says nothing about holding separate hearings; it merely explains the logical order in which the two jurisdictional issues should be *decided*. 975 F.2d at 1416.  Nor does due process somehow require two hearings.  Relators had all the process they were due when they were served with Corinthian's duly noticed motion.[16]  (7SER 2021-22.)

Relators suggest, without any supporting authority, that they were entitled to withhold evidence until a later hearing because of the "necessary waiver of attorney-client privilege and work product [protection]" to prove that they are original sources.  (AOB 46-47.)  But Relators could easily have availed themselves of *in camera* procedures if this had been a real concern.  *See* C.D. Cal. L.R. 79-5.1. In any event, relators are sometimes forced to choose between waiving privilege and facing an adverse judgment if privilege is not waived.  *See, e.g., Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 921-22 (7th Cir. 2009).  Such a requirement does not present due process concerns.

### 2.    The District Court Did Not Abuse its Discretion In Rejecting Lee's Sham Affidavit

Relators next complain that the district court failed to consider the three-page affidavit submitted in Lee's name in opposition to the Rule 12(b)(1) motion.

---

[16] Relators argue that the motion failed to include the statement of uncontroverted facts required by C.D. Cal. L.R. 56-1.  (AOB 45-47.)  But that rule applies to motions for summary judgment, not Rule 12(b)(1) motions (where courts are free to decide disputed facts relevant to jurisdiction).  *See Biddle,* 161 F.3d at 535.

(AOB 60-63.)  The district court rejected the affidavit on two independent grounds, and neither was an abuse of discretion.

*First*, ample evidence supported the court's conclusion that the affidavit was a sham.  "[A] party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony," and a court may disregard such sham evidence. *Yeager*, 693 F.3d at 1078-80 (citation omitted).  Lee's affidavit states that her performance evaluations and compensation depended "solely," "only," and "entire[ly]" on "recruitment numbers."  (2SER 541 ¶¶ 7-9.)  In direct contrast, Lee repeatedly testified at her deposition that she had no firsthand knowledge of the reasons why she or anyone else received raises (other than documents she signed showing that qualitative factors were considered), and in fact understood that enrollment numbers were only "part" of her evaluation and compensation. *See supra* at 16-17.  Despite 90 minutes of questioning at Lee's deposition, (1SER 6 ¶ 3), Relators' counsel failed to rehabilitate Lee's testimony and submitted only 14 non-consecutive pages of Lee's transcript in opposition to the Rule 12(b)(1) motion.[17]  (2SER 524-37.)  Lee's affidavit was a transparent attempt to create the record that Lee would not attest to under oath at her deposition.  Far from being clearly erroneous, the district court's finding that Lee's affidavit "directly conflicts with the substance of Lee's testimony" (1ER 62-63) was the only reasonable conclusion supported by the evidence. *Yeager*, 693 F.3d at 1081.

---

[17] Read in context, these snippets confirm that Lee had no basis for asserting that compensation was "all about the numbers," other than her perception that she could be fired for not meeting her quota—a permissible employment practice. *See supra* at 18-19.

*Second*, Relators presented no argument to the district court based on the contents of the affidavit, stating only that it was "incorporated [in Relators' opposition brief] for all purposes." (2ER 294.) The district court's observation that it had no obligation to manufacture arguments for Relators based on the affidavit (1ER 63) was well-supported and was not an abuse of discretion. *See, e.g*, *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003) ("Our circuit has repeatedly admonished that we cannot manufacture arguments [for a party]") (citation omitted).

Further, the district court was entitled to "resolve factual disputes based on the evidence presented." *Biddle*, 161 F.3d at 535. Given Lee's copious testimony showing she was not an original source, the district court was well within its discretion to credit that testimony over the affidavit.

### 3.    The Handling of Flash and Activity Reports Did Not Prejudice Relators and Was Not an Abuse of Discretion

Relators' argument that they were denied an opportunity to present evidence of Flash and Activity Reports is yet another attempt to distract from their complete failure of proof. (AOB 63-64.) The reports are irrelevant to any issue (including issues Relators raise for the first time on appeal), and the only reason they are not part of the record is that Relators ignored the district court's instruction to file them.

Relators' initial attempt to lodge the reports was rejected by the clerk for multiple filing errors. (1SER 3.) Relators requested reconsideration (which Corinthian did not oppose), and the court *granted* that request, ordering the reports

to "be filed." (2ER 335-36.) At that point, Relators could have placed the reports on record for appeal.[18]

But Relators did not, and it is clear why: the reports have absolutely no bearing on any jurisdictional issue and expose the utter lack of merit to Relators' case. Whether Relators possessed "direct and independent knowledge" depends on what Relators *knew*, not the contents of documents. *See Nat'l Gas Royalties*, 562 F.3d at 1045 (district court properly excluded documents from its analysis of FCA relators' knowledge). Here, no report could change Relators' testimony that they did not witness any conduct by Corinthian inconsistent with the incentive compensation ban.

In fact, as Lee testified, the reports did not "say anything about raises or promotions," "they just showed you the numbers of everybody's enrollments." (1SER 10:4; 1SER 124:23-125:13.) Aside from encouraging "you to perform better," Lee "[did not] know what else they would be used for." (1SER 199:1-15.) Of course, providing performance data to recruiters does not violate the HEA. *Lee I*, 655 F.3d at 992-93. Thus, the only evidence on record about the reports confirms their irrelevance.

---

[18] Relators complain that the court struck the reports an additional time. That later order, however, addressed exhibits Relators attempted to lodge in opposition to Corinthian's *sanctions* motion (again without following court procedures). 2ER 304 (May 10 order rejecting "Exhibit 1 to Declaration of Levy" for filing discrepancies); 1SER 1-2 (Levy Declaration and exhibits in opposition to sanctions motion, filed May 10). It has nothing to do with the present appeal.

In any event, these new arguments about the significance of the reports are waived.  Relators never argued before the district court that the reports established their original source status.  Instead, Relators argued that (1) the reports' "confidential" status meant there was no public disclosure, and (2) Relators needed discovery of *additional* reports.  (2ER 279-81, 295-97.)  The court addressed and correctly rejected each argument (1ER 60, 64), neither of which required consideration of the contents of the unfiled reports.  The district court cannot be faulted for failing to consider arguments Relators did not make regarding documents they did not file.

To the extent Relators argue that *sealing* the reports was improper (it was not), that did not prejudice them either.  Sealing the reports did not limit the court's ability to consider them—Relators' failure to place them on the record did that.  Indeed, although Corinthian advocated sealing the reports to protect its proprietary information, (9SER 2197-2206), Corinthian had no objection to the reports' being considered given their irrelevance.  (*See* 8SER 2157-58 (Corinthian reply brief, citing the reports).)

### 4.    Relators Were Not Entitled to Additional Discovery

Relators make the equally frivolous argument that they were improperly denied discovery of additional Flash and Activity Reports under Rule 56(d).

Rule 56(d) required Relators to show that further discovery would enable them to present facts "essential to justify [their] opposition" to Corinthian's 12(b)(1) motion.  But again, the reports were inconsequential to any jurisdictional

issue raised by the motion.  The three parts of the original source test—
(1) Relators' knowledge of the information behind their allegations; (2) the timing
and substance of their disclosures to the government, and (3) their involvement in
bringing public disclosures to light—are matters entirely within Relators' personal
knowledge.  The reports sought by Relators were not "essential" to any of these
questions.  *See U.S. ex rel. Glaser v. Wound Care Consultants, Inc*. 2007 WL
2934885, at *1 (S.D. Ind. Oct. 5, 2007) (denying discovery request in opposition to
public disclosure motion because relator "herself is in the best position to know
what the source of her knowledge was").  Moreover, direct and independent
knowledge is acquired through one's "own labor unmediated by anything else,"
*Meyer*, 565 F.3d at 1202, and does not include knowledge obtained through
discovery.  *Kinney v. Stoltz*, 327 F.3d 671, 675 (8th Cir. 2003).  Because the
discovery was not "relevant to whether or not the court ha[d] subject matter
jurisdiction," denying Relators' request was not an abuse of discretion.  *Alaska
Cargo Transport, Inc. v. Alaska Ry. Corp*., 5 F.3d 378, 383 (9th Cir. 1993).[19]

## C.    Relators Also Failed to Establish the Other Requirements to be Original Sources

Aside from Relators' failure to meaningfully challenge the district court's
conclusion that they lacked direct and independent knowledge, Relators also failed
to satisfy the two other original source requirements, further compelling
affirmance.

---

[19] Relators' complaints about "one-sided" discovery (AOB 16-17) fail for the same
reasons.

### 1.    The Pre-Filing Disclosure Requirement Was Not Met

Even a relator who has direct and independent knowledge will not qualify as an original source if he fails to make a timely disclosure to the government of "the information on which the allegations are based."  31 U.S.C. § 3730(e)(4).  The disclosure must be made "'before filing' [the] *qui tam* action."  *Wang*, 975 F.2d at 1417-20.

Relators made no attempt to satisfy this requirement.  In fact, the record evidence establishes they cannot.  Relators admitted in their Rule 26 disclosures that the only documentary proof they believed would support their claims is a "Confidential & Privileged Disclosure Statement made to the U.S. Department of Justice Pursuant to 31 U.S.C. § 3730(e)(4)(b) and (b)(2), including 402 pages of internal communications between Corinthian Colleges and Nyoka Lee."  (2SER 360.)  The very name of the document confirms it as Relators' attempt to satisfy Section 3730(e)(4)(B)'s voluntary disclosure requirement.  Relators' interrogatory responses, however, establish that they provided this document to the government on *April 26, 2007*, one month *after* filing their Original Complaint, and, therefore, too late for them to qualify as original sources.  (2SER 367-68; 2SER 373-74.)  Moreover, both Relators testified that they met with the government only after filing their lawsuit.  (1SER 215:6-217:16; 2SER 348:19-350:8.)  Because Relators failed to make a timely voluntary disclosure, they cannot be "original sources."

### 2.    Relators Had No Hand in the Public Disclosures

Despite their burden of proof, Relators also made no attempt to show that they had a "hand" in bringing about the public disclosures of the alleged fraud. *See Meyer*, 565 F.3d at 1201.  Relators therefore fail to qualify as "original sources" on this score, too.

## IV.   The District Court's Statute of Limitations Ruling Does Not Affect the Outcome and Was Correct in Any Event

Relators also appeal the district court's dismissal of pre-2005 claims as time-barred.  But Relators' attempt to dredge up statute of limitations issues is pointless, because the district court lacked jurisdiction whether or not Relators' claims date back to 2000, as alleged in the FAC, or to 2005, as alleged in the Original Complaint.

Because the jurisdictional analysis depends on the Original Complaint, the FAC's expanded temporal scope is irrelevant to whether the public disclosure bar applies.  *Makro Capital of America, Inc. v. UBS AG*, 543 F.3d 1254, 1260 (11th Cir. 2008) (jurisdictional defects cannot be cured by amendment).  In any event, the FAC's broader time period does not change the fact that Relators' allegations were publicly disclosed.  Nor does it make Relators any more likely to qualify as original sources.  The district court found, correctly, that Relators lacked direct knowledge that Corinthian engaged in *any* fraud *at any time*.  *See supra* at 15-22, 43-45.  Moreover, Relators' failure to make a timely pre-filing disclosure or prove they had a hand in any public disclosure does not depend on the time period covered by their complaint.

53

Relators' statute of limitations argument is not only irrelevant to this appeal, it also lacks substantive merit. The Original Complaint alleged that Corinthian made false claims "particularly in 2005 and subsequently." (1ER 115 ¶ 25.) The FAC, filed in December 2011, alleged that Corinthian made false claims "[f]rom 2000 to 2010." (1ER102-03 ¶ 88.) The FCA requires a relator to file a lawsuit within (1) six years after the alleged violation, or (2) three years after he knew or reasonably should have known the material facts, whichever is later. *U.S. ex rel. Hyatt v. Northrop Corp.,* 91 F.3d 1211, 1218 (9th Cir. 1996); 31 U.S.C. § 3731(b). Because there is no suggestion that tolling applies, all claims dating back more than six years from the filing of the FAC in 2011—all pre-2005 claims—are time-barred unless they relate back. They do not.

The relation back doctrine applies only if the two pleadings "share a common core of operative facts sufficient to impart fair notice of the transaction, occurrence, or conduct called into question." *Martell v. Trilogy, Ltd.*, 872 F.2d 322, 327 (9th Cir. 1989); *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008). "Cases are legion which refuse to allow relation back when the new allegations go beyond the time-frame of the original complaint," because defendants are not on fair notice of such allegations. *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 138 (D. Mass. 2006); *see also Patterson v. Gen. Motors Corp.*, 631 F.2d 476, 486-87 (7th Cir. 1980).

Contrary to Relators' argument (AOB 50, 55), the Original Complaint's allegation that Relators' employment began in 2000 hardly indicated that Relators would allege *fraud* dating back to 2000. If anything, coupled with the Original

54

Complaint's express statement that the alleged fraud occurred "particularly in 2005 and subsequently," it suggested that Relators were *not* pursuing fraud claims before 2005.  Because the Original Complaint gave no notice that Relators would seek to capture Corinthian's pre-2005 conduct within the scope of their lawsuit, the FAC does not relate back.  *See In re Markus*, 313 F.3d 1146, 1151 (9th Cir. 2002) (rejecting relation back when earlier pleading "pointed in a completely different direction.")

Relators' lengthy digression into the nuances of the "false certification" theory of FCA liability also does not help them, (AOB 50-55), because relation-back does not depend on the theory of fraud pled, but, rather, on whether the new legal theory relies on "different facts" (in which case relation back is inappropriate).  *Williams*, 517 F.3d at 1133.  Because the Original Complaint gave no notice of *any* misconduct before 2005—whether characterized as express certification, implied certification, or otherwise—the FAC's pre-2005 claims are time-barred.

## CONCLUSION

Relators are anything but "whistleblowing insider[s]" who have brought valuable information about a fraud to the government's attention.  *Wang*, 975 F.2d at 1419.  This attorney-made case is the paradigm parasitic lawsuit precluded by the public disclosure bar.  The district court's decision should be affirmed.

DATED:  January 6, 2014          MUNGER TOLLES & OLSON LLP
                                      Blanca F. Young
                                      Achyut J. Phadke
                                      Hannah E. Shearer


                                 By: /s/ *Blanca F. Young*
                                      Attorneys for Defendants
                                      Corinthian Colleges, Inc., David Moore,
                                      and Jack D. Massimino

## STATEMENT OF RELATED CASES

Pursuant to Federal Rule of Appellate Procedure 28-2.6, Corinthian is aware of one related case currently pending in this Court: Relators' counsel's appeal from the district court sanctions order, case no. 13-56121.

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Federal Rules of Appellate Procedure 32(a)(7)(C) that the attached brief is proportionately spaced, has a typeface of 14 points, and, based on the word count of the word processing system used to prepare the brief (Microsoft Word 2010) contains 13,839 words.

Dated: January 6, 2014          By: /s/ *Blanca F. Young*

                                      Blanca F. Young

# Statutory and Regulatory Addendum

**31 U.S.C. § 3730(e)(4)(1994)**

United States Code Annotated
    Title 31. Money and Finance (Refs & Annos)
        Subtitle III. Financial Management
            Chapter 37. Claims (Refs & Annos)
                Subchapter III. Claims Against the United States Government (Refs & Annos)

This section has been updated. Click here for the updated version.

31 U.S.C.A. § 3730

§ 3730. Civil actions for false claims

**(a) Responsibilities of the Attorney General.**--The Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person.

**(b) Actions by private persons.--(1)** A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

**(2)** A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. [1] The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

**(3)** The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

**(4)** Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall--

    **(A)** proceed with the action, in which case the action shall be conducted by the Government; or

    **(B)** notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

**(5)** When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

Case: 13-55700    01/06/2014    ID: 8926682    DktEntry: 31-1    Page: 72 of 85

**(c) Rights of the parties to qui tam actions.--(1)** If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

**(2)(A)** The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

**(B)** The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

**(C)** Upon a showing by the Government that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation, such as--

    **(i)** limiting the number of witnesses the person may call;

    **(ii)** limiting the length of the testimony of such witnesses;

    **(iii)** limiting the person's cross-examination of witnesses; or

    **(iv)** otherwise limiting the participation by the person in the litigation.

**(D)** Upon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation.

**(3)** If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

**(4)** Whether or not the Government proceeds with the action, upon a showing by the Government that certain actions of discovery by the person initiating the action would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts, the court may stay such discovery for a period of not more than 60 days. Such a showing shall be conducted in camera. The court may extend the 60-day period upon a further showing in camera that the Government has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the civil action will interfere with the ongoing criminal or civil investigation or proceedings.

**(5)** Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section. For purposes of the preceding sentence, a finding or conclusion is final if it has been finally determined on appeal to the appropriate court of the United States, if all time for filing such an appeal with respect to the finding or conclusion has expired, or if the finding or conclusion is not subject to judicial review.

**(d) Award to qui tam plaintiff.--(1)** If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [2] Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation. Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

**(2)** If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

**(3)** Whether or not the Government proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of section 3729 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under paragraph (1) or (2) of this subsection, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation. If the person bringing the action is convicted of criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action and shall not receive any share of the proceeds of the action. Such dismissal shall not prejudice the right of the United States to continue the action, represented by the Department of Justice.

**(4)** If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

**(e) Certain actions barred.--(1)** No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

**(2)(A)** No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

**(B)** For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in paragraphs (1) through (8) of section 101(f) of the Ethics in Government Act of 1978 (5 U.S.C. App.).

**(3)** In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

**(4)(A)** No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [3] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

**(B)** For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

**(f) Government not liable for certain expenses.**--The Government is not liable for expenses which a person incurs in bringing an action under this section.

**(g) Fees and expenses to prevailing defendant.**--In civil actions brought under this section by the United States, the provisions of section 2412(d) of title 28 shall apply.

**(h)** Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

CREDIT(S)

(Pub.L. 97-258, Sept. 13, 1982, 96 Stat. 978; Pub.L. 99-562, §§ 3, 4, Oct. 27, 1986, 100 Stat. 3154, 3157; Pub.L. 100-700, § 9, Nov. 19, 1988, 102 Stat. 4638; Pub.L. 101-280, § 10(a), May 4, 1990, 104 Stat. 162; Pub.L. 103-272, § 4(f)(1)(P), July 5, 1994, 108 Stat. 1362.)

Footnotes

1    See, now, Rule 4(i) of the Federal Rules of Civil Procedure.

Case: 13-55700    01/06/2014    ID: 8926682    DktEntry: 31-1    Page: 75 of 85

2        So in original. Probably should be "General".

3        So in original. Probably should be "General".

31 U.S.C.A. § 3730, 31 USCA § 3730

Current through P.L. 113-57 (excluding P.L. 113-54 and 113-56) approved 12-9-13

**End of Document**                                           © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**34 C.F.R. § 668.14(b)(22)(ii)(A)(2008)**

Code of Federal Regulations
  Title 34. Education
    Subtitle B. Regulations of the Offices of the Department of Education
      Chapter VI. Office of Postsecondary Education, Department of Education
        Part 668. Student Assistance General Provisions (Refs & Annos)
          Subpart B. Standards for Participation in Title IV, Hea Programs (Refs & Annos)

This section has been updated. Click here for the updated version.

34 C.F.R. § 668.14

§ 668.14 Program participation agreement.

Effective: [See Text Amendments] to June 30, 2008

(a)(1) An institution may participate in any Title IV, HEA program, other than the LEAP and NEISP programs, only if the institution enters into a written program participation agreement with the Secretary, on a form approved by the Secretary. A program participation agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part, the individual program regulations, and any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet.

(2) An institution's program participation agreement applies to each branch campus and other location of the institution that meets the applicable requirements of this part unless otherwise specified by the Secretary.

(b) By entering into a program participation agreement, an institution agrees that--

(1) It will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program;

(2) As a fiduciary responsible for administering Federal funds, if the institution is permitted to request funds under a Title IV, HEA program advance payment method, the institution will time its requests for funds under the program to meet the institution's immediate Title IV, HEA program needs;

(3) It will not request from or charge any student a fee for processing or handling any application, form, or data required to determine a student's eligibility for, and amount of, Title IV, HEA program assistance;

(4) It will establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under the Title IV, HEA programs, together with assurances that the institution will provide, upon request and in a timely manner, information relating to the administrative capability and financial responsibility of the institution to--

(i) The Secretary;

(ii) A guaranty agency, as defined in 34 CFR part 682, that guarantees loans made under the Federal Stafford Loan and Federal PLUS programs for attendance at the institution or any of the institution's branch campuses or other locations;

(iii) The nationally recognized accrediting agency that accredits or preaccredits the institution or any of the institution's branch campuses, other locations, or educational programs;

(iv) The State agency that legally authorizes the institution and any branch campus or other location of the institution to provide postsecondary education; and

(v) In the case of a public postsecondary vocational educational institution that is approved by a State agency recognized for the approval of public postsecondary vocational education, that State agency;

(5) It will comply with the provisions of § 668.15 relating to factors of financial responsibility;

(6) It will comply with the provisions of § 668.16 relating to standards of administrative capability;

(7) It will submit reports to the Secretary and, in the case of an institution participating in the Federal Stafford Loan, Federal PLUS, or the Federal Perkins Loan Program, to holders of loans made to the institution's students under that program at such times and containing such information as the Secretary may reasonably require to carry out the purpose of the Title IV, HEA programs;

(8) It will not provide any statement to any student or certification to any lender in the case of an FFEL Program loan, or origination record to the Secretary in the case of a Direct Loan Program loan that qualifies the student or parent for a loan or loans in excess of the amount that the student or parent is eligible to borrow in accordance with sections 425(a), 428(a)(2), 428(b)(1)(A) and (B), 428B, 428H, and 455(a) of the HEA;

(9) It will comply with the requirements of subpart D of this part concerning institutional and financial assistance information for students and prospective students;

(10) In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment--

(i) The most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and

(ii) Relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students;

Case: 13-55700    01/06/2014    ID: 8926682    DktEntry: 31-1    Page: 79 of 85

(11) In the case of an institution participating in the FFEL program, the institution will inform all eligible borrowers, as defined in 34 CFR part 682, enrolled in the institution about the availability and eligibility of those borrowers for State grant assistance from the State in which the institution is located, and will inform borrowers from another State of the source of further information concerning State grant assistance from that State;

(12) It will provide the certifications described in paragraph (c) of this section;

(13) In the case of an institution whose students receive financial assistance pursuant to section 484(d) of the HEA, the institution will make available to those students a program proven successful in assisting students in obtaining the recognized equivalent of a high school diploma;

(14) It will not deny any form of Federal financial aid to any eligible student solely on the grounds that the student is participating in a program of study abroad approved for credit by the institution;

(15)(i) Except as provided under paragraph (b)(15)(ii) of this section, the institution will use a default management plan approved by the Secretary with regard to its administration of the FFEL or Direct Loan programs, or both for at least the first two years of its participation in those programs, if the institution--

    (A) Is participating in the FFEL or Direct Loan programs for the first time; or

    (B) Is an institution that has undergone a change of ownership that results in a change in control and is participating in the FFEL or Direct Loan programs.

(ii) The institution does not have to use an approved default management plan if--

    (A) The institution, including its main campus and any branch campus, does not have a cohort default rate in excess of 10 percent; and

    (B) The owner of the institution does not own and has not owned any other institution that had a cohort default rate in excess of 10 percent while that owner owned the institution.

(16) [Reserved]

(17) The Secretary, guaranty agencies and lenders as defined in 34 CFR part 682, nationally recognized accrediting agencies, the Secretary of Veterans Affairs, State agencies recognized under 34 CFR part 603 for the approval of public postsecondary vocational education, and State agencies that legally authorize institutions and branch campuses or other locations of institutions to provide postsecondary education, have the authority to share with each other any information pertaining to the institution's eligibility for or participation in the Title IV, HEA programs or any information on fraud and abuse;

(18) It will not knowingly--

(i) Employ in a capacity that involves the administration of the Title IV, HEA programs or the receipt of funds under those programs, an individual who has been convicted of, or has pled nolo contendere or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds, or has been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds;

(ii) Contract with an institution or third-party servicer that has been terminated under section 432 of the HEA for a reason involving the acquisition, use, or expenditure of Federal, State, or local government funds, or that has been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds; or

(iii) Contract with or employ any individual, agency, or organization that has been, or whose officers or employees have been--

(A) Convicted of, or pled nolo contendere or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds; or

(B) Administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds;

(19) It will complete, in a timely manner and to the satisfaction of the Secretary, surveys conducted as a part of the Integrated Postsecondary Education Data System (IPEDS) or any other Federal collection effort, as designated by the Secretary, regarding data on postsecondary institutions;

(20) In the case of an institution that is co-educational and has an intercollegiate athletic program, it will comply with the provisions of § 668.48;

(21) It will not impose any penalty, including, but not limited to, the assessment of late fees, the denial of access to classes, libraries, or other institutional facilities, or the requirement that the student borrow additional funds for which interest or other charges are assessed, on any student because of the student's inability to meet his or her financial obligations to the institution as a result of the delayed disbursement of the proceeds of a Title IV, HEA program loan due to compliance with statutory and regulatory requirements of or applicable to the Title IV, HEA programs, or delays attributable to the institution;

(22)(i) It will not provide any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds, except that this limitation does not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive title IV, HEA program funds.

(ii) Activities and arrangements that an institution may carry out without violating the provisions of paragraph (b)(22)(i) of this section include, but are not limited to:

(A) The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. For this purpose, an increase in fixed compensation resulting from a cost of living increase that is paid to all or substantially all full-time employees is not considered an adjustment.

(B) Compensation to recruiters based upon their recruitment of students who enroll only in programs that are not eligible for title IV, HEA program funds.

(C) Compensation to recruiters who arrange contracts between the institution and an employer under which the employer's employees enroll in the institution, and the employer pays, directly or by reimbursement, 50 percent or more of the tuition and fees charged to its employees; provided that the compensation is not based upon the number of employees who enroll in the institution, or the revenue they generate, and the recruiters have no contact with the employees.

(D) Compensation paid as part of a profit-sharing or bonus plan, as long as those payments are substantially the same amount or the same percentage of salary or wages, and made to all or substantially all of the institution's full-time professional and administrative staff. Such payments can be limited to all, or substantially all of the full-time employees at one or more organizational level at the institution, except that an organizational level may not consist predominantly of recruiters, admissions staff, or financial aid staff.

(E) Compensation that is based upon students successfully completing their educational programs, or one academic year of their educational programs, whichever is shorter. For this purpose, successful completion of an academic year means that the student has earned at least 24 semester or trimester credit hours or 36 quarter credit hours, or has successfully completed at least 900 clock hours of instruction at the institution.

(F) Compensation paid to employees who perform clerical "pre-enrollment" activities, such as answering telephone calls, referring inquiries, or distributing institutional materials.

(G) Compensation to managerial or supervisory employees who do not directly manage or supervise employees who are directly involved in recruiting or admissions activities, or the awarding of title IV, HEA program funds.

(H) The awarding of token gifts to the institution's students or alumni, provided that the gifts are not in the form of money, no more than one gift is provided annually to an individual, and the cost of the gift is not more than $100.

(I) Profit distributions proportionately based upon an individual's ownership interest in the institution.

Case: 13-55700    01/06/2014    ID: 8926682    DktEntry: 31-1    Page: 82 of 85

(J) Compensation paid for Internet-based recruitment and admission activities that provide information about the institution to prospective students, refer prospective students to the institution, or permit prospective students to apply for admission on-line.

(K) Payments to third parties, including tuition sharing arrangements, that deliver various services to the institution, provided that none of the services involve recruiting or admission activities, or the awarding of title IV, HEA program funds.

(L) Payments to third parties, including tuition sharing arrangements, that deliver various services to the institution, even if one of the services involves recruiting or admission activities or the awarding of title IV, HEA program funds, provided that the individuals performing the recruitment or admission activities, or the awarding of title IV, HEA program funds, are not compensated in a manner that would be impermissible under paragraph (b)(22) of this section.

(23) It will meet the requirements established pursuant to part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies;

(24) It will comply with the requirements of § 668.22;

(25) It is liable for all--

(i) Improperly spent or unspent funds received under the Title IV, HEA programs, including any funds administered by a third-party servicer; and

(ii) Returns of title IV, HEA program funds that the institution or its servicer may be required to make; and

(26) If the stated objectives of an educational program of the institution are to prepare a student for gainful employment in a recognized occupation, the institution will--

(i) Demonstrate a reasonable relationship between the length of the program and entry level requirements for the recognized occupation for which the program prepares the student. The Secretary considers the relationship to be reasonable if the number of clock hours provided in the program does not exceed by more than 50 percent the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student, as established by the State in which the program is offered, if the State has established such a requirement, or as established by any Federal agency; and

(ii) Establish the need for the training for the student to obtain employment in the recognized occupation for which the program prepares the student.

(c) In order to participate in any Title IV, HEA program (other than the LEAP and NEISP programs), the institution must certify that it--

(1) Has in operation a drug abuse prevention program that the institution has determined to be accessible to any officer, employee, or student at the institution; and

(2)(i) Has established a campus security policy in accordance with section 485(f) of the HEA; and

(ii) Has complied with the disclosure requirements of § 668.47 as required by section 485(f) of the HEA.

(d)(1) The institution, if located in a State to which section 4(b) of the National Voter Registration Act (42 U.S.C. 1973gg–2(b)) does not apply, will make a good faith effort to distribute a mail voter registration form, requested and received from the State, to each student enrolled in a degree or certificate program and physically in attendance at the institution, and to make those forms widely available to students at the institution.

(2) The institution must request the forms from the State 120 days prior to the deadline for registering to vote within the State. If an institution has not received a sufficient quantity of forms to fulfill this section from the State within 60 days prior to the deadline for registering to vote in the State, the institution is not liable for not meeting the requirements of this section during that election year.

(3) This paragraph applies to elections as defined in section 301(1) of the Federal Election Campaign Act of 1971 (2 U.S.C. 431(1)), and includes the election for Governor or other chief executive within such State.

(e)(1) A program participation agreement becomes effective on the date that the Secretary signs the agreement.

(2) A new program participation agreement supersedes any prior program participation agreement between the Secretary and the institution.

<Text of subsection (f) effective until July 1, 2008.>

(f)(1) Except as provided in paragraphs (h) and (i) of this section, the Secretary terminates a program participation agreement through the proceedings in subpart G of this part.

(2) An institution may terminate a program participation agreement.

(3) If the Secretary or the institution terminates a program participation agreement under paragraph (g) of this section, the Secretary establishes the termination date.

<Text of subsection (f) effective July 1, 2008.>

(f)(1) Except as provided in paragraphs (g) and (h) of this section, the Secretary terminates a program participation agreement through the proceedings in subpart G of this part.

Case: 13-55700    01/06/2014    ID: 8926682    DktEntry: 31-1    Page: 84 of 85

(2) An institution may terminate a program participation agreement.

(3) If the Secretary or the institution terminates a program participation agreement under paragraph (f) of this section, the Secretary establishes the termination date.

(g) An institution's program participation agreement automatically expires on the date that--

(1) The institution changes ownership that results in a change in control as determined by the Secretary under 34 CFR part 600; or

(2) The institution's participation ends under the provisions of § 668.26(a)(1), (2), (4), or (7).

(h) An institution's program participation agreement no longer applies to or covers a location of the institution as of the date on which that location ceases to be a part of the participating institution.

(Approved by the Office of Management and Budget under control number 1840–0537)

(Authority: 20 U.S.C. 1085, 1088, 1091, 1092, 1094, 1099a–3, 1099c, and 1141)

**Credits**

[54 FR 46538, Nov. 3, 1989; 55 FR 26200, June 27, 1990; 57 FR 57310, Dec. 3, 1992; 58 FR 32202, June 8, 1993; 58 FR 36870, July 9, 1993; 59 FR 21866, April 26, 1994; 59 FR 22423, 22425, April 29, 1994; 59 FR 32657, June 24, 1994; 59 FR 34964, July 7, 1994; 63 FR 40623, July 29, 1998; 64 FR 58617, Oct. 29, 1999; 64 FR 59038, Nov. 1, 1999; 65 FR 38729, June 22, 2000; 65 FR 65637, Nov. 1, 2000; 67 FR 67072, Nov. 1, 2002; 73 FR 35492, June 23, 2008]

SOURCE: 45 FR 86855, Dec. 31, 1980; 50 FR 26953, June 28, 1985; 51 FR 8948, March 14, 1986; 51 FR 29398, Aug. 15, 1986; 52 FR 45727, Dec. 1, 1987; 56 FR 61337, Dec. 2, 1991; 59 FR 21866, April 26, 1994; 59 FR 22318, 22418, April 29, 1994; 60 FR 61433, Nov. 29, 1995; 64 FR 57358, Oct. 22, 1999; 64 FR 58617, Oct. 29, 1999; 64 FR 59037, 59066, Nov. 1, 1999; 65 FR 38729, June 22, 2000; 65 FR 65637, 65674, Nov. 1, 2000; 68 FR 66615, Nov. 26, 2003; 73 FR 35492, June 23, 2008, unless otherwise noted.

AUTHORITY: 20 U.S.C. 1001, 1002, 1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, and 1099c–1, unless otherwise noted.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated:       January 6, 2014

                              */s/ Blanca F. Young*
                              Blanca F. Young