**Case No. 13-55700**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

Nyoka Lee and Talala Mshuja

*Plaintiffs-Appellants,*

v.

Corinthian Colleges, Inc., et al.

*Defendants-Appellees.*

---

*On Appeal from the United States District Court
for the Central District of California, Case No. 07-1984
The Honorable Philip S. Gutierrez, Presiding*

---

**Defendant-Appellees' Joint Supplemental Excerpts of Record
Volume 1 of 9 (SER 0001 – SER 0300)**

---

MUNGER, TOLLES & OLSON LLP
Blanca F. Young
Achyut J. Phadke
Hannah E. Shearer
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

*Attorneys for Defendants-Appellees
Corinthian Colleges, Inc., David
Moore, and Jack D. Massimino*

MORRISON & FOERSTER LLP
Robert B. Hubbell
Ryan W. Borho
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017
Telephone: 213.892.5200
Facsimile: 213.892.5454

MORRISON & FOERSTER LLP
Ryan G. Hassanein
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000
Facsimile: 415.268.7522

*Attorneys for Defendant-Appellee
Ernst & Young LLP*

**DEFENDANT-APPELLEES' JOINT SUPPLEMENTAL EXCERPTS OF RECORD**
**-**
**TABLE OF CONTENTS**

| Docket No. | Description of Document | Page(s) |
|---|---|---|
| **Volume 1** | | |
| 265.1 | Declaration of Scott D. Levy in Opposition to Motion for Sanctions | SER 0001 |
| 204 | Notice of Document Discrepancies | SER 0003 |
| 200.1 | Supplemental Declaration of Blanca. F. Young in support of Defendants Corinthian Colleges, Inc., David Moore and Jack D. Massimino's Motion to Dismiss | SER 0005 |
| 192 | Corrected Declaration of Achyut J. Phadke in Support of Defendants Corinthian Colleges, Inc., David Moore and Jack D. Massimino's Motion to Dismiss | SER 0014 |
| **Volume 2** | | |
| 192 | Corrected Declaration of Achyut J. Phadke in Support of Defendants Corinthian Colleges, Inc., David Moore and Jack D. Massimino's Motion to Dismiss (*Continued*) | SER 0301 |
| 190 | Relators' Opposition to Defendants' Corinthian Colleges, Inc.'s Et Al, and Ernst & Young LLP's Motions to Dismiss | SER 0385 |
| 157 | [Corrected] Defendant Ernst & Young LLP's Request for Judicial Notice in Support of its Motion to Dismiss Under Fed. R. Civ. P.12(B)(1) for Lack of Subject Matter Jurisdiction | SER 0548 |
| 157.3 | Exhibits 2-8 to Corrected Request for Judicial Notice in Support of Ernst & Young LLP's Motion to Dismiss Under Fed. R. Civ. P.12(B)(1) for Lack of Subject Matter Jurisdiction | SER 0552 |
| **Volume 3** | | |
| 157.3 | Exhibits 2-8 to Corrected Request for Judicial Notice in Support of Ernst & Young LLP's Motion to Dismiss Under Fed. R. Civ. P.12(B)(1) for Lack of Subject Matter Jurisdiction (*Continued*) | SER 0601 |
| 155 | Declaration of Ryan G. Hassanein in Support Of Defendant Ernst & Young LLP's Motion to Dismiss Under Fed. R. Civ. P. 12(B)(1) for Lack of Subject Matter Jurisdiction | SER 0830 |
| 155.1 | Exhibits to the Declaration of Ryan G. Hassanein in Support Of Defendant Ernst & Young LLP's Motion to Dismiss Under Fed. R. Civ. P. 12(B)(1) for Lack of Subject Matter Jurisdiction | SER 833 |
| **Volume 4** | | |
| 155.1 | Exhibits to the Declaration of Ryan G. Hassanein in Support Of Defendant Ernst & Young LLP's Motion to Dismiss Under Fed. R. Civ. P. 12(B)(1) for Lack of Subject Matter Jurisdiction (*Continued*) | SER 901 |

| Docket No. | Description of Document | Page(s) |
|---|---|---|
| 154 | Defendant Ernst & Young LLP's Notice of Motion and Motion to Dismiss Under Fed. R. Civ. P. 12(B)(1) for Lack of Subject Matter Jurisdiction; Memorandum of Points and Authorities in Support Thereof | SER 0968 |
| 152 | Defendants Corinthian Colleges, Inc., David Moore, and Jack D. Massimino's Request for Judicial Notice in Support of Rule 12(B)(1) Motion to Dismiss | SER 0998 |
| **Volume 5** | | |
| 152 | Defendants Corinthian Colleges, Inc., David Moore, and Jack D. Massimino's Request for Judicial Notice in Support of Rule 12(B)(1) Motion to Dismiss (*Continued*) | SER 1201 |
| **Volume 6** | | |
| 152 | Defendants Corinthian Colleges, Inc., David Moore, and Jack D. Massimino's Request for Judicial Notice in Support of Rule 12(B)(1) Motion to Dismiss (*Continued*) | SER 1501 |
| **Volume 7** | | |
| 152 | Defendants Corinthian Colleges, Inc., David Moore, and Jack D. Massimino's Request for Judicial Notice in Support of Rule 12(B)(1) Motion to Dismiss (*Continued*) | SER 1801 |
| 150 | Defendants Corinthian Colleges, Inc., David Moore, and Jack D. Massimino's Notice of Motion and Rule 12(B)(1) Motion to Dismiss; Memorandum of Points and Authorities | SER 2021 |
| **Volume 8** | | |
| 150 | Defendants Corinthian Colleges, Inc., David Moore, and Jack D. Massimino's Notice of Motion and Rule 12(B)(1) Motion to Dismiss; Memorandum of Points and Authorities (*Continued*) | SER 2101 |
| 66 | Order Granting Defendants' Motion to Dismiss | SER 2112 |
| 37 | Defendant Ernst & Young LLP's Request for Judicial Notice in Support of its Motion to Dismiss | SER 2120 |
| 37.5 | Exhibit D to Defendant Ernst & Young LLP's Request for Judicial Notice in Support of its Motion to Dismiss | SER 2124 |
| 21 | Notice of Election by the United States of America to Decline Intervention | SER 2127 |
| 200 | Reply in Support of Corinthian Colleges, Inc., David Moore, and Jack D. Massimino's Rule 12(B)(1) Motion to Dismiss for Lack of Jurisdiction | SER 2133 |
| **Volume 9 (UNDER SEAL)** | | |
| 168 **(UNDER SEAL)** | Exhibits G-K to Declaration of Achyut J. Phadke in Support of Defendants Corinthian Colleges Inc., David Moore, and Jack D. Massimino's Motion to Dismiss | SER 2163 |
| 207 **(UNDER SEAL)** | Application to File Under Seal School Documents Filed with Relators' Opposition | SER 2197 |

1 | SCOTT D. LEVY
2 | Scott D. Levy & Associates PC
3 | Tex. Bar No. 24000598
4 | 1844 Wheeler Street
5 | Houston, Texas  77004
6 | (713) 528-5409 Tel.
7 | (713) 528-0117 Fax
8 | levy.scott@mac.com
9 |
10 |
11 | Attorneys for Relators
12 | NYOKA JUNE LEE AND TALALA MSHUJA
13 |
14 |                         U.S. DISTRICT COURT
15 |
16 |     CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION
17 |
18 |
19 | UNITED STATES OF AMERICA,          CASE NO. CV 07-01984 PSG (MANx)
20 | EX REL. NYOKA LEE and
21 | TALALA MSHUJA,                     **DECLARATION OF SCOTT D. LEVY**
22 |                                    **IN SUPPORT OF RELATORS'**
23 |                                    **OPPOSITION TO DEFENDANT**
24 |               Plaintiff,           **ERNST & YOUNG LLP'S**
25 |                                    **MOTION FOR SANCTIONS**
26 | CORINTHIAN COLLEGES INC.,          [Filed Concurrently with Opposition]
27 | et al.,
28 |               Defendants.
29 |                                    Place:  Courtroom 880
30 |                                    Judge: Hon. Philip S. Gutierrez
31 |                                    Date:  June 10, 2013
32 |                                    Time:  1:30 p.m.
33 |
34 |
35 |
36 |
37 |
38 |
39 |
40 |

1

1             I, Scott D. Levy, hereby declare:

2           1.    I am an attorney serving as counsel of record for Relators

3 Talala Mshuja and Nyoka Lee.  I am duly admitted to practice in the State of

4 Texas and before this Court in the above-captioned matter.  I have personal

5 knowledge of the matters set forth herein and if called upon to do so, I could and

6 would testify competently thereto under oath.

7           2.    I make this declaration in support of Relators' Opposition

8 to Corinthian Colleges, Inc., David Moore, and Jack Massimino's motion for

9 sanctions.

10          3.    Attached hereto as Exhibit 1 is a true and correct copy of

11 the 789 pages of documents produced by Relators and filed as an exhibit to

12 the Deposition of Nyoka Lee.  [EXHIBIT 1 IS LODGED UNDER SEAL]

13          4.    Attached hereto as Exhibit 2 is a true and correct copy of

14 the Deposition of Nyoka Lee.

15          5.    Attached hereto as Exhibit 3 is a true and correct copy of

16 the Deposition of Talala Mshuja.

17             I declare under of perjury under the laws of the United States

18 and the State of Texas that the foregoing is true and correct.

19             Executed on May 10, 2013, at Houston, Texas.

20

21                        */s/  Scott D. Levy*

22                        Scott D. Levy

23

24

2

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF DOCUMENT DISCREPANCIES

To: ☑ U.S. District Judge / ☐ U.S. Magistrate Judge  Philip S. Gutierrez

From: W. Hernandez _____, Deputy Clerk     Date Received: 02-29-13

Case No.: CV 07-1984-PSG (MANx):     Case Title: U.S.A., EX REL., ET AL -VS- CORINTHIAN COLLEGES, E

Document Entitled: LODGING UNDER SEAL EXHIBIT 1 TO THE AFFIDAVIT OF NYOKA JUNE LEE

Upon the submission of the attached document(s), it was noted that the following discrepancies exist:

| | | |
|---|---|---|
| ☐ Local Rule 5-4.1 | Documents must be filed electronically | |
| ☐ Local Rule 6-1 | Written notice of motion lacking or timeliness of notice incorrect | |
| ☐ Local Rule 7-19.1 | Notice to other parties of ex parte application lacking | **FILED** |
| ☐ Local Rule 7.1-1 | No Certification of Interested Parties and/or no copies | CLERK, U.S. DISTRICT COURT |
| ☐ Local Rule 11-3.1 | Document not legible | MAR - 4 2013 |
| ☐ Local Rule 11-3.8 | Lacking name, address, phone, facsimile numbers, and e-mail address | |
| ☑ Local Rule 11-4.1 | No copy provided for judge | CENTRAL DISTRICT OF CALIFORNIA |
| ☐ Local Rule 11-6 | Memorandum/brief exceeds 25 pages | BY_____ DEPUTY |
| ☐ Local Rule 11-8 | Memorandum/brief exceeding 10 pages shall contain table of contents | |
| ☐ Local Rule 15-1 | Proposed amended pleading not under separate cover | |
| ☐ Local Rule 16-7 | Pretrial conference order not signed by all counsel | |
| ☐ Local Rule 19-1 | Complaint/Petition includes more than 10 Does or fictitiously named parties | |
| ☐ Local Rule 56-1 | Statement of uncontroverted facts and/or proposed judgment lacking | |
| ☐ Local Rule 56-2 | Statement of genuine disputes of material fact lacking | |
| ☐ Local Rule 83-2.11 | No letters to the judge | |
| ☐ Fed. R. Civ. P. 5 | No proof of service attached to document(s) | |
| ☑ Other: | No application and proposed order requesting exhibit 1 to be filed under seal submitted; | |
| | Notice of Manual filing must be e-filed; application, proposed order and exhibit must be filed at | |
| | at the window. | |

**Please refer to the Court's website at www.cacd.uscourts.gov for Local Rules, General Orders, and applicable forms.**

### ORDER OF THE JUDGE/MAGISTRATE JUDGE

IT IS HEREBY ORDERED:

☐ The document is to be filed and processed. The filing date is ORDERED to be the date the document was stamped "received but not filed" with the Clerk. Counsel* is advised that any further failure to comply with the Local Rules may lead to penalties pursuant to Local Rule 83-7.

_____                    _____
Date                                        U.S. District Judge / U.S. Magistrate Judge

☑ The document is **NOT** to be filed, but instead **REJECTED**, and is ORDERED returned to counsel.* Counsel* shall immediately notify, in writing, all parties previously served with the attached documents that said documents have **not** been filed with the Court.

3/4/13_____                    _____
Date                                        U.S. District Judge / U.S. Magistrate Judge

* The term "counsel" as used herein also includes any pro se party. See Local Rule 1-3.

COPY 1 -ORIGINAL-OFFICE     COPY 2 -JUDGE     COPY 3 -SIGNED & RETURNED TO FILER     COPY 4 -FILER RECEIPT

CV-104A (06/12)                    NOTICE OF DOCUMENT DISCREPANCIES

SCOTT D. LEVY
Scott D. Levy & Associates PC
Tex. Bar No. 24000598
1844 Wheeler Street
Houston, Texas  77004
(713) 528-5409 Tel.
(713) 528-0117 Fax
levy.scott@mac.com

THOMAS D MAURIELLO
Mauriello Law Firm APC
1181 Puerta Del Sol Suite 120
San Clemente, CA 92673
949-542-3555
Fax: 949-606-9690
Email: tomm@maurlaw.com

Attorney for Relators
NYOKA JUNE LEE AND TALALA MSHUJA

1                           U.S. DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. NYOKA LEE and TALALA MSHUJA, <br><br> Plaintiff, <br><br> v. <br><br> CORINTHIAN COLLEGES INC., DAVID MOORE, JACK MASSIMINO, AND ERNST & YOUNG LLP, <br><br> Defendants. | CASE NO. CV 07-01984 PSG (MANx) <br><br> **LODGING UNDER SEAL EXHIBIT 1 TO THE AFFIDAVIT OF NYOKA JUNE LEE** <br><br> Place:  Courtroom 880 <br> Judge: Hon. Philip S. Gutierrez <br> Date:  March 11, 2013 <br> Time:  1:30 p.m. |

3
4
5                 **EXHIBIT 1 LODGED UNDER SEAL**

1  BLANCA F. YOUNG (State Bar No. 217533)
2  Blanca.Young@mto.com
   ACHYUT J. PHADKE (State Bar No. 261567)
3  Achyut.Phadke@mto.com
   MUNGER, TOLLES & OLSON LLP
4  560 Mission Street
5  Twenty-Seventh Floor
   San Francisco, California 94105-2907
6  Telephone:  (415) 512-4000
7  Facsimile:   (415) 512-4077

8
   Attorneys for Defendants
9  Corinthian Colleges Inc., David Moore,
   and Jack D. Massimino
10

11              UNITED STATES DISTRICT COURT

12       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

14
   United States ex rel. Nyoka Lee, et    Case No. 07-cv-01984 PSG (MANx)
15 al.,
                                            **SUPPLEMENTAL DECLARATION**
16             Plaintiff,                   **OF BLANCA F. YOUNG IN SUPPORT**
                                            **OF DEFENDANTS CORINTHIAN**
17       vs.                                **COLLEGES, INC., DAVID MOORE**
                                            **AND JACK D. MASSIMINO'S**
18                                          **MOTION TO DISMISS**
19 Corinthian Colleges Inc., et al.,
                                            [Reply in Support of Motion to Dismiss
20             Defendants.                  filed concurrently herewith]
21
22                                          Judge:      Honorable Philip S. Gutierrez
23                                          Courtroom:  880
                                            Date:       March 11, 2013
24                                          Time:       1:30 p.m.
25
26
27
28

   20052817v1                              YOUNG DECL. ISO MOT. TO DISMISS
                                           CASE NO. 07-CV-01984 PSG (MANx)

1          I, Blanca F. Young, hereby declare:

2          1.          I am a partner in the law firm of Munger, Tolles & Olson, LLP,

3   ("MTO") counsel of record for Defendants Corinthian Colleges Inc., David Moore

4   and Jack D. Massimino.  I am an attorney duly admitted to practice in the State of

5   California and before this Court in the above-captioned matter.  I have personal

6   knowledge of the matters set forth herein and if called upon to do so, I could and

7   would testify competently thereto under oath.

8          2.          Attached hereto as Exhibit A is a true and correct copy of an

9   excerpt of the transcript of the December 17, 2012 deposition of Nyoka Lee ("Lee

10  Deposition").

11         3.          I attended and participated in the Lee Deposition.  At the Lee

12  Deposition, counsel for Relators in this action, Scott D. Levy, examined Ms. Lee

13  from 5:17 p.m. to 6:47 p.m.  Relators' counsel's examination takes up 57 pages in

14  the certified reporter's transcript for the Lee Deposition.

15         I declare under penalty of perjury under the laws of the United States

16  and the State of California that the foregoing is true and correct.

17         Executed on February 15, 2013, at San Francisco, California.

18

19                                                         */s/ Blanca F. Young*
                                                            Blanca F. Young
20

21

22

23

24

25

26

27

28

20052817v1                              -1-              YOUNG DECL. ISO MOT. TO DISMISS
                                                         CASE NO. 07-CV-01984 PSG (MANx)

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

```
UNITED STATES OF AMERICA,          )
Ex Rel. NYOKA LEE and              )
TALALA MSHUJA,                     )
                                   )
                                   )
          Plaintiff,               )  No. CV-07-01984
                                   )     PSG (MANx)
     vs.                           )
                                   )
CORINTHIAN COLLEGES, INC.; ERNST & )
YOUNG, LLP; DAVID MOORE; and       )
JACK D. MASSIMINO,                 )
                                   )
          Defendants.              )
_____)
```

VOLUME I

VIDEOTAPED DEPOSITION OF:  NYOKA J. LEE

MONDAY, DECEMBER 17, 2012, 9:07 A.M.

SANTA ANA, CALIFORNIA

REPORTED BY:

KIMBERLY REICHERT, CSR
CERTIFICATE NO. 10986

2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                       WESTERN DIVISION

 4

 5

 6   UNITED STATES OF AMERICA,          )
     Ex Rel. NYOKA LEE and              )
 7   TALALA MSHUJA,                     )
                                        )
 8                                      )
                 Plaintiff,             ) No. CV-07-01984
 9                                      )       PSG (MANx)
          vs.                           )
10                                      )
     CORINTHIAN COLLEGES, INC.; ERNST & )
11   YOUNG, LLP; DAVID MOORE; and       )
     JACK D. MASSIMINO,                 )
12                                      )
                 Defendants.            )
13   _____)

14

15

16

17          Videotaped deposition of NYOKA J. LEE,

18   Volume I, taken on behalf of the Defendants, before

19   Kimberly Reichert, Certified Shorthand Reporter No.

20   10986 for the State of California, with principal

21   office in the County of Orange, commencing at 9:07

22   a.m. on Monday, December 17, 2012, located at

23   Corinthian Colleges, Inc., 6 Hutton Centre Drive,

24   Santa Ana, California.

25
```

```
 1   director.  You have to turn that lead into an
 2   interview and that interview into a new enrollment.
 3   And there were numbers for all the people that got
 4   that, all the admissions reps.  There were numbers
 5   on those sheets.
 6        Q    Okay.
 7        A    Okay.
 8        Q    Okay.  Did the --
 9        MR. LEVY:  Objection; form.
10   BY MS. YOUNG:
11        Q    Did the flash sheets say anything about
12   raises or promotions?
13        A    No, they didn't say that on there.  They
14   just showed you the numbers of everybody's
15   enrollments and leads to conversions and interviews.
16        MS. YOUNG:  Let's go off the record for a quick
17   second.
18        MR. LEVY:  Can we take a restroom break?
19        MS. YOUNG:  Okay.  Sure.
20        THE VIDEOGRAPHER:  The video deposition is now
21   going off record at 10:07 a.m.
22                  (A recess was taken from 10:07 a.m.
23   to 10:22 a.m.)
24        THE VIDEOGRAPHER:  The video deposition is now
25   returning to record at 10:22 a.m.
```

```
1                  CHANGES AND SIGNATURE (Continued)

2    PAGE    LINE    CHANGES                    REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14

15

16                            -oOo-

17            I certify, under penalty of perjury under

18   the laws of the United States of America, that the

19   foregoing is true and correct, with the exceptions,

20   if any, noted above.

21

22   Executed at  _____ on _____, 2013.
                      (Place)              (Date)
23

24                               _____
                                   (Signature of Deponent)
25
```

```
1   STATE OF CALIFORNIA )
2                       ) SS.
3   COUNTY OF ORANGE    )
4
5           I, KIMBERLY C. REICHERT, Certified Shorthand
6   Reporter, Certificate No. 10986, for the State of
7   California, hereby certify that:
8           I am the deposition officer that
9   stenographically recorded the testimony in the foregoing
10  deposition;
11          Prior to being examined, the deponent was by
12  me first duly sworn;
13          The foregoing transcript is a true record of
14  the testimony given.
15          I further certify that I am neither counsel
16  for, related to, nor employed by any of the parties or
17  attorneys in the action in which this proceeding was
18  taken, and further certify that I am not financially or
19  otherwise interested in the outcome of the action;
20          Pursuant to information given to me at the
21  time said testimony was taken, the appearance page
22  includes counsel for all parties of record;
23          Before completion of the deposition, review of
24  the transcript { X } was { } was not requested.
25          If review and signature was requested, the
```

1  noticing letter was send to the witness or to the

2  attorney for the witness for examination, for review,

3  corrections and signature;

4         That any changes made by the deponent,

5  according to the FRCP, and provided to the reporter

6  during the period allowed, are appended hereto.

7

8  Dated:  January 4, 2013.

9

10

11                              _____

                                KIMBERLY C. REICHERT
12                              CSR NO. 10986

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BLANCA F. YOUNG (State Bar No. 217533)
2  Blanca.Young@mto.com
   ACHYUT J. PHADKE (State Bar No. 261567)
3  Achyut.Phadke@mto.com
   MUNGER, TOLLES & OLSON LLP
4  560 Mission Street
5  Twenty-Seventh Floor
   San Francisco, California 94105-2907
6  Telephone:   (415) 512-4000
7  Facsimile:    (415) 512-4077

8
   Attorneys for Defendants
9  Corinthian Colleges Inc., David Moore,
10 and Jack D. Massimino

11              UNITED STATES DISTRICT COURT

12     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

14
15 United States ex rel. Nyoka Lee, et     Case No. 07-cv-01984 PSG (MANx)
   al.,
16                                         **CORRECTED DECLARATION OF
              Plaintiff,                    ACHYUT J. PHADKE IN SUPPORT
17                                          OF DEFENDANTS CORINTHIAN
18      vs.                                 COLLEGES INC., DAVID MOORE,
                                            AND JACK D. MASSIMINO'S
19 Corinthian Colleges Inc., et al.,        MOTION TO DISMISS**

20
              Defendants.                  [Filed in Support of Notice of Motion and
21                                         Motion to Dismiss with attached
22                                         Memorandum of Points and Authorities]

23                                         Judge: Honorable Philip S. Gutierrez
24                                         Courtroom:  880
                                           Date:    March 11, 2013
25                                         Time:  1:30 p.m.
26

27         __**EXHIBITS G-K FILED UNDER SEAL**__
28

                                                   CORRECTED PHADKE DECL.
                                                   CASE NO. 07-CV-01984 PSG (MANX)

1          I, Achyut J. Phadke, hereby declare:

2          1.      I am an attorney in the law firm of Munger, Tolles & Olson,

3    LLP, counsel of record for Defendants Corinthian Colleges Inc. (the "School") and

4    David Moore and Jack D. Massimino (the "Individual Defendants").  I am an

5    attorney duly admitted to practice in the State of California and before this Court in

6    the above-captioned matter.  I have personal knowledge of the matters set forth

7    herein and if called upon to do so, I could and would testify competently thereto

8    under oath.

9          2.      I make this declaration in support of the School and Individual

10   Defendants' Rule 12(b)(1) Motion to Dismiss.

11         3.      Attached hereto as Exhibit A is a true and correct copy of

12   excerpts of the transcript of the December 17, 2012 deposition of Relator Nyoka Lee

13   ("Lee Deposition").

14         4.      Attached hereto as Exhibit B is a true and correct copy of

15   excerpts of the transcript of the December 18, 2012 deposition of Relator Talala

16   Mshuja ("Mshuja Deposition").

17         5.      Attached hereto as Exhibit C is a true and correct copy of a

18   document entitled "Privilege Log," electronically mailed by Relators to the School

19   and Individual Defendants on December 10, 2012.

20         6.      Attached hereto as Exhibit D is a true and correct copy of a

21   document entitled "Plaintiff's Initial Disclosures," electronically mailed by Relators

22   to the School and Individual Defendants on September 10, 2012.

23         7.      Attached hereto as Exhibit E is a true and correct copy of

24   "Relator Nyoka Lee's Objections and Responses to Defendants Corinthian Colleges,

25   Inc., David Moore, and Jack D. Massimino's Interrogatories to Relator Nyoka Lee –

26   Set One, Dated November 9, 2012 (7 Items)," electronically mailed by Relators to

27   the School and Individual Defendants on December 10, 2012.

28         8.      Attached hereto as Exhibit F is a true and correct copy of

-1-

CORRECTED PHADKE DECL.
CASE NO. 07-CV-01984 PSG (MANX)

1  "Relator Talala Mshuja's Objections and Responses to Defendants Corinthian

2  Colleges, Inc., David Moore and Jack D. Massimino's Interrogatories to Relator

3  Talala Mshuja – Set One, Dated November 9, 2012 (7 Items)," electronically mailed

4  by Relators to the School and Individual Defendants on December 10, 2012.

5          9.      Attached hereto as Exhibit G is a true and correct copy of

6  Exhibit 5 to the Lee Deposition.

7          10.     Attached hereto as Exhibit H is a true and correct copy of

8  Exhibit 6 to the Lee Deposition.

9          11.     Attached hereto as Exhibit I is a true and correct copy of

10  Exhibit 7 to the Lee Deposition.

11          12.     Attached hereto as Exhibit J is a true and correct copy of

12  Exhibit 8 to the Lee Deposition.

13          13.     Attached hereto as Exhibit K is a true and correct copy of

14  Exhibit 13 to the Lee Deposition.

15          I declare under penalty of perjury under the laws of the United States

16  and the State of California that the foregoing is true and correct.

17          Executed on February 12, 2013, at San Francisco, California.

18

19                              */s/ Achyut J. Phadke*
                                 Achyut J. Phadke
20

21

22

23

24

25

26

27

28

-2-                          CORRECTED PHADKE DECL.
                             CASE NO. 07-CV-01984 PSG (MANX)

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA,           )
Ex Rel. NYOKA LEE and               )
TALALA MSHUJA,                      )
                                    )
                                    )
          Plaintiff,                ) No. CV-07-01984
                                    )      PSG (MANx)
     vs.                            )
                                    )
CORINTHIAN COLLEGES, INC.; ERNST & )
YOUNG, LLP; DAVID MOORE; and        )
JACK D. MASSIMINO,                  )
                                    )
          Defendants.               )
_____)


VOLUME I

VIDEOTAPED DEPOSITION OF:  NYOKA J. LEE

MONDAY, DECEMBER 17, 2012, 9:07 A.M.

SANTA ANA, CALIFORNIA


REPORTED BY:

KIMBERLY REICHERT, CSR
CERTIFICATE NO. 10986

**0003**

```
 1                IN THE UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                      WESTERN DIVISION

 4

 5

 6   UNITED STATES OF AMERICA,        )
     Ex Rel. NYOKA LEE and            )
 7   TALALA MSHUJA,                   )
                                      )
 8                                    )
                  Plaintiff,          ) No. CV-07-01984
 9                                    )     PSG (MANx)
          vs.                         )
10                                    )
     CORINTHIAN COLLEGES, INC.; ERNST & )
11   YOUNG, LLP; DAVID MOORE; and     )
     JACK D. MASSIMINO,               )
12                                    )
                  Defendants.         )
13   _____)

14

15

16

17          Videotaped deposition of NYOKA J. LEE,

18   Volume I, taken on behalf of the Defendants, before

19   Kimberly Reichert, Certified Shorthand Reporter No.

20   10986 for the State of California, with principal

21   office in the County of Orange, commencing at 9:07

22   a.m. on Monday, December 17, 2012, located at

23   Corinthian Colleges, Inc., 6 Hutton Centre Drive,

24   Santa Ana, California.

25
```

VALERIE RASMUSSEN COURT REPORTING   **949.888.7858**          2

**0004**

```
 1    schools and stuff like that, you know, like
 2    alternative schools.  So I guess that would be for
 3    profit.
 4        Q    What do you mean by "alternative schools"?
 5        A    Oh, they have schools that are like
 6    schools for students who don't do well in academic
 7    settings.  And they set up schools, alternative
 8    schools for their training, hands-on training in
 9    different areas.
10        Q    And were these high school students --
11        A    Yes.
12        Q    -- that attended the schools?
13        A    Uh-huh.
14        Q    Okay.  Other than --
15        A    Yes.
16        Q    Other than this consulting work that you
17    did with alternative schools from time to time prior
18    to 1999, did you have any other work that you did in
19    the education sector before 1999?
20        A    Let's see.  I can't remember anything.
21        Q    So let's talk about your employment at
22    Corinthian.  You started there in 1999?
23        A    Uh-huh.
24        Q    Do you recall what month you started?
25        A    Well, let's see.  I think it was at the
```

**0005**

 1   beginning of that year.

 2        Q    Okay.  And in what capacity were you

 3   employed in 1999 at Corinthian?

 4        A    I was employed as an independent test

 5   proctor.

 6        Q    What were your responsibilities in that

 7   position?

 8        A    To test students who were coming into the

 9   school to enroll and get an education.

10        Q    Did you have any other interaction with

11   the students other than proctoring the exams?

12        A    No.

13        Q    So you had no responsibility for

14   recruiting them to the school?

15        A    No.

16        Q    Is that right?

17        A    Not as a proctor, no.

18        Q    Okay.  And how were you paid as a test

19   proctor?

20        A    As an independent consultant.

21        Q    So did you have an independent contract

22   with the school?

23        A    Yes, I did.

24        Q    And what -- what was your pay based on?

25   Was it based on an hourly rate or how were you paid?

```
 1        A    I was paid hourly.

 2        Q    So the only thing your compensation

 3   depended on as a test proctor was how many hours you

 4   worked; is that right?

 5        A    Yes.

 6        Q    It didn't depend on how many students

 7   passed the test; is that right?

 8        A    That's correct.

 9        Q    And it didn't depend on whether they

10   enrolled in the school; is that correct?

11        A    That's right.  Correct.

12        Q    Did you receive any bonuses during the

13   time that you worked as a test proctor?

14        A    No, I did not.

15        Q    How long did you work as a test proctor

16   for the school?

17        A    Approximately nine months.

18   MS. YOUNG:  I'm handing you what we'll mark as

19   Exhibit 1.

20             (Defendants' Exhibit 1 was marked for

21   identification by the deposition officer and is

22   bound under separate cover.)

23   BY MS. YOUNG:

24        Q    Ms. Lee, what I just handed you is a

25   document titled "Independent Contractor Service
```

```
 1    Agreement."
 2            And if you turn to the third page, under
 3    the signature line for "Contractor," is that your
 4    signature there?
 5         A    This page (indicating)?
 6         Q    Correct.
 7         A    Yes, it is.
 8         Q    And did you sign this document on
 9    November 19th, 1999?
10         A    Yes, I did.
11         Q    And is this --
12         A    I thought it was the beginning of that
13    year.  I see it's 11/99.
14         Q    Is this when you commenced your employment
15    with Corinthian, in November of 1999?
16         A    I believe so, yes.
17         MR. LEVY:  Can you give her a minute to look
18    through it?
19    BY MS. YOUNG:
20         Q    Take a minute to look through the
21    document, Ms. Lee.
22         A    Okay.  Yes.  Okay.
23         Q    Okay.  And this is the agreement that set
24    out the terms of your employment as an independent
25    test proctor with the school?
```

```
 1        A    Yes.
 2        Q    At what location did you work as a test
 3   proctor for the school?
 4        A    San Francisco.
 5        Q    Did you work as a test proctor for the
 6   school in any other location?
 7        A    For this school or --
 8        Q    For Corinthian.
 9        A    No, I did not.
10        Q    Okay.  And then you think you were in this
11   position for about nine months?
12        A    Yes.
13        Q    What did you do next?
14        A    Well, I got recruited into the admissions
15   department.
16        Q    Okay.  Who recruited you?
17        A    Cary Kaplan, who was the director of
18   admissions at that time.
19        Q    And is this again at the San Francisco
20   campus?
21        A    Yes.
22        Q    Did you join the admissions department at
23   the San Francisco campus?
24        A    Yes.
25        Q    When did you do that?
```

```
1        A    What month or --

2        Q    If you can recall.

3        A    I think it was August.

4        Q    In August of what year?

5        A    So this was '99.  So that would have been

6   2000.  From 11 to -- to August.  I think that's nine

7   months, isn't it?

8        Q    Uh-huh.

9        A    Yes.

10       MS. YOUNG:  Well, I tested your memory.  I have

11  a document here we can look at that nails it down,

12  but let's see.  We'll mark this as Exhibit 2.

13            (Defendants' Exhibit 2 was marked for

14  identification by the deposition officer and is

15  bound under separate cover.)

16       THE WITNESS:  Thank you.

17  BY MS. YOUNG:

18       Q    So take a moment to look at this document.

19  This is a letter dated August 8th of 2000 titled

20  "Confirmation of employment."  And at the bottom it

21  says "Accepted by" and there's a signature.

22            Is that your signature at the bottom?

23       A    Yes, it is.

24       Q    And it says here that -- in the first

25  paragraph you can see it congratulates you on your
```

```
 1    new position at Bryman College.

 2              And it says, "Your starting date" -- at

 3    the end of that paragraph it says, "Your starting

 4    date will be August 14th, 2000."

 5              Does that sound about right?

 6    A      Uh-huh, it does.  Thank you.

 7    Q      Okay.

 8    A      Or should I say "yes."

 9    Q      I take it you read this letter before you

10    signed it?

11    A      Yes.

12    Q      Is that your practice, you read through

13    documents before you sign them?

14    A      Yes, it is.

15    Q      And you understood that signing the letter

16    would indicate your agreement with what was in the

17    letter; correct?

18    A      Yes.

19              Did I miss something?  Hopefully --

20    Q      No, I'm just --

21    A      Oh, okay.

22    Q      I'm asking for your thoughts in signing

23    the letter.

24    A      Yes, I signed it.  Mr. Plant gave it to

25    me.
```

```
 1       Q    Okay.  And it says here in the last
 2   paragraph, "Your signature below will acknowledge
 3   that there have been no representations by this
 4   company or its agents or any other agreements
 5   regarding your employment that are not reflected in
 6   this agreement."
 7            Do you see that?
 8       A    Yes, I do.
 9       Q    You read that before you signed it; is
10   that right?
11       A    Yes.
12       Q    And that was an accurate statement as of
13   the date that you signed that letter --
14       A    Yes.
15       Q    -- correct?
16            Okay.  And what was your title when you
17   were hired into the admissions department?
18       A    Campus admissions rep.
19       Q    What were your responsibilities in that
20   position?
21       A    My responsibilities were to recruit
22   students, motivate them to come to school -- come to
23   the school, interview them and get them tested if
24   they wanted to go to school and to encourage them to
25   meet with financial aid, see if they qualified, and
```

```
 1    also give them a tour of the school, and enroll
 2    them.  Make sure they started on time, they stayed
 3    in school until they graduated.
 4        Q    So it wasn't just to recruit them and get
 5    them into -- in the door; right, you had continuing
 6    responsibilities to these students?
 7        A    Yes, I did.
 8        Q    Okay.  Was career guidance one of those
 9    responsibilities?
10        A    Sorry?
11        Q    Was providing them with career guidance
12    one of those responsibilities?
13        A    Well, they didn't say I was supposed to do
14    that, but I did it.  You know, I provided them with
15    career guidance and encouraged them to continue
16    their education.
17        Q    Okay.  Did you have any responsibilities
18    as a campus admissions representative for
19    supervising other admissions representatives?
20        A    Well, that wasn't in my contract, but I
21    did it because I was good at my job and Cary Kaplan
22    trusted me and he wanted me to do it.
23        Q    As a campus admissions representative,
24    were you ever in a position to fill out a formal
25    performance evaluation of other admissions
```

```
 1   representatives?

 2        A    No, I was not.

 3        Q    So supervising other admissions

 4   representatives may have been something you did, but

 5   it wasn't officially part of your job description?

 6        A    No.  I wasn't really supervising them.  I

 7   was just being an example for them.

 8        Q    Okay.  And how long did you work as an

 9   admissions representative on the San Francisco

10   campus?

11        A    For about six years.

12        Q    Let's see if we can take a look at some

13   documents to maybe clear up the work history a

14   little bit.  I realize a lot of this is in the past.

15        A    Uh-huh.

16        Q    And I'm not trying to trick you.  I have

17   some documents that can maybe help us get a clear

18   chronology here.

19        A    Okay.  Great.

20        MS. YOUNG:  I'm sorry.  I keep bumping you.

21        THE VIDEOGRAPHER:  That's okay.

22        MS. YOUNG:  I'm handing you what we'll mark as

23   Exhibit 3.

24             (Defendants' Exhibit 3 was marked for

25   identification by the deposition officer and is
```

1 | bound under separate cover.)

2 | BY MS. YOUNG:

3 |     Q    And I'd ask you to hold on to it.  We

4 | might come back to it again a little later.  Oops.

5 | Why don't you give that to the court reporter to

6 | mark.

7 |     A    All right.

8 |     Q    And take a moment again to look at this

9 | document.  This is a letter dated June 4th, 2004.

10 | It states, "I am pleased to confirm Terry Harty's

11 | offer of employment and your acceptance of a

12 | position at Bryman College, Hayward campus."

13 |     A    Uh-huh.

14 |     Q    And then if you look on the second page,

15 | there's a signature line for "Accepted by."  Is that

16 | your signature in the line there?

17 |     A    It is.

18 |     Q    And the date on which this was signed was

19 | June 10th, 2004?

20 |     A    That's what this says, yes.

21 |     Q    Okay.  And do you recognize this document?

22 |     A    Yes, I do.

23 |     Q    And what is it?

24 |     A    Well, it's giving me an outline of my

25 | salary, of course, and the different dates that I

 1   was supposed to be trained for specific job

 2   descriptions that I was supposed to perform.

 3        Q    Okay.  This document states -- where it

 4   says "Start Date" in the margin on the first page,

 5   you commenced employment in this position on

 6   June 1st, 2004.  And the title in that same section

 7   says "Director of Admissions."

 8             Did you become a director of admissions at

 9   Hayward -- at the Hayward campus on June 1st, 2004?

10        A    Yes, I did.  I think that was the date,

11   but there was some confusion with that specific

12   transfer.  It didn't take place properly.

13        Q    Okay.

14        A    So I'm not sure if that's the correct

15   date.

16        Q    Did you start sometime in the month of

17   June in 2004 as the director of admissions at

18   Hayward?

19        A    It couldn't have -- it could be that date

20   or it could have been -- I'm sure if it said June, I

21   started in June.

22        Q    Okay.  In June 2004?

23        A    Yes.

24        Q    And were you working as an admissions

25   representative in the San Francisco campus up until

```
 1   that time, from 2000 up until that time?

 2        A    Yes.  Yes, I was.  Or, yes, I did I should

 3   say.

 4        Q    So I don't think that's quite six years.

 5   I think it's more like three years and -- and nine

 6   months at San Francisco before you became a director

 7   of admissions at Hayward.

 8        A    Oh, it was more than that.

 9        Q    Okay.  Well, I -- I thought we just talked

10   about you starting to work as an admissions

11   representative in San Francisco --

12        A    I was -- I thought you were speaking of

13   when I started employment because I did start in

14   1999.

15        Q    Okay.

16        A    And then I went into admissions.  So...

17        Q    All I'm trying to do is understand how

18   long you were an admissions representative in San

19   Francisco before you became the director of

20   admissions at Hayward.

21        A    Uh-huh.  Yeah.  Well, that's from 2000 --

22   let's see.  2000 to 2004, maybe.  Because I was a

23   student at University of Phoenix and I was an

24   admissions rep the whole time I was going to school

25   from when I started with my B.S. to when I finished
```

**0017**

```
 1   my courses, and my doctoral courses.

 2       Q    Okay.

 3       A    I was an admissions rep during that time.

 4   I was going to school and working at Bryman at the

 5   same time.

 6       Q    Okay.

 7       A    So that's how I was gauging how long I

 8   worked there.  And then I went to Hayward.

 9       Q    Okay.

10       A    Okay.  For a short period of time.

11       Q    Just focusing on your stint as an

12   admissions representative in San Francisco, that was

13   from August of 2000 until about the end of May 2004;

14   is that right?

15       A    Uh-huh.  Yes, something like that.

16   Uh-huh.

17       Q    All right.  And again, just focusing on

18   when you first started in San Francisco as a campus

19   admissions representative, how were you compensated?

20       A    Uh-huh.  As a campus rep?

21       Q    Uh-huh.

22       A    Well, I was salaried.  I was a salaried

23   employee.

24       Q    Okay.  And what was your starting salary?

25       A    I think it was on this page right here
```

```
 1    (indicating).  It said 38-.

 2         Q    Are you referring to what we've marked as

 3    Exhibit 2?

 4         A    This one, yeah, something like that.

 5    Yeah, right here (indicating).

 6         Q    Okay.  And the first paragraph says -- in

 7    the last sentence of the first paragraph it says,

 8    "As we discussed, your beginning salary is $38,400."

 9         A    Uh-huh, yes.

10         Q    Is that consistent with what you recall?

11         A    Yes, it is.

12         Q    And was there a compensation plan that

13    governed your employment as a campus admissions

14    representative?

15         A    Compensation plan would be like how much I

16    was receiving or --

17         Q    Well, was there any plan that told you

18    what you would have to do to be eligible for a

19    promotion or for a raise?

20         A    In writing?  There might have -- not at

21    that time.  There might have been something that

22    came up later.

23         Q    Uh-huh.

24         A    Okay.

25         Q    Yeah, I'm focusing just on when you were
```

```
 1    hired.  Did you ever --
 2         A    Well, this is what I received when I went
 3    in there, was this letter here.
 4         Q    Okay.  And did you --
 5         A    There was no compensation plan that came
 6    with this.
 7         Q    Okay.
 8         A    That I recall.
 9         Q    If you look at the second-to-last
10    paragraph in Exhibit 2 that you were just looking
11    at, the second-to-last sentence of that -- of that
12    paragraph says, "You will not be eligible for merit
13    increase consideration until October 1st, 2001" --
14         A    Uh-huh.
15         Q    -- "at which time you will be reviewed
16    again.
17              "Admissions representatives will be
18    reviewed for Meritorious Performance in accordance
19    with the Meritorious Performance Compensation Plan,
20    which will be given to you on your first day of
21    employment."
22              Do you see that?
23         A    Yes, I do.
24         Q    And do you recall getting a meritorious
25    performance compensation plan on your first day of
```

```
 1    employment?

 2        A    No, I don't.  I don't recall receiving

 3    that, but -- I recall receiving it later maybe, but

 4    not on this.

 5        Q    Okay.

 6        A    Because I was given so many papers.  It

 7    could have been there, but I don't remember it.

 8        MS. YOUNG:  Okay.  Let me show you a document

 9    that was produced to us by your attorney.  We'll

10    mark this as Exhibit 4.

11                (Defendants' Exhibit 4 was marked for

12    identification by the deposition officer and is

13    bound under separate cover.)

14        THE WITNESS:  Thanks.

15    BY MS. YOUNG:

16        Q    If you'd take a moment to review this.

17        MS. YOUNG:  For the record, this document is

18    titled "Corinthian Schools, Inc. Campus Based

19    Admissions Representative Compensation Plan,

20    Effective October 1st, 1998."

21        Q    And on the second page of this document,

22    again, there are some signature lines.  Is that your

23    signature at the bottom of the document?

24        A    Yes, it is.

25        Q    And this document says, "Received,
```

```
 1    acknowledged and agreed to this 10th day of August,

 2    2000."

 3             Do you see that?

 4        A    Yes, I do.

 5        Q    Did you receive this document on the 10th

 6    day of August 2000?

 7        A    As far as I know, it was -- I signed it

 8    the 10th.

 9        Q    And -- and this was produced to us by your

10    attorney.  So is this something that you maintained

11    in your own file?

12        A    Probably.  Sometimes things were moving so

13    fast, I might not have signed it on that date, but I

14    used that date.

15        Q    Okay.  Do you see on page 2 there's a

16    heading B, "Promotion Criteria"?

17        A    Yes, I do.

18        Q    And that makes reference to "the

19    achievement of the performance criteria outlined in

20    the enclosed promotional guidelines."

21             Do you see that at the end of that

22    paragraph?

23        A    I see that.

24        Q    Did you also receive the promotional

25    guidelines that this paragraph references?
```

```
 1        A      Probably.  I'm sure I must have.

 2        Q      Do you know what they were sitting here

 3   today?

 4        A      I'm not sure.  Not at this time.  I don't

 5   remember what they were.

 6        Q      When you were hired as an admissions

 7   representative in 2000, were you given any other

 8   documents that explained how you would be

 9   compensated or when you would be eligible for a

10   promotion or a -- or a raise other than what we've

11   discussed?

12        A      Not at that time.  I have to say that.

13        Q      Okay.  And when you were hired as an

14   admissions representative in 2000, did you discuss

15   with anybody at the school how you would be

16   compensated?

17        A      Compensated for enrollments or --

18        Q      For your -- for your work there.

19        A      Well, I discussed that with the director

20   I'm sure.

21        Q      Okay.  Do you recall the substance of that

22   discussion?

23        A      Let's see.  Not at this time.  I don't

24   recall that.

25        Q      Did you discuss with anyone at the school
```

```
 1    what you would have to do -- and again, this is

 2    focusing on the time when you were hired in August

 3    of 2000.

 4           Did you discuss with anyone at the school

 5    in August of 2000 what you would have to do to be

 6    eligible for a promotion or a raise?

 7        A    I'm sure I must have because I was told

 8    that I needed to enroll students.

 9        Q    Okay.

10        A    And I was hired to enroll students and

11    that's what I was supposed to do.

12        Q    Who told you you needed to enroll

13    students?

14        A    The director.  Everyone knew you get hired

15    to enroll students.  If you don't enroll students,

16    you get fired.  That was the general conversation in

17    the admissions department.

18        Q    Okay.  I want to understand exactly what

19    the conversation was about.  So is your

20    understanding that you needed to hire -- so -- so

21    you understood that you would be fired if you didn't

22    enroll students?

23        A    Yeah, if you didn't --

24        MR. LEVY:  Objection to form.

25        THE WITNESS:  In other words -- I'm sorry.
```

```
 1        MR. LEVY:  Objection to form.  It was just a
 2   little confusing.
 3        THE WITNESS:  Well, everybody knew if you
 4   didn't enroll students and meet your quotas, you
 5   were out of there.
 6   BY MS. YOUNG:
 7        Q    Okay.
 8        A    That was the general consensus in the
 9   admissions department.
10        Q    And what was --
11        A    So I got busy.
12        Q    What was the basis for that consensus?
13   Why did you believe that?
14        A    Because of what was happening around me
15   and what I was doing.
16        Q    Okay.  Tell me what that was.
17        A    I was recruiting students, getting them to
18   come to school and going by my leads that the
19   director gave me, leads -- he gave me specific
20   leads.  And I had to transform the leads into
21   interviews and interviews into enrollments,
22   conversion rates.  And I was responsible for doing
23   that.
24             That was my responsibility as an admission
25   rep -- admissions rep.  Leads to interviews,
```

1    interview -- interviews to enrollments, enrollments

2    to starts.

3        Q    Okay.  So we started off by talking about

4    whether you discussed with anyone what you were

5    required to do in order to get a promotion or a

6    raise.

7            Did you have a conversation with anyone

8    when you were hired at the school --

9        A    Uh-huh.

10       Q    -- in 2000 about what you had to do to get

11   a promotion or a raise?

12       A    I don't recall having specific

13   discussions.  I was given paperwork to read and told

14   by the director on many different occasions what I

15   had to do, but I don't remember the exact

16   conversations.  But I know that it was understood.

17   It was understood that you had to get enrollments

18   and -- and keep your numbers up.

19       Q    Okay.  You said you were told by the

20   director on many occasions about what you had to do.

21           Did you mean you were told by the director

22   on many occasions about what you had to do in order

23   to do your job or in order to get a promotion or a

24   raise?

25       A    Well, that's the same thing, isn't it?  Do

```
 1    my job and get a promotion.
 2         Q    Did the -- did your director specifically
 3    tell you what you had to do in order to get a
 4    promotion or a raise or is that something you were
 5    just implying from what she said or he said?
 6         A    No, I wasn't implying anything.  The
 7    director was circling the admissions department all
 8    the time to make sure that we converted our leads
 9    into interviews.
10         Q    Yeah, I understand that your job was to
11    recruit students and that your director was trying
12    to make sure you did that.
13         A    Okay.
14         Q    What I'm trying to understand is what
15    specifically he -- it was a "he"; right?
16         A    Uh-huh.
17         Q    -- what specifically he said to you, to
18    the extent he said anything --
19         A    Uh-huh.
20         Q    -- about how recruiting students would
21    translate into getting a promotion or a raise.
22         MR. LEVY:  Objection; form.
23         THE WITNESS:  Okay.  Let me see how I can word
24    this.  I knew that I had to enroll students to get a
25    raise if I wanted one, but I don't know if he
```

```
 1    specifically said that in our conversation, you
 2    know.
 3              That's what you're getting at; right?
 4    BY MS. YOUNG:
 5       Q    Yeah.  I'm trying to understand how you --
 6    what made you know that you had to enroll students
 7    in order to get a raise?
 8       A    The admissions environment made me know
 9    that and the director of education, everything that
10    was happening at school made me know that.
11       Q    Did anyone specifically tell you, "You
12    have to enroll a certain number of students to get a
13    raise"?
14       A    Yes, the director would tell me that and
15    also the president, Mr. Plant, would tell me that,
16    and other admissions reps would tell me that.
17       Q    So the director told you you had to enroll
18    students to get a raise?
19       A    Uh-huh.
20       Q    The director's name was?
21       A    Cary Kaplan.
22       Q    You say the president told you you would
23    have to enroll students to get a raise?
24       A    The president told me that.
25       Q    And the president's name was?
```

```
 1          A     And Jim Martin told me that.

 2          Q     Back up.  The president's name was?

 3          A     Mr. Plant.  At that particular time when I

 4   was there it was Mr. Plant.

 5                And Jim Martin would come and we would

 6   have admissions meetings and -- and they would go

 7   over the script with us and tell us what we had to

 8   do to increase our numbers.

 9          Q     Who is Jim Martin?

10          A     Well, at that time he was vice president

11   of marketing and sales.

12          Q     You said other admissions representatives

13   would say you had to enroll students to get a raise?

14          A     Yeah, people that had been working there

15   for a long time before I started.

16          Q     Who were they?

17          A     Who were those people?

18          Q     Who told you -- who were the admissions

19   representatives who told you, "You have to enroll

20   students to get a raise"?

21          A     Well, the people were -- that were working

22   there at that time.  I'm sure they're not there now.

23          Q     Do you recall any of their names?

24          A     Yes, I recall their names.

25                Would you like for me to give them to you?
```

```
 1        Q    I would.
 2        A    Estella Aranas, Jan Dixon, Steve Aranas
 3   (sic).  Let's see.  I can remember some other people
 4   that were in that department at that time.  Katie
 5   Aspen, Daniel Vargas.
 6             You need more?
 7        Q    I want the names of everybody you can
 8   remember who told you --
 9        A    Okay.  Well, that's it.
10        Q    Just a minute.
11             -- who told you you have to enroll
12   students to get a raise.
13        A    Well, they didn't say, "You have to enroll
14   students to get a raise."  They said, "You have to
15   enroll students to keep your job."  Now, if you kept
16   your job, you could get a raise.
17        Q    So just so I'm clear --
18        A    Uh-huh.
19        Q    -- these admissions representatives you
20   just identified --
21        A    Uh-huh.
22        Q    -- none of them said to you, "You have to
23   enroll students to get a raise"; is that correct?
24        A    Well, they all said that.  People talked
25   in the admissions department.  Everybody talked
```

1   about what you had to do to keep your job.  And that

2   was part of the conversation that everybody knew and

3   everybody talked about and everybody was pressured

4   about.

5        Q    I just -- I just want to make sure that

6   we're clear on --

7        A    Uh-huh.

8        Q    -- the difference between getting a raise

9   and being fired; okay?

10       A    Okay.

11       Q    So was the communication to you, "You need

12  to enroll students to get your job"?

13       A    To keep your job.

14       Q    To keep your job?

15       A    Yeah.

16       Q    Okay.

17       A    Because if you didn't have your job, you

18  couldn't get a raise, of course.

19       Q    Okay.  But did anyone say to you, "You

20  need to enroll students in order to get a raise"

21  without talking about whether you needed to keep it

22  -- do it to keep your job?

23       A    Well, the bottom line was if you enrolled

24  X amount of students, you got a raise.  That was the

25  bottom line of that conversation.

```
 1              Now, what don't you understand?  Maybe I
 2    could make you -- clear it up.
 3         Q    Well, I'm trying -- I'm trying to
 4    understand where -- how you personally got to that
 5    bottom line.
 6              Is that something that you --
 7         A    I got there from working in admissions and
 8    being in the daily routine of the job.
 9         Q    Okay.  So you arrived at the bottom line
10    based on what you personally had to do in the job;
11    correct?
12         A    That's right.
13         Q    Which was to enroll students?
14         A    Recruit them, enroll them, test them.
15         Q    And your job -- okay.
16         A    Let them get -- meet with financial aid
17    and start to school.  That was what I had to do.
18         Q    And you also arrived at the bottom line
19    because people talked about you would get fired if
20    you didn't enroll students?
21         A    Well, people were getting fired.  I was --
22    I saw what was happening.  I saw exactly what was
23    happening.  In other words, I was able to put it all
24    together in my head about what I needed to do for
25    myself to stay employed.  And I got that from other
```

```
 1    admissions reps, admissions reps from other schools,
 2    you know, talking on the phone, observing people and
 3    listening to conversations.
 4        Q    Okay.  But -- but the conversations you
 5    were listening to that caused you to conclude --
 6        A    Uh-huh.
 7        Q    -- that you needed to enroll students to
 8    get a raise were conversations about you could get
 9    fired if you don't enroll enough people?
10        A    Yeah, and I saw people getting fired who
11    weren't doing it.
12        Q    Were there any other types of
13    conversations that led you to believe that you had
14    to enroll students in order to get a raise?
15        MR. LEVY:  Objection; form.
16        THE WITNESS:  Well, I don't remember any.  That
17    was enough.  I didn't, you know -- I was in
18    admissions and I was doing what I had to do for my
19    spot in the cubby hole.  And that's how I performed
20    like that.  I didn't really talk to other people,
21    you know.
22             I heard conversations when I was working
23    there.  I just did my job and I enrolled students
24    and recruited them.  I mostly talked to my students
25    and I saw what was happening in the department.
```

SER 0048

```
 1   BY MS. YOUNG:
 2       Q    And again, what you saw was happening was
 3   people were getting fired if they didn't enroll
 4   enough students; right?
 5       A    Yes, ma'am.
 6       Q    Okay.  And again, this is --
 7       A    And I got fired for not meeting my numbers
 8   when I went to Hayward.  So -- and then I got hired
 9   again and then fired again for not meeting my
10   numbers.
11       Q    Okay.
12       A    So if you didn't meet your numbers,
13   basically, the bottom line is you get fired.
14   They're not going to pay you to not enroll students.
15       Q    Uh-huh.
16       A    That was the general consensus in that
17   department.
18       Q    Okay.
19       A    Okay.
20       Q    And we'll talk about all of that later.
21   I -- I just want to keep focusing on your -- your
22   first round of employment in San Francisco from 2000
23   to 2004; okay?
24       A    Okay.  Uh-huh.
25       Q    So other than the documents that we've
```

```
1        Q    Okay.  And the 2000 date is the correct

2   date; is that right?

3        A    I think it is because that's this date

4   here.  This says 10th and that says the 14th, but

5   like I said, things were misconstrued sometimes

6   there at that campus.  And sometimes I would get

7   papers and I wouldn't even sign them until a month

8   later maybe.  I don't know.  It wasn't necessarily

9   always on the date I got it.

10       Q    Okay.  But to the best of your

11   recollection, you started working as an admissions

12   representative at the San Francisco campus in August

13   of 2000?

14       A    August -- because my hire date was 1999,

15   November.  So I was a proctor for nine months and I

16   went into admissions that August.

17       Q    Okay.

18       A    So that would make it 2000.

19       Q    Okay.  Now, I think we looked earlier at a

20   compensation plan --

21       A    I don't know why that was '01.  I'm not

22   sure.

23       Q    Okay.

24       A    Okay.

25       Q    I think we looked earlier at a
```

```
 1   compensation plan that you signed when you first

 2   started as a campus admissions representative in San

 3   Francisco.

 4            Do you recall that?

 5       A    Excuse me.  One of these documents

 6   (indicating)?

 7       Q    I think it was what we marked as

 8   Exhibit 4.

 9       A    Okay.  That's this -- that's this one.

10   2000.

11       Q    Okay.

12       A    Uh-huh.

13       Q    And we now have in front of us a

14   compensation plan that you've signed in November of

15   2001.

16            Do you --

17       A    Which exhibit is that?

18       Q    Exhibit 5.

19       A    Okay.  This one.  Okay.

20       Q    Why did you sign a new compensation plan?

21       MR. LEVY:  When?

22   BY MS. YOUNG:

23       Q    In 2001.

24       A    I don't recall.  I don't know why.  It's

25   signed right here.  I don't know why this happened.
```

1      Q    Okay.  Before you signed this document,
2  did you go over it with anyone else?
3      A    I don't recall.
4      Q    Did anyone tell you that the school
5  doesn't actually follow this plan?
6      A    Why would I be signing it and they give it
7  to me if they don't follow it?  I don't understand
8  the question.
9      Q    So no- -- nobody told you that "Here's the
10 plan, but we don't actually follow this plan," did
11 they?
12     A    I don't remember anybody telling me that,
13 but it probably happened because they were always
14 saying something that might not happen sometimes,
15 you know.
16     Q    It probably happened, but you don't know
17 if, in fact, it did happen, do you?
18     A    Are you speaking of this document here or
19 just things in general?
20     Q    No, I'm speaking about my question to you.
21     A    Okay.
22     Q    Which was did anyone tell you, "Here's the
23 plan, but we don't actually follow it"?
24     MR. LEVY:  Objection to form.
25     THE WITNESS:  Nobody told me that.  I don't

```
 1  recall anyone telling me that.

 2  BY MS. YOUNG:

 3      Q    Let's look at the document within here

 4  that starts -- it's actually page 4 of the exhibit.

 5  The title of it is "Minimum Standards of

 6  Performance."

 7      A    The one you just gave me?

 8      Q    Correct.  It's what we've marked as

 9  Exhibit 5.

10      A    I don't see a page 4.

11      Q    It's not numbered as page 4, but it is the

12  fourth page in the document.

13      A    Okay.

14      Q    And the title on it is "Minimum Standards

15  of Performance."  That's it (indicating).

16      A    Okay.

17      Q    Okay.  Are you with me?

18      A    I'm with you.

19      Q    Okay.  What's your understanding of what

20  this document is?

21      A    Well, it looks like what I was supposed to

22  do as an admissions rep.

23      Q    Okay.

24      A    Take all inquiry calls, return inquiry

25  calls.  That's what I was supposed to do.  It takes
```

 1    -- it looks like that to me, what I -- what my

 2    duties were.

 3        Q    Okay.  And there's a list of 18 things

 4    here on this document.

 5        A    Uh-huh, yes, I see it.

 6        Q    Were you supposed to do all those 18

 7    things as an admissions representative?

 8        A    Probably, which was a lot.

 9        Q    Uh-huh.  So let's just talk about a couple

10    of them.  The first one is "Take all inquiry calls

11    from all potential students interested in knowing or

12    receiving information about the programs, including

13    entrance requirements, curricula and academic

14    standards."

15        A    Uh-huh.

16        Q    Was that one of the requirements of your

17    job?

18        A    Yes.

19        Q    Did you strive to do that?

20        A    I strived to do everything that's on this

21    list.

22        Q    Okay.  And were your calls monitored, your

23    phone calls with prospective students, were they

24    monitored by your director of admissions?

25        A    Sometimes and they would tell us that it

 1   was monitored by corporate.

 2        Q    Okay.  And what was your understanding of

 3   the purpose of having those calls monitored?

 4        A    I guess they wanted to make sure we were

 5   doing our job.  I don't know.  I never discussed

 6   that with anyone.

 7        Q    Did you understand that your performance

 8   was being evaluated based on how you were

 9   communicating with the prospective students?

10        A    Yes.

11        Q    And that was one of the factors that your

12   director of admissions was looking at?

13        A    All the time.

14        Q    When you were doing your job; right?

15        A    Yes, uh-huh.

16        Q    No. 2 says, "Return inquiry calls promptly

17   to all potential students and give accurate

18   information about the programs, including entrance

19   requirements, curricula and academic standards."

20        A    Yes.

21        Q    And that was another responsibility in

22   your job?

23        A    Yes.

24        Q    And you tried to do that; right?

25        A    Yes.

```
 1        Q      And this meant, among other things, noting
 2   how -- giving accurate information to students?
 3        A      Giving as accurate as it was given to me.
 4        Q      Okay.  And was that important to you, to
 5   make sure students got accurate information?
 6        A      It was very important to me because I was
 7   a student myself and I didn't want to misinform
 8   anyone.
 9        Q      Uh-huh, of course.  And -- and did you
10   understand that your director of admissions was
11   monitoring you to see that you were giving accurate
12   information to students?
13        A      Yes, I sat right across from his office.
14   He could hear me talking.
15        Q      And you understood that he would be
16   evaluating your performance in part based on whether
17   you were giving accurate information to people; is
18   that right?
19        A      That was probably his job, to monitor me
20   on that, yes.
21        Q      And you understood that that was his job;
22   right?
23        A      Uh-huh.  Yes, I did.
24        Q      No. 3 is "Accurately classify all
25   inquiries by the appropriate media source and
```

```
 1    account for all inquiries."

 2            Do you see that?

 3        A    Yes, I do.

 4        Q    And that -- that again was part of your

 5    responsibilities; correct?

 6        A    Yes.

 7        Q    Okay.  And you tried to do that in your

 8    job?

 9        A    Yes, I did.

10        Q    And was it your understanding that your

11    director was monitoring your performance to see if

12    you accurately classified all inquiries that came

13    in?

14        A    Yes, he would do that through the flash

15    sheets.

16        Q    Okay.  And "classify all inquiries by the

17    appropriate media source," what does that mean?

18    What do you understand that to mean?

19        A    Which one is that?  No. 4?

20        Q    It's No. 3.

21        A    No. 3.  That meant that -- the media

22    source would be the zip code from all the leads that

23    I received.

24        Q    Okay.

25        A    It would have a zip code on it.  So I
```

 1    would organize those leads in zip codes when I would

 2    call my students.

 3        Q    Okay.

 4        A    I believe that's what that means.

 5        Q    Okay.  And I'm not going to go through all

 6    of these, but just to touch on a couple of other

 7    ones.

 8             No. 5, "Comply with governmental

 9    regulations and standards of accreditation as they

10    relate to enrolling students."

11             Do you see that?

12        A    Yes, I do.

13        Q    And that was part of your job

14    responsibilities as an admissions representative?

15        A    Yes, it was.

16        Q    And did you understand that your

17    performance was being evaluated in part by whether

18    you were complying with the governmental regulations

19    and standards of accreditation as they relate to

20    enrolling students?

21        A    Yes, because I explained all that to my

22    students.

23        Q    Okay.  Another thing on here was -- just

24    take a look at No. 14 and No. 15.  They're kind of

25    related.  "Ensure that all pre-start paperwork is

1    completed."

2              That was part of your responsibilities?

3        A    Yes.

4        Q    And you tried to do that?

5        A    Yes.

6        Q    And you understood that your performance

7    would be evaluated based in part on whether your

8    prestart paperwork was complete; correct?

9        A    Correct.

10       Q    And same thing with No. 15, "Keep all

11   required reports current and accurate"?

12       A    I did all those things, yes, I did.

13       Q    And you understood that your performance

14   was being evaluated in part on whether you kept

15   required reports current and accurate?

16       A    Yes, I suppose that's what Cary did

17   because I didn't -- you know, he had his own rules

18   for his evaluations on everybody in the department.

19       Q    Okay.  Say that one more time.

20       A    You know, he -- he evaluated all of his

21   admissions reps.  So I'm sure he had his own

22   evaluation criteria.

23       Q    Do you know what his evaluation criteria

24   were?

25       A    No, I never had a conversation with him

```
 1    about it, but he expected high standards.  I know
 2    that.
 3         Q    Uh-huh.
 4         A    That's what he was getting from me.
 5         Q    Okay.
 6         A    Maybe he went by this list.  I don't know
 7    anything about that.
 8         Q    Okay.
 9              Again, I'm so sorry.
10         THE VIDEOGRAPHER:  If this is a good time, I'll
11    switch the tapes over now.
12         MS. YOUNG:  Yes.  Off the record.
13         THE VIDEOGRAPHER:  The video deposition is now
14    going off record at 10:42 a.m.  This will also
15    conclude video No. 1 in today's deposition.
16                   (A recess was taken from 10:42 a.m.
17    to 10:51 a.m.)
18         THE VIDEOGRAPHER:  The video deposition of
19    Nyoka J. Lee, Volume No. 1, is returning to record
20    at 10:51 a.m.  This will also begin video No. 2 in
21    today's deposition.
22              The location is still 6 Hutton Centre
23    Drive, Fourth Floor, in Santa Ana, California.  The
24    date is still Monday, December 17th, 2012.
25              And my name is Ali Saheb with Dean Jones
```

```
 1   Attorney Video Services in Los Angeles and

 2   Santa Ana, California.

 3   BY MS. YOUNG:

 4       Q    Ms. Lee, I would remind you you're still

 5   under oath.  Do you understand that?

 6       A    Yes, I do.

 7       Q    And is there anything you would like to

 8   change about your testimony you've given today?

 9       MR. LEVY:  No, there's nothing she would like

10   to change.

11       MS. YOUNG:  I'm asking the witness.  I would

12   like an answer from the witness.

13       THE WITNESS:  No.

14   BY MS. YOUNG:

15       Q    Okay.  And just remember, our court

16   reporter is trying to take everything down.

17       A    Uh-huh.  Yes.

18       Q    And sometimes you've been jumping in

19   before I finish my question.  So please make an

20   effort to wait for me to finish completely before

21   you answer; okay?

22       A    Yes.

23       MS. YOUNG:  Okay.  I'm handing you what we're

24   going to mark as Exhibit 6.

25                    (Defendants' Exhibit 6 was marked for
```

```
 1    identification by the deposition officer and is

 2    bound under separate cover.)

 3    BY MS. YOUNG:

 4         Q    Now, this is a document titled

 5    "Confidential Employee Performance Review."  You see

 6    on the last page where there's a line for a

 7    signature, employ- -- for "Employee Acknowledgment."

 8              Is that your signature?

 9         A    Yes, it is.

10         Q    And it's dated November 19, 2001?

11         A    Yes, it is.

12         Q    And beneath that it says, "Review of

13    Performance Discussion Summary and Employee

14    Comments."

15              Do you see that?

16         A    Yes, I do.

17         Q    Do you recognize the signature beneath

18    that line?

19         A    Yes, it looks like Mr. Plant's signature.

20         Q    Okay.  And there are a couple of other

21    signatures on the same page in the box with section

22    Roman numeral VI.  One is over a line for

23    "Supervisor."

24              Do you see that?

25         A    Yes.
```

```
 1        Q    Do you know whose signature that is?

 2        A    Cary Kaplan.

 3        Q    Okay.  And where it says "Approval," do

 4   you know whose signature that is?

 5        A    It looks like Mr. Plant's signature.

 6        Q    Do you know whether Mr. Plant had to

 7   approve this document?

 8        A    Well, he obviously did.  It's his

 9   signature on it.  He's the president of the school.

10        Q    Okay.  What is this document?

11        A    It says "Employee Performance Review."

12        Q    Is this a performance review that you

13   received while working on the San Francisco campus?

14        A    I was working there at that time, yes.

15        Q    And is this a performance review you

16   received?

17        A    Well, it's got my name on it and everybody

18   else's, so I received it.

19        Q    Okay.  Do you know -- and this form has

20   scores that are identified in various columns.

21        A    I see that.

22        Q    You'll see in section three there's a four

23   or a five in some of these columns, and then there

24   are other scores that are noted in the "Overall

25   Employee Rating" box there.
```

```
 1                  Do you see that?
 2        A    Yes, I do.
 3        Q    Do you know how the scores on this form
 4   were awarded?
 5        A    Well, the director put them in there, the
 6   director of admissions.
 7        Q    And that was Cary Kaplan?
 8        A    Yes.
 9        Q    Do you know how Cary Kaplan decided what
10   score --
11        A    No, I do not.  I don't know how he did it.
12   All I saw was the numbers.
13        Q    Okay.
14        A    I don't know how he came to the
15   conclusion.  He never told me how.
16        Q    Okay.  And just remember to wait for me to
17   finish my question first, please.
18        A    Okay.
19        Q    Okay.  Let's take a look at section three
20   of this form.  It says "Performance Categories," and
21   then there are several of them listed here.
22                  Do you see that?
23        A    Which one?
24        Q    In section three of the form.
25        A    I see three, yes.
```

```
 1        Q     In that section there are a number of

 2   different categories listed beneath that.

 3              Do you see that?

 4        A     Uh-huh.  Yes, I do.

 5        Q     There are about 15 different categories?

 6        A     Uh-huh.

 7        Q     Okay.  And they're scored either

 8   "Improvement Critical," "Needs Improvement,"

 9   "Satisfactory," "Good" or "Excellent."

10              Do you see that?

11        A     Yes, I do.

12        Q     Okay.  You don't know how Mr. Kaplan

13   decided where you fell in this grid, do you?

14        A     No, I don't know how he made his

15   decisions.

16        Q     Do you agree with the scores that you

17   received here?

18        A     I agree in terms of if they're accurate

19   or --

20        Q     Yeah, is that an accurate assessment of

21   your performance?

22              For example, the first criteria,

23   "demonstrates job knowledge and skill level required

24   for the position," and you got a five for excellent.

25              Did you agree with that assessment?
```

```
 1        A    When I first looked at this, I probably
 2   didn't agree.
 3        Q    Why not?
 4        A    Because I felt I was excellent in all
 5   those areas, but I didn't get excellent.  But, you
 6   know, like I said, I don't know how he evaluated me.
 7        Q    Okay.  So you got "Good" in some and
 8   "Excellent" in others.  You felt you should have
 9   gotten "Excellent" in everything; is that right?
10        A    Yeah.
11        Q    And none of these categories here ask
12   whether you met an enrollment quota, do they?
13        A    I don't see that on there.  No, I don't.
14        Q    Take a look at section four, "Major
15   Accomplishments."
16        A    Okay.
17        Q    And right under that it says, "Zero to 25
18   Points of Evaluation," and then there's a little
19   narrative about your work.
20             Do you see that in that box?
21        A    Uh-huh.  Yes, I do.
22        Q    It says, "Nyoka has an outstanding work
23   ethic; arrives to work focused and prepared.  She is
24   highly organized and pays attention to detail.  She
25   relates exceptionally well with students and has
```

```
 1    excellent customer service.  It is my recommendation
 2    that Nyoka receive a promotion from Campus
 3    Admissions Representative to Senior Admissions
 4    Representative."
 5            Do you see that?
 6        A    Yes, I do.
 7        Q    And did you agree with that assessment of
 8    your performance?
 9        A    Yes, of course, I did.
10        Q    And again, you don't know how Mr. Kaplan
11    arrived at this particular assessment; right?
12        A    Not from these numbers here, if that's
13    what you're asking me.
14            These numbers here (indicating), you're
15    asking me about them?
16        Q    No, I'm asking about what he wrote in --
17    in the box No. 4.
18        A    I have no idea other than the fact that he
19    observed me when I was working and he wrote
20    something he was feeling honest about.
21        Q    Okay.  So you have no knowledge of
22    Mr. Kaplan's basis for the ultimate score he awarded
23    you on this performance evaluation?
24        A    How could I know?  No.
25        Q    Were you offered a promotion at this time?
```

1      A    When I received this paper?

2      Q    Correct.  And remember --

3      A    According to this, I was offered one from

4    campus to senior.

5      Q    Okay.  It says, "It's my recommendation

6    that Nyoka receive a promotion from Campus

7    Admissions Representative to Senior Admissions

8    Representative."

9           Do you --

10     A    And I'm sure he based that on my numbers.

11     Q    Okay.  Why are you sure he based that on

12   your numbers?

13     A    Because he based everything on numbers,

14   you know, and then he had to fill this in because

15   this is the paper that they gave him to fill in.  So

16   he had to fill it in.

17     Q    Okay.  But he didn't tell you he was

18   making the recommendation for your promotion because

19   you met your numbers, did he?

20     A    He always told me that.

21     Q    He told you that you were being

22   recommended for a promotion because you met --

23     A    Well, he was always interested in my

24   numbers.

25     Q    Oh, I understood he was interested.

```
 1        A     Uh-huh.

 2        Q     I want to understand if he told you that

 3   the reason he was recommending you for promotion --

 4        A     Yes, he told me that.  Yes, he did.

 5        Q     Let me finish my question.

 6        A     Okay.  Sorry.

 7        Q     I want to understand if he told you that

 8   the reason that he was recommending you for

 9   promotion on this form in November of 2001 --

10        A     Yes.

11        Q     -- was because of the numbers that you met

12   as an admissions representative?

13        A     Yes.

14        Q     When did that conversation take place?

15        A     I have no idea.  I can't answer that

16   question.

17        Q     Did anyone else hear that conversation?

18        A     I don't know.

19        Q     What else did he say during that

20   conversation?

21        A     I don't know.

22        Q     Do you know where it happened?

23        A     Probably in the admissions department.

24        Q     Okay.  Was it in his office?  Was it in

25   the hallway?
```

```
 1        A    It could have been in his office.  It
 2   could have been in the hallway.  It could have been
 3   at lunch.  It could have been --
 4        Q    It could have been, but you don't remember
 5   where it was?
 6        A    No, I don't remember when I had that
 7   conversation with Cary, but he was always talking
 8   about it with me.
 9        Q    About what?
10        A    My numbers.
11        Q    Your numbers?
12        A    Yes.  Because my numbers meant his
13   numbers.
14        Q    Uh-huh.
15        A    So that's how that worked.
16        Q    Okay.  But you can't recall if you
17   actually got promoted at this time, can you?
18        A    Well, this is the paperwork for it.  This
19   was my promotion right here.  That's what this is.
20   It says it right there, campus rep to admissions rep
21   -- I mean, to senior rep.
22        Q    Where are you looking?
23        A    Right here (indicating).
24        Q    Where it says a "recommendation"?
25        A    Yes.
```

1      Q    You don't -- you don't know if that

2  recommendation was accepted, do you?

3      A    I worked there.  Of course, it was

4  accepted because I was still at that company.

5      Q    Were you promoted to senior admissions

6  representative in November of 2001?

7      A    I was promoted, yes, and then I got

8  promoted again.

9      Q    My question was --

10     A    Yes, I was promoted.

11     Q    Please let me finish my question before

12 you answer.

13     A    Okay.

14     MR. LEVY:  Objection to form.

15     THE WITNESS:  Finish, finish.

16 BY MS. YOUNG:

17     Q    Were you promoted to a senior admissions

18 representative in November of 2001?

19     A    Yes, I was.

20     Q    And you're certain of that date?

21     A    Yes, I am.

22     MS. YOUNG:  Let's take a look at some other

23 documents.  I'm handing you what we're marking as

24 Exhibit 7.

25              (Defendants' Exhibit 7 was marked for

```
 1    identification by the deposition officer and is

 2    bound under separate cover.)

 3    BY MS. YOUNG:

 4        Q    This is a document that was produced to us

 5    by your lawyer.  It's titled "Corinthian Colleges,

 6    Inc. Turnaround Document."

 7             Do you see that at the top?

 8        A    Yes, I do.

 9        Q    Okay.  And look in the box where it says

10    "Job Information."  Do you see that?

11        A    Which one?

12        Q    No. 4.  It's got the number 4 by it.

13        A    Yes, I see that.

14        Q    Okay.  And then it has one column that

15    says FDT (sic).  Do you have an understanding of

16    what that means?

17        A    Up here, FDT -- EFFDT?  Is that the one

18    you're looking at?

19        Q    Uh-huh.

20        A    No.  What is it?

21        Q    No.  I'm asking if you understand what

22    that means?

23        A    I said no.  What is it?  I'm asking you

24    what it is.

25        Q    I'm not here to answer the question,
```

```
 1    Ms. Lee.
 2         A    Okay.  Well, then, no, I don't.
 3         Q    So you don't know if that means "effective
 4    date" or something else?
 5         A    It probably means -- EFFDT probably means
 6    "effective date."
 7         Q    Okay.  And right underneath that is the
 8    date August 2nd, 2002.
 9         A    Uh-huh.  I see that.
10         Q    In that same row it says, "Job Title,
11    Senior Campus Admissions Representative."  Do you
12    see that?
13         A    Yes, I do.
14         Q    Did you -- were you promoted to senior
15    campus admissions representative on August 2nd of
16    2002?
17         A    Well, if this is saying -- I'm not sure if
18    these dates are correct, you know.  I'm not sure,
19    but I know I was promoted from campus to senior,
20    senior to master.
21         Q    Uh-huh.
22         A    I don't know if the dates are correct.  I
23    can't tell you at this moment.
24         Q    Okay.
25         A    Because that transpired already.  I can't
```

```
 1    tell you that.

 2         Q    Okay.  Is that your signature at the

 3    bottom of this document?

 4         A    It is.

 5         Q    And this document was signed on

 6    November 5th, 2003?

 7         A    Yes, it is.  According to this paper, yes.

 8         Q    Okay.  And where you see the numeral

 9    ten -- do you see that?

10         A    Yes, I see No. 10.

11         Q    Where it says "Remarks," it says, "Changed

12    From Senior to Master Rep."  Do you see that?

13         A    Yes.

14         Q    Did you receive a promotion from senior to

15    master representative on or around November 5th,

16    2003?

17         A    According to this document, I was.

18         Q    Is that consistent with your recollection?

19         A    As far as I can tell, yes.

20         Q    Okay.  So is it fair to say you're not

21    sure exactly when or exactly what the date was when

22    you were promoted from a campus admissions

23    representative to a senior admissions

24    representative?

25         A    I don't recall that because it was a while
```

```
 1   ago.  I don't know those dates.

 2        Q    Okay.  That's completely understandable.

 3        A    So no is the answer.

 4        Q    Okay.  So you mean yes, it's fair to say

 5   that you don't remember exactly when you received

 6   that promotion?

 7        A    Yes, it's fair to say that.

 8        MS. YOUNG:  I'm handing you what we will mark

 9   as Exhibit 8.

10             (Defendants' Exhibit 8 was marked for

11   identification by the deposition officer and is

12   bound under separate cover.)

13        THE WITNESS:  Thank you.

14   BY MS. YOUNG:

15        Q    This is another turnaround document.  Is

16   that your signature at the bottom of the page?

17        A    That's my signature.

18        Q    Okay.  And it's dated in March of 2002.

19   Do you see that?

20        A    Yes, I do.  I can't see the two on my

21   signature, but I see it above that, yes.

22        Q    Did you receive a raise in or around March

23   of 2002?

24        A    This looks like I did.

25        Q    Okay.  Do you recall the reason for that
```

```
 1   raise?
 2       A    It looks like Mr. Plant was in a good mood
 3   that day.  I don't know.  I don't recall the reason,
 4   but I'm looking at this paper and it looks like I
 5   received a raise.
 6       Q    Okay.  And the other people who signed
 7   these documents, do you recognize those other
 8   signatures?
 9       A    Yes, it's Cary and Mr. Plant.
10       Q    Okay.
11       A    Same signatures.
12       Q    Okay.  In the -- next to the numeral ten
13   there's a box called "Remarks."  Do you see that?
14       A    Yes, "Employee Hires."  That's where you
15   are?
16       Q    Uh-huh.  And it says, as best I can tell
17   from reading the handwriting, "Employee hired in at
18   very low wage and new employees with less experience
19   are hired in at projected wages of something like
20   $45,000 due to high cost of Bay Area."
21            Do you see that?
22       A    I see it.
23       Q    Do you recall being given that reason as
24   the reason why you were getting this raise?
25       A    No, I don't recall that.
```

```
 1        Q    You don't recall any reason you were given

 2   for getting this raise; is that correct?

 3        A    No, I don't recall, but I see what

 4   Mr. Plant wrote.

 5        Q    Okay.  We looked in Exhibit -- what was

 6   it -- Exhibit 7 a document showing that you received

 7   a promotion from senior to master campus admissions

 8   representative.

 9             Do you see that?

10        A    Yes, I do.

11        Q    What's your understanding of why you

12   received that promotion?

13        A    Once again, Blanca, anytime you received a

14   raise, it was because you had outstanding numbers

15   for enrolling students.  And I'm -- I'm pretty sure

16   I enrolled some students.  And I got it because

17   that's how you got your raises.

18        Q    And again, did you have a conversation

19   with anyone in which they told you that the reason

20   you were being -- getting that promotion from

21   master -- senior to master campus admissions

22   representative in 2003 was because of the number of

23   people you enrolled?

24        A    No, I do not recall a conversation like

25   that, but I know that anytime anybody received a
```

```
 1   raise in admissions, it was because of how they

 2   enrolled their students -- excuse me, how many

 3   students they enrolled, their conversion rates and

 4   all of that.

 5        Q    And again, you know that because --

 6        A    That's how admissions is run or was run.

 7   I don't know how it's run now, you know.

 8        Q    Okay.  That's how it you was run at the

 9   time you were employed at the school?

10        A    When I was employed there, that's how

11   admissions was run.

12        Q    And the time you were employed there was

13   from 1999 until 2005; correct?

14        A    That's correct.

15        Q    May of 2005; correct?

16        A    To my knowledge.

17        Q    Okay.  And you don't know how admissions

18   was run after you left in May of 2005?

19        A    And I don't know how it was run before I

20   got there, but that's how it was run when I was

21   there.

22        Q    Okay.

23        A    Okay.

24        Q    And let me make sure I get a clear answer

25   to my question.  So please wait for me to finish.
```

 1          You don't know how admissions was run

 2   after May of 2005, do you?

 3       A    Well, I didn't work there anymore.

 4       Q    And you didn't know; correct?

 5       A    Well, no, I didn't know.  I didn't work

 6   there.  How could I know?  But I'm sure it was run

 7   the same way before I left, after I left.

 8       Q    But you don't know?

 9       A    No.  How could I know?

10       Q    Let's take another look at Exhibit 7.

11       A    Okay.

12       Q    Now, attached to this document is --

13       A    No. 7?

14       Q    Correct.  Please flip over the top page.

15          -- another employee performance review

16   form.  Do you see that?

17       A    I see it.

18       Q    Do you know why it was produced just next

19   to this turnaround document that we just looked at?

20       A    Why it was produced or stapled to?

21       Q    Well, this is something that we got from

22   your attorney and these documents were produced next

23   to each other.

24          Do you know why they came in that

25   sequence?

| | |
|---|---|
| 1 | THE WITNESS:  Maybe you need to answer that. |
| 2 | MR. LEVY:  No. |
| 3 | THE WITNESS:  I don't know.  I don't know. |
| 4 | BY MS. YOUNG: |
| 5 | Q    Are these -- are these documents that you |
| 6 | had in your possession and then provided to your |
| 7 | attorney? |
| 8 | A    I had these documents in my possession |
| 9 | because when they were given to me and I signed |
| 10 | them, I filed them. |
| 11 | Q    Okay. |
| 12 | A    So I had them. |
| 13 | Q    I'm just trying to understand why these |
| 14 | two documents were next to each other in your files. |
| 15 | A    I can't tell you that. |
| 16 | Q    Okay. |
| 17 | A    This is the first time I'm seeing this. |
| 18 | Q    Okay.  So you don't know if this |
| 19 | confidential performance review form informed the |
| 20 | fact that you got a promotion, as noted in the |
| 21 | turnaround document that's on top? |
| 22 | A    You need to say that again.  Okay. |
| 23 | Q    Sorry.  There's this performance review |
| 24 | form. |
| 25 | A    Yes. |

1    Q    It was produced to us just next to this

2   turnaround document, which indicates you got a

3   promotion in 2003.

4    A    Yes, that seems logical.

5    Q    Okay.  Do you have any knowledge as to

6   whether this employee performance review form

7   informed the decision to give you the promotion?

8    A    No, I don't.

9    Q    And that's because you weren't involved in

10  making that decision; right?

11   A    No, I wasn't involved.  It was Mr. Plant

12  and Cary Kaplan's decision.

13   Q    And, in fact, you don't know what reasons

14  they had for giving you the promotion?

15   A    No, I did not other than the fact that I

16  made my numbers.

17   Q    For the reasons that we've already talked

18  about?

19   A    Yes, for the reasons we've already talked

20  about.

21   MR. LEVY:  Objection to form.

22   THE WITNESS:  Because you got acknowledged for

23  that.  When you made numbers in admissions, you got

24  acknowledged for it in more than one way.

25  ///

```
 1    BY MS. YOUNG:

 2        Q    Okay.  Let's look at the performance

 3    review form.

 4        A    No. 7 again?

 5        Q    That is on No. 7.  Correct.

 6        A    Okay.

 7        Q    And again, there's a number of criteria

 8    listed in here that have points assigned to them.

 9    Do you see that?

10        A    Yes, I do.

11        Q    Do you know how those points were

12    assigned?

13        A    No, I do not.  I said that before.  No, I

14    do not.

15        Q    And in section four, again, which is that

16    box with the narrative description of your major

17    accomplishments and contributions --

18        A    Uh-huh, uh-huh.  I see that.

19        Q    -- do you know how the decision was made

20    about what to write into that box?

21        A    No, I do not.

22        Q    Okay.  So we talked about promotions that

23    you received from being a campus admissions

24    representative to being a senior admissions

25    representative to being a master admissions
```

```
 1    representative?
 2         A    Yeah, it was some sheet that was...
 3         Q    Did you receive any other promotions while
 4    you were working at the San Francisco campus from
 5    2000 until 2004?
 6         A    Other than what you see here, I didn't
 7    receive any promotions.
 8         Q    And did you receive any other salary
 9    increases other than what we discussed so far?
10         A    No.
11         Q    Did you receive any bonuses while you were
12    working at the San Francisco campus from August of
13    2000 until May 2005?
14         A    Bonuses like money bonuses?
15         Q    I'm sorry, May 2004.
16         A    Money bonuses?
17         Q    Yes, right.
18         A    Well, a bonus could be a new coat.  I
19    don't know.  That's why I asked you.
20         Q    Okay.
21         A    No.
22         Q    Did you get anything like a new coat as
23    well?
24         A    No, I did not, unfortunately.
25         Q    Okay.  So after you worked as an
```

```
 1    admissions representative in San Francisco until May
 2    of 2004, you then became the director of admissions
 3    at Hayward; is that right?
 4         A    That's true.
 5         Q    And that was in June of 2004?
 6         A    Well, it had to be after I left Bryman in
 7    San Francisco.  And that was in 2005.
 8         Q    Okay.  So I think we looked --
 9         A    If I have the dates right.
10         Q    Yeah, I think we looked earlier at this
11    document, but let's take another look just to make
12    sure.  So this, I think, was Exhibit 3.  It's a
13    June 4, 2004 letter that we looked at earlier.
14         A    Yeah, I think this is from Terry Harty;
15    right?
16         Q    Right.  And this is about commencing
17    employment as director of admissions in June of
18    2004; right?
19         A    From my memory, I think I received this
20    like 30 days after I was in the position.  It was
21    late.  I know that.
22         Q    Okay.  But -- but you started --
23         A    So the dates are off is all I'm saying.
24         Q    Okay.  But is it accurate that you started
25    as the director of admissions at the Hayward campus
```

```
 1   in June of 2004?
 2        A    Well, it's accurate that I started there,
 3   but I don't know if the date was exactly June.
 4        Q    Okay.
 5        A    I was over at the Hayward campus, yes, I
 6   was.
 7        Q    Okay.  And you started at the Hayward
 8   campus as director of admissions sometime in June of
 9   2004?
10        A    As director of admissions sometime in June
11   of 2004.
12        Q    Okay.  Now, how were you paid as a
13   director of admissions at the Hayward campus?
14        A    I was salaried.
15        Q    And were you eligible for a bonus?
16        A    Well, I was eligible if I could have
17   worked there long enough to get it, but I didn't
18   work there.
19        Q    How long did you work at the Hayward
20   campus?
21        A    Not very long because I was fired.
22        Q    When were you fired?
23        A    I'm not sure, but I worked there not even
24   long enough to produce any numbers.
25        Q    Okay.  Let's see if we can't pin that date
```

```
 1    down.
 2        A    There should be a termination somewhere,
 3    I'm sure.
 4        MS. YOUNG:  I'm handing you what we're going to
 5    mark as Exhibit -- 8?
 6        THE REPORTER:  9.
 7        MS. YOUNG:  9.  Exhibit 9.
 8                 (Defendants' Exhibit 9 was marked for
 9    identification by the deposition officer and is
10    bound under separate cover.)
11    BY MS. YOUNG:
12        Q    This document is titled "Separation
13    Report."  And it says the -- it says your name on it
14    as the employee's name, "Job Title, Director of
15    Admissions," "Last Day Worked, August 13th, 2004."
16              Does that sound right as the last day that
17    you worked as a director of admissions at the
18    Hayward campus?
19        A    I'm not sure, but my Social Security
20    number is incorrect.
21        Q    Okay.  So if you started as a director of
22    admissions in June of 2004, does it sound about
23    right that you worked in that position for about two
24    and a half months before you were terminated?
25        A    Yes, that sounds about right, maybe less
```

```
 1   than that.

 2        Q    Okay.  Two and a half months or less?

 3        A    Uh-huh.  "Failure to meet admissions

 4   goals." That's what it says on there.

 5        Q    And what were your responsibilities as a

 6   director of admissions?

 7        A    Well, at that particular time my

 8   responsibilities were to make sure that I met the

 9   goals and the numbers for that particular -- for the

10   admissions department over there, but it wasn't

11   possible to do that.

12        Q    Okay.  You were not directly responsible

13   yourself for recruiting students?

14        A    I was responsible -- according to Terry

15   Harty, I was responsible.

16        Q    Did you interact with students in your

17   role as a director of admissions?

18        A    Yes, I did.

19        Q    You did.  Tell me what those interactions

20   were like.

21        A    It was like just doing second interviews

22   and sometimes interviewing because I had no

23   admissions department, everybody quit when I came

24   over there.

25        Q    How many people were in the department
```

```
 1   when you --

 2       A    I don't know.  Five or six, something like

 3   that.

 4       Q    Please let me finish my question,

 5   otherwise we're not going to have a clear record of

 6   what you're answering.

 7       A    Okay.

 8       Q    How many people were in the department

 9   when you started, in the admissions department when

10   you started?

11       A    Five or six.

12       Q    And you said that they all quit?

13       A    That's what I said.

14       Q    All -- all of them?

15       A    All of them quit.

16       Q    So not a single one was left?

17       A    Yeah, nobody was in admissions but me.

18   And I was the director.

19       Q    Okay.  So you never gave anyone a

20   promotion when you were the director?

21       A    No.  I had to hire a whole new team and I

22   couldn't do that in a month.  It was impossible.

23       Q    Uh-huh.  And you never filled out a

24   performance evaluation for any employee?

25       A    No, I did not.
```

```
 1        Q    All right.  You never recommended anyone

 2   for a raise when you were the director of

 3   admissions?

 4        A    No, I did not.

 5        Q    Did you demote anybody when you were a

 6   director of admissions at Hayward?

 7        A    No, I did not.

 8        Q    Was one of your responsibilities as a

 9   director of admissions to evaluate employee

10   performance?

11        A    Yes, that's a responsibility of a

12   director.

13        Q    Okay.  And we saw earlier some performance

14   review forms that had been filled out for you by

15   your director of admissions when you were an

16   admissions representative.

17             Do you recall that?

18        A    Yes, I do.

19        Q    Were you supposed to fill out a similar

20   form for your employees when it became time for them

21   to be reviewed?

22        A    I'm not sure because I never collaborated

23   with Terry Harty on that and he never gave me one.

24   We didn't get that far.

25        Q    Okay.  So did you have any discussion with
```

```
 1    anyone at the Hayward campus about how you were
 2    supposed to go about doing those reviews?
 3         A    No.
 4         MS. YOUNG:  I'd like to show you a document.
 5    Okay.  Let's mark this as Exhibit 10.
 6                  (Defendants' Exhibit 10 was marked
 7    for identification by the deposition officer and is
 8    bound under separate cover.)
 9         THE WITNESS:  Thank you.
10    BY MS. YOUNG:
11         Q    And this is a document that was produced
12    to us by your attorney.  Have you ever seen it
13    before?
14         A    It looks like the rest of the documents
15    that you showed me in terms of performance review.
16         Q    Uh-huh.  But this one is a blank one and
17    it also has some material attached to the end
18    starting at page R 00373 --
19         A    Uh-huh.
20         Q    -- which is titled "Performance
21    Evaluations For Employees," and then there's some
22    guidelines laid out here about how to fill out the
23    form.
24                  Is that something you've seen before?
25         A    I don't recall this document.
```

 1        Q    Do you know how that -- is this a document

 2   that you provided to your counsel?

 3        A    I'm not sure.

 4        Q    So you don't recall if this document came

 5   from your own files?

 6        A    No, I don't recall, not at this moment.

 7        Q    Okay.

 8        A    But it's a typical CCI document.

 9        Q    And I may have asked you this before, but

10   let me just ask in case I didn't.  I take it in the

11   two and a half months you worked as the director of

12   admissions for Hayward you never recommended anybody

13   for a salary increase; is that right?

14        A    No.

15        Q    Is that correct?

16        A    That's correct.

17        MS. YOUNG:  Okay.  I'm handing you what we're

18   going to mark as Exhibit 11.

19             (Defendants' Exhibit 11 was marked

20   for identification by the deposition officer and is

21   bound under separate cover.)

22   BY MS. YOUNG:

23        Q    And at the end of the document, is that

24   your signature?

25        A    Yes, it is.

1        Q     Did you create this document?

2        A     Yes, I did.

3        Q     What is it?

4        A     It was a goal plan for my admissions rep,

5    the person that was hired over there.

6        Q     So you created this in the first week you

7    were hired as a director of admissions at Hayward?

8        A     Yes, I did.

9        Q     So sometime in June of 2004?

10       A     Something like that.

11       Q     Did you create this document on a

12   computer?

13       A     Yes, I did.

14       Q     Okay.  And what computer was it that you

15   created the document on?

16       A     Well, I don't know what computer it was.

17   It could have been one at the school or I don't

18   know.  I would have to say that or it could have

19   been one at my house.  I'm not sure.  It wasn't a

20   typewriter.  That's for sure.

21       Q     Okay.  And you said you created this in

22   the first week, but looking at the very top of the

23   document, it says "Week Four."

24              Do you see that?

25       A     Okay.  First week, second week, first

```
 1        A    Yes, I wrote that.

 2        Q    And then -- I wasn't asking if you wrote

 3   it, I was asking if it's an accurate statement.

 4        A    It is accurate.

 5        Q    And then you continue, "The termination

 6   will be based upon their attitude and current

 7   marketing/sales plan that he/she is responsible to

 8   develop."  Is that an accurate statement?

 9        A    Yes, it is.

10        Q    So termination wasn't based on numbers, it

11   was based on their attitude and marketing plan;

12   right?

13        MR. LEVY:  Objection to form.

14        THE WITNESS:  Marketing, attitude, numbers,

15   enrollments.  It was based on all of that because

16   that's admissions.  That's what missions --

17   admissions is all about.

18   BY MS. YOUNG:

19        Q    When you wrote this sentence, you didn't

20   say "numbers," "admissions"?

21        A    No, I didn't because it's not in there,

22   but that's what it was.

23        Q    Okay.  But when you wrote this document,

24   you said, "The termination will be based upon their

25   attitude and current marketing/sales plan," and
```

```
 1    that's all you said; right?
 2        MR. LEVY:  Objection; the document speaks for
 3    itself.
 4        THE WITNESS:  That's what I wrote in this.
 5    Right.
 6    BY MS. YOUNG:
 7        Q    Okay.  Take a look at paragraph seven.  In
 8    paragraph seven of this document you write,
 9    "Promotions occur when you meet or exceed the yearly
10    quota agreed upon at the time of hire.  The Director
11    of Admissions and members of the Corporate
12    Management Team determine promotions."
13            Do you see that?
14        A    Yes, I do.
15        Q    And that was your interpretation of how
16    things worked; is that right?
17        A    That was how it worked when I worked in
18    admissions.  And I feel, as a director, it was still
19    on board when I went to Hayward.  That was how it
20    worked when I was in admissions in San Francisco.
21        Q    Okay.
22        A    And that's how it worked at Hayward.
23        Q    But you never promoted anyone at Hayward,
24    so how do you know that?
25        A    No.  Excuse me?  Because -- because --
```

1        Q     How do you know --

2        A     -- I know polices -- policies.  I knew the

3  company policies because it was given to me when I

4  was hired.  And I worked there for several years, so

5  I know -- I knew the company policies.

6        Q     Okay.  So the written policy is what you

7  followed?

8        A     Yes.

9        Q     Okay.  And --

10       A     And what my director and my president told

11  me.

12       Q     Okay.  And --

13       A     So I followed the policies.

14       Q     And it's your understanding that other

15  directors of admissions followed the written policy;

16  is that right?

17       A     Yes.  You're an employee.  If you're an

18  employee and you're a director, you have to follow

19  the policies.

20       Q     Okay.  So if we want to figure out what

21  the practices were like, we should look at the

22  written policies?

23       A     Yeah, that or the brochures or whatever

24  corporate sends you or whatever.

25       Q     Okay.  But in your experience, the

```
1   directors of admissions, the other people that were
2   responsible for determining promotions and salary
3   raises, they just did what the written policy told
4   them to do; right?
5        MR. LEVY:  Objection; form, calls for
6   speculation.
7        THE WITNESS:  As far as I know.
8   BY MS. YOUNG:
9        Q    That's your understanding; right?
10       A    Yes, that's my understanding because I
11  wasn't trying to create any new rules.
12       Q    Okay.  When you say in paragraph seven,
13  "The Director of Admissions and members of the
14  Corporate Management Team determine promotions,"
15  what did you mean by the word "determine"?
16       A    Make the final decision.
17       Q    Okay.  So they have some discretion in
18  terms of who gets a promotion; is that right?
19       A    Yes.  Yes, they do.
20       Q    When they -- when they exercise that
21  discretion, they can consider factors other than
22  enrollments; isn't that right?
23       A    Well, they never said that to me, but
24  that's how you got -- that's how you got to the top,
25  so to speak.  You enrolled your students and you got
```

1    your numbers.

2        Q    Now, a director of admissions couldn't

3    just promote somebody all by themself; right?

4        A    I never knew one director that did that.

5        Q    Okay.  Didn't they have to get approval

6    from someone else before somebody got promoted?

7        A    I'm not sure because I didn't ever promote

8    anybody.

9        Q    Okay.  So you don't know whether --

10       A    I only know from my experience of getting

11   promoted.  That's all I know.

12       Q    Okay.  Understood.

13       A    Okay.

14       Q    So you don't know to what extent there was

15   management oversight over the decision to promote

16   somebody or give them a raise?

17       A    No.  Because that was always done for me,

18   so I just know that part.

19       Q    You just know it was done for you?

20       A    Yes.

21       Q    Okay.  Now, I want to talk about your

22   compensation in the short time that you were the

23   director of admissions at Hayward for two and a half

24   months.

25       A    Yes.

```
 1        Q    Did you -- did you get any promotions
 2   while you were the director of admissions --
 3        A    No, I got demoted if you want to know the
 4   truth.
 5        Q    Okay.  Again, please let me finish.
 6             Did you get --
 7        MR. LEVY:  Objection to form.
 8             You keep interrupting her and you're
 9   saying she's cutting you off, but, you know, your
10   questions have been complete and she's answered
11   them.  So...
12        MS. YOUNG:  No, I've -- I've been unable to get
13   a complete question on the record and she's jumping
14   in and I want our transcript to be clear.  And for
15   the benefit of the court reporter, I would like to
16   finish my question before she answers.
17        MR. LEVY:  And it -- and it sounds like you are
18   finished and she's answering them timely.
19        MS. YOUNG:  No, that's not, in fact, true.  And
20   if you want to review the transcript during a break,
21   you should do that because I'm certain I have not
22   been able to get an answer to my question.  And
23   that's not the only time I've asked Ms. Lee to
24   please wait for me to finish.
25             Can I please have the last question read
```

```
 1    back into the record as well as the answer.

 2                    (Whereupon, the record was read as

 3    follows:

 4                    "Question:  Did you -- did you

 5            get any promotions while you were

 6            the director of admissions --

 7                    "Answer:  No, I got demoted if

 8            you want to know the truth.")

 9    BY MS. YOUNG:

10        Q    Okay.  And did you get any salary

11    increases while you were the director of admissions

12    at Hayward for that two-and-a-half month period?

13        A    No, I did not.

14        Q    And I take it you didn't receive any

15    bonuses either.  I think you testified to that.

16        A    No, I didn't.

17        Q    Okay.  After you were terminated from

18    Hayward, which was in or around -- when was it --

19    August of 2004, did you re-apply for employment with

20    Corinthian?

21        A    No, I did not.  I was asked to be

22    reinstated at San Jose by one of the district

23    managers because I was a heavy hitter.

24        Q    Who asked you to be reinstated?

25        A    I think it was Chris VanEs.  I'm not sure.
```

```
 1        Q    So you did accept that offer and ended up
 2   becoming employed again at Corinthian?
 3        A    I got rehired.
 4        Q    And when --
 5        THE REPORTER:  I'm sorry.  I didn't hear you.
 6        THE WITNESS:  Huh?
 7        THE REPORTER:  I didn't hear your answer.
 8        THE WITNESS:  She asked me a question.  I did
 9   get rehired.
10   BY MS. YOUNG:
11        Q    And when did you get rehired?
12        A    I'm not sure of the date.  I think it was
13   one month after I left Hayward.
14        MS. YOUNG:  Okay.  Let's take a look at a
15   document that may help pin it down.  Okay.  Let's
16   mark this as Exhibit 12 -- I think we're on.
17                 (Defendants' Exhibit 12 was marked
18   for identification by the deposition officer and is
19   bound under separate cover.)
20   BY MS. YOUNG:
21        Q    Okay.  And now, this document has your
22   signature on the second and third page; is that
23   correct?
24        A    The second page is correct.  The third
25   page is correct.
```

    1       Q    The signature is dated November 19, 2004.

    2    Do you see that?

    3       A    Yes, I see it.

    4       Q    And the title on the first page of the

    5    document says, "Application for Employment,

    6    Corinthian Colleges.  Position Desired:  Master

    7    Rep."

    8            Do you see that?

    9       A    Yes, I see that.

   10       Q    Was this the application that you filled

   11    out to be rehired in San Jose?

   12       A    Probably.  It looks like it could be.

   13       Q    Okay.  Does November of 2004 sound like

   14    the right time period when you were rehired in

   15    San Jose?

   16       A    Might be.  I'm not sure.  It was about a

   17    month and a half after I left the Hayward campus or

   18    around something like that.

   19       Q    Okay.

   20       A    Uh-huh.

   21       Q    So sometime around maybe November 2004 or

   22    thereabouts --

   23       A    Yes.

   24       Q    -- you were rehired as a master admissions

   25    representative to San Jose?

```
 1        A     Yes.

 2        Q     And you were getting a salary-based

 3   compensation again?

 4        A     Yes.

 5        MS. YOUNG:  I'm handing you what we'll mark as

 6   Exhibit 13.

 7                  (Defendants' Exhibit 13 was marked

 8   for identification by the deposition officer and is

 9   bound under separate cover.)

10        MR. LEVY:  Can I have one?

11        MS. YOUNG:  I'm sorry.

12        MR. LEVY:  That's all right.  Thank you.

13   BY MS. YOUNG:

14        Q     And if you look at page 3, is that your

15   signature on the document?

16        A     That's it.

17        Q     And then again, there's some additional

18   three pages toward the back.  And on the very last

19   page, is that also your signature?

20        A     Yes, it is.

21        Q     Is this the compensation plan that

22   governed your employment as a master campus

23   admissions representative in San Jose?

24        A     I think this is the same one you showed me

25   before, yes.
```

```
 1        Q    Is this what applied to you in the 2004

 2   time period when you were rehired?

 3        A    Yes, it applied to me.  Tim Lee was the

 4   district manager.  Actually, he was the director of

 5   admissions.  There's his signature right there

 6   (indicating).

 7        Q    Okay.  And who signed as college president

 8   here, if you know?

 9        A    Somebody.  I don't know who that was.

10        Q    Okay.

11        A    Lozer (phon.) or something.  I'm not sure.

12        Q    You read this document before you signed

13   it?

14        A    Yes.

15        Q    And you understood it before you signed

16   it; correct?

17        A    Yes.

18        Q    And on the first page of this document it

19   says, "Minimum Standards of Performance," and then

20   it lists 18 standards again.

21             Do you see that?

22        A    Yes, I do.

23        Q    And just like we talked about before,

24   these are -- were your job responsibilities when you

25   were rehired as an admissions representative in
```

 1   2004?

 2       A    Same, yes.  It didn't change.

 3       Q    And -- and you tried to fulfill these

 4   responsibilities?

 5       A    Yes, I did.

 6       Q    And you understood that you were being

 7   evaluated based on whether you fulfilled all 18 of

 8   these responsibilities?

 9       A    That and my numbers.  It's always numbers.

10       Q    Okay.

11       A    Enrollments.

12       Q    When you received this document that we've

13   marked as Exhibit 13, did you go over it with

14   anybody?

15       A    I'm not sure, but I don't know why I

16   should have had to go over it with anyone because I

17   already had it before.

18       Q    Okay.  You don't recall whether or not you

19   reviewed this with someone, do you?

20       A    No, no.

21       Q    Okay.  And when you were hired as an

22   admissions representative in San Jose in 2004, did

23   you have any discussion with anybody about how you

24   would be compensated?

25       A    I'm sure I had a conversation with either

```
 1    the director or the district manager.
 2         Q    Do you recall the substance of that
 3    conversation?
 4         A    No, I don't recall.
 5         Q    How long did you work as a master
 6    admissions representative in San Jose?
 7         A    Not long.
 8         Q    Can you give me an estimate?  A couple of
 9    months?
10         A    One month maybe.  And they sent me to San
11    Francisco.  So they juggled me around quite a bit.
12         Q    Okay.  So you never received a promotion
13    when you were a master admissions representative
14    working in San Jose?
15         A    No.
16         Q    No, you never -- it's correct that you
17    never received a promotion?
18         A    I never received a promotion in the one
19    month that I was working there.
20         Q    Okay.  And you never received a salary
21    increase in the one month you were working there?
22         A    No.
23         Q    Is that correct?
24         A    That's correct.
25         Q    And you never got a bonus during that time
```

```
 1    period either?
 2         A    Never got a bonus.
 3         Q    Okay.  So you transferred to San Francisco
 4    after that short period of time?
 5         A    I didn't transfer, they sent me to San
 6    Francisco.
 7         Q    Okay.  You were transferred?
 8         A    Without a transfer.  They didn't have a
 9    transfer.
10         Q    Okay.
11         A    They just sent me to San Francisco.
12         Q    Do you know why they did that?
13         A    You'd have to ask them.
14         Q    Okay.
15         A    They said they needed a heavy hitter in
16    San Francisco.  That's what Tim Lee told me.  "Can
17    you go to San Francisco?"  So I went to San
18    Francisco.
19         Q    Okay.  Did you maintain your position as a
20    master admissions representative when you
21    transferred?
22         A    When I went to San Francisco, I did, yes.
23         Q    You did.  And did you maintain your same
24    salary level when you transferred from San Jose to
25    San Francisco?
```

```
 1        A     As far as I know and can remember because
 2   they never got it right.
 3        Q     And when you made that transfer from
 4   San Jose to San Francisco, at that time did you have
 5   a discussion with anyone about how you would be
 6   compensated?
 7        A     Oh, man, I had conversations with a whole
 8   bunch of people, with the corporate headquarters,
 9   whoever was in H.R. at that time.  I can't remember
10   names.  And I had conversations with the school in
11   San Jose, the director of admissions, the president,
12   the president in San Francisco, and the director up
13   there.
14        Q     Describe the substance of those
15   communications with me.
16        A     Confused.  They didn't have their
17   paperwork in order.  So I was getting my paycheck
18   from San Jose and I'm working in San Francisco.
19   They didn't transfer me properly.
20        Q     Okay.  So your discussions relating to
21   your compensation during that time period had to do
22   with paperwork issues related to the transfer; is
23   that correct?
24        A     Yeah, related to the nontransfer.
25        Q     Or the nontransfer?
```

```
 1        A    Okay.

 2        Q    Okay.  In those discussions did the

 3   subject of what you would have to do in order to get

 4   a promotion or salary increase --

 5        A    All the time.

 6        Q    -- come up?

 7        A    All the time.

 8        Q    Okay.

 9        A    Produce the numbers.  That was always the

10   production -- I mean, the conversation.

11        Q    And, again, in this time period --

12        A    I had -- hardly had any time to produce

13   any numbers before I was fired again because I

14   didn't produce.

15        Q    Okay.

16        A    Okay.

17        Q    Again, that's not what my question was.

18        A    Okay.  What was your question?

19        Q    Please let me ask my question.

20             In this time period when you were

21   transferring or being transferred from San Jose to

22   San Francisco --

23        A    Uh-huh.

24        Q    -- can you recall a specific conversation

25   with anybody where your compensation was discussed
```

1    in connection with your numbers?

2        A    Well, my conversations with the director

3    in San Francisco was all about numbers.  Okay.

4    "Produce the numbers" and that's all I got from

5    them.

6        Q    And were those conversations in

7    connection --

8        A    And convert the leads into interviews.

9    That's all it was.  All the time.

10       Q    Okay.  And were those discussions in

11   connection with how you would be compensated or was

12   it just --

13       A    Well, I was salaried at that point.

14       Q    Okay.

15       A    So it was on this -- I didn't need to

16   discuss anything because when I hired in, I was

17   quoted a salary and that was it.

18       Q    Okay.  So when you had discussions the

19   second time around in the San Francisco campus about

20   the need to make numbers and all about enrollments,

21   that was not in connection with your compensation?

22   Am I understanding you correctly?

23       MR. LEVY:  Objection to form.  That completely

24   mischaracterizes what she's saying.

25   ///

```
 1   BY MS. YOUNG:

 2        Q    I just want to make sure --

 3        A    Well, compensation is a salary.

 4        Q    Right.

 5        A    That's it.

 6        Q    Okay.

 7        A    Compensation is what salary they quoted me

 8   they were going to pay me.  Okay.

 9             Now, what are you getting at?

10        Q    I just want to know in what context the

11   discussion about meeting your numbers and enrolling

12   people took place.

13             Did that conversation when you were

14   working as an admissions representative in San

15   Francisco for the second time --

16        A    Yes.

17        Q    -- happen in the context of discussing

18   what your salary would be or what your compensation

19   would be?

20        A    No.  Once you signed the contract saying

21   you are getting a salary, you don't have to discuss

22   that no more.  All you have to do is get your

23   numbers.

24        Q    Okay.

25        A    You know, we never discussed changing my
```

 1    salary at that time or anything.  Do you understand?

 2        Q    I understand.

 3        A    Okay.  That's what happened.

 4        Q    Okay.  How long did you work in San

 5    Francisco after you were transferred there?

 6        A    Barely a month.

 7        Q    So once again, you were not promoted

 8    during that one-month time period?

 9        A    No, I was not.  I was humiliated.

10        Q    Okay.

11        A    Okay.

12        Q    And you didn't get a salary increase?

13        A    No, I didn't.

14        Q    You didn't get a bonus?

15        A    I didn't get a bonus, I didn't get a

16    salary increase, I didn't get a compliment, I didn't

17    get anything.  But, you know, leads to conversions.

18    That's always what it is, your numbers.  "Produce."

19        Q    And then you were terminated?

20        A    Yes.

21        Q    Do you recall roughly what month?

22        A    I think it was May.  I'm not sure.

23        Q    May of 2005?

24        A    I'm pretty sure it was May.

25        Q    Do you know why you were terminated?

```
 1        A    I just told you, Blanca.  I couldn't make

 2   any numbers in 30 days because I was starting from

 3   scratch in San Jose.

 4        Q    Uh-huh.

 5        A    As far as I can remember, I interviewed

 6   about 100 people and I had my pipeline going, and

 7   then something happened.  I was out of there.  They

 8   didn't want me there anymore, so...

 9        Q    I'm --

10        A    Because I wasn't producing.  There was no

11   way I could produce ten enrollments because the

12   economy was down, everything -- people weren't

13   enrolling at that particular time.  There was just

14   no way it was possible to do that.

15        Q    Okay.  So let me just see if I can

16   summarize your work history with Corinthian.

17        A    Okay.

18        Q    You were --

19        A    Good luck.

20        Q    Well, we'll see if we can do it.

21        A    Uh-huh.

22        Q    You were an independent contractor working

23   as a test proctor for the school --

24        A    Uh-huh.

25        Q    -- from approximately November 1999 until
```

1    August of 2000; is that correct?

2         A    Uh-huh.  I think that's what we said.

3         Q    Okay.  And then you worked as an

4    admissions representative at the San Francisco

5    campus at various levels --

6         A    Uh-huh.

7         Q    -- from approximately September or

8    thereabouts of 2000 until roughly May of 2004; is

9    that right?

10        A    Uh-huh.  Yes.

11        Q    Okay.  Then you were a director of

12   admissions at Hayward for a short period of time?

13        A    Uh-huh.

14        Q    Maybe from June of 2004 to about August of

15   2004; right?

16        A    Something like that.

17        Q    Okay.  And then you were rehired to work

18   as an admissions representative in San Jose around

19   November of 2004; is that right?

20        A    Whatever that paper says in there.  You're

21   getting me confused now.

22        Q    Okay.

23        A    But it was a short period.

24        Q    It was shortly after -- a few months after

25   you were terminated from Hayward, you were then

```
 1   asked to --

 2       A    To go to San Jose and shortly after that I

 3   was asked -- asked to go to San Francisco.

 4       Q    Okay.

 5       A    Because nobody was making any numbers up

 6   there.  And whenever they needed somebody to come

 7   and make enrollments, they called Nyoka.  And that's

 8   what they did.  And they asked me to go to San

 9   Francisco, Tim Lee did.  Didn't do a transfer or

10   nothing, just said, "Can you report to San

11   Francisco?"

12       Q    Okay.

13       A    It was very confusing to me, but I did

14   what my district manager asked me to do.  And that's

15   what I was supposed to do and he was supposed to

16   handle the rest, so...

17       Q    Okay.  So then you went to San Francisco

18   and worked there until about May of 2005?

19       A    Uh-huh.  Something like that, yes.  That

20   sounds about right.

21       Q    Okay.  And since May of 2005, you've never

22   done any work for Corinthian Colleges?

23       A    Huh-uh.  I don't think they would hire me

24   again after all of that, do you?  I've never worked

25   for Corinthian again.
```

```
 1        Q    Okay.

 2        A    It's the first time I showed up today at

 3   Corinthian Colleges.

 4        Q    And we've discussed all of the promotions

 5   that you ever received as a Corinthian employee; is

 6   that correct?

 7        A    Uh-huh.  Yes.

 8        Q    We've discussed all the salary increases

 9   you ever received as a Corinthian employee; is that

10   right?

11        A    Yeah, that's in these documents here.

12        Q    Okay.  And we've discussed all the

13   compensation that you received from Corinthian

14   Colleges; is that right?

15        A    As far as I know.

16        Q    Okay.  And you never at any time got a

17   bonus from the school; is that right?

18        A    No, I never went to Parthenon or any of

19   that stuff.

20        Q    You never got a bonus from the school?

21        A    No.

22        Q    And you've never at any time worked at a

23   school campus other than San Francisco, San Jose or

24   Hayward; is that correct?

25        A    Not for Corinthians (sic).
```

1        Q    Not for Corinthian?

2        A    No -- or actually, yes -- no, as you say.

3    Yes, I haven't worked for -- or no, I haven't.

4    You're getting me confused.  No, I haven't worked

5    for any other campuses at Corinthians.

6        Q    Other than San Francisco, San Jose or

7    Hayward?

8        A    Yes.

9        Q    Okay.  And you've never recruited students

10   to go to a campus other than San Francisco, San Jose

11   or Hayward?

12       A    I never worked in admissions after I left

13   Corinthian's admissions at any other campus.

14       Q    Okay.  And you don't have any firsthand

15   knowledge of how admissions representatives at other

16   campuses besides San Francisco, San Jose or Hayward

17   were compensated?

18       A    I have some idea.  They were operated on

19   the same principle because I went to three schools.

20   And we -- admissions reps talk, you know.  They do

21   the same thing that we were doing at other campuses.

22       Q    How do you know that?

23       A    Well, because admissions rep -- admissions

24   reps that I worked with while I was at Bryman or

25   Corinthians, they would quit when they couldn't make

VALERIE RASMUSSEN COURT REPORTING   **949.888.7858**        135

**0101**

```
 1   family.  They talk to each other, you know.
 2        Q    Okay.
 3        A    So I can't give you any specific dates or
 4   times or names at this moment, but it -- that was
 5   the general consensus.
 6        Q    Okay.  Can you name --
 7        A    And I thought it was shocking, but it --
 8   that's what happened.
 9        Q    Can you name a single admissions
10   representative --
11        A    No, I don't want to name any names.  I
12   don't have a name for you right now.  I don't have
13   any names.
14        Q    Okay.  Ms. Lee, if you know a name, I'm
15   entitled to it.
16        A    Well, I don't know any names.
17        Q    So you can't give me a name -- please let
18   me finish my question.  You can't give me a name of
19   an admissions representative at any campus other
20   than the ones you worked at for Corinthian who told
21   you anything about how they were compensated.  Am I
22   correct?
23        A    Compensated?  Oh, I thought we were
24   talking about -- can you state the question again
25   because you confused me on that one.
```

```
 1        Q     Sorry about that.

 2        MS. YOUNG:  Can I have my question read back,

 3    please.

 4                    (Whereupon, the record was read as

 5    follows:

 6                    "Question:  You can't give me a

 7                name of an admissions representative

 8                at any campus other than the ones

 9                you worked at for Corinthian who

10                told you anything about how they

11                were compensated.  Am I correct?")

12        THE WITNESS:  When you say "compensated," are

13    you talking about their salary or their numbers?

14    Because being compensated is one thing, your numbers

15    is another when you work in admissions.

16    BY MS. YOUNG:

17        Q     I'm talking about how people got paid, how

18    they got compensated.

19        A     Well, they got compensated on how many

20    enrollments they made, which are numbers, when they

21    got their promotion.  You got promoted because you

22    made 120 starts or however many they say it is now.

23    I'm not sure.  You got -- you got compensated on how

24    many starts you made, how many people stayed in

25    school.  If you had 120 starts, you could get
```

```
 1    promoted from one admissions rep to another or
 2    whatever the numbers are.  I just used that as an
 3    example.
 4        Q    I --
 5        A    That's how you got promoted in admissions.
 6        Q    I understand that's what you believe.
 7        A    No, that's what I know.
 8        Q    But I would like -- I would like an answer
 9    to my question.
10        MS. YOUNG:  If I can have it read back again,
11    please.
12        MR. LEVY:  Objection to form, argumentative.
13        THE REPORTER:  I'm sorry.  Objection to form
14    and?
15        MR. LEVY:  Argumentative.
16        THE WITNESS:  I'm just trying to understand
17    what you're -- where you're coming from.
18               (Whereupon, the record was read as
19    follows:
20               "Question:  You can't give me a
21           name of an admissions representative
22           at any campus other than the ones
23           you worked at for Corinthian who
24           told you anything about how they
25           were compensated.  Am I correct?")
```

```
 1        THE WITNESS:  That's correct.
 2   BY MS. YOUNG:
 3        Q    And did you have a discussion with any
 4   admissions representative who worked for Corinthian
 5   at a campus other than where you worked about
 6   whether they got promotions or raises?
 7        MR. LEVY:  Can I have that question again.
 8             (Whereupon, the record was read as
 9   follows:
10             "Question:  And did you have a
11        discussion with any admissions
12        representative who worked for
13        Corinthian at a campus other than
14        where you worked about whether they
15        got promotions or raises?")
16   THE WITNESS:  Basically, Blanca, the
17   conversations I had with other admissions reps were
18   always about numbers.  That's what it was always
19   about.  I never discussed their compensation or how
20   much they got for a raise or -- they didn't talk
21   about stuff like that.  They talked about how many
22   enrollments you had.
23   BY MS. YOUNG:
24        Q    And did they discuss anything about
25   getting promotions or whether they were --
```

```
 1        A    No, I didn't discuss that kind of
 2   information with other employees.  Nobody talked to
 3   me about it, and I didn't talk to them about it
 4   because it wasn't my business.  Because I could see
 5   what enrollments were when I got the flashes.  And
 6   everybody that worked at all the campuses could see
 7   that.
 8        Q    Uh-huh.
 9        A    And that's what we got.
10        Q    Okay.
11        A    Weekly, monthly and daily.
12        Q    You didn't discuss --
13        A    No, I didn't discuss.
14        Q    Stop just a minute.
15             You didn't discuss salary raises or
16   whether someone was eligible for a raise with other
17   employees of Corinthian, did you?
18        A    Again, no, I didn't discuss that.
19        Q    Have you ever visited a campus of
20   Corinthian other than San Francisco, San Jose or
21   Hayward?
22        A    Let's see.  I don't think so.  I don't
23   recall.
24        Q    So just to summarize, since May of 2005
25   you've not been employed by the school in any
```

```
 1   capacity?

 2        A    No, I have not.

 3        Q    You've not provided any services or any

 4   independent contracting work to the school since

 5   May of 2005; is that correct?

 6        A    That's correct.

 7        Q    You've received no compensation from the

 8   school at all since you were terminated in May of

 9   2005; is that correct?

10        A    No, I haven't.  That's correct.

11        Q    All the promotions you received at the

12   school happened before January 1st, 2005; is that

13   right?

14        A    That's correct.

15        Q    All the salary increases you received from

16   the school happened before January 1st, 2005; is

17   that correct?

18        A    I'm pretty sure those dates are correct,

19   but I would have to see it in writing on these

20   papers, but I'm going to say yes to that.

21        MS. YOUNG:  Okay.  And just make sure that your

22   mic is -- can you hear her on the mic?  I want to

23   make sure that --

24        THE WITNESS:  I need to leave to go to the

25   restroom.
```

```
1          MS. YOUNG:  Okay.

2          MR. LEVY:  Okay.  We'll take a break.

3          MS. YOUNG:  Let's take a quick break.

4          THE WITNESS:  Thank you.

5          THE VIDEOGRAPHER:  The video deposition is now

6   going off record at 12:08 p.m.  This will also

7   conclude video No. 2 in today's deposition.

8                    (A recess was taken from 12:08 p.m.

9   to 12:25 p.m.)

10         THE VIDEOGRAPHER:  The videotaped deposition of

11  Nyoka J. Lee, Volume No. 1, is returning to record

12  at 12:25 p.m.  This will also begin video No. 3 in

13  today's deposition.

14              The location is still 6 Hutton Centre

15  Drive, Second Floor, in Santa Ana, California.  The

16  date is Monday, December 17th, 2012.

17              My name is Ali Saheb with Dean Jones

18  Attorney Video Services in Los Angeles and Santa

19  Ana, California.

20  BY MS. YOUNG:

21      Q    Okay.  Ms. Lee, you understand you're

22  still under oath?

23      A    Yes, I do.

24      Q    Okay.  And we'll go for just a little bit

25  longer and then break for lunch.
```

1    BY MS. YOUNG:

2         Q    I'm sorry.  Go ahead, Ms. Lee.

3         A    Well, this is what the director would give

4    us every week, every Monday, as a matter of fact,

5    showing us how we stacked up against all the rest of

6    the admissions and all -- how all the directors

7    stacked up against all the rest of the directors.

8    They just would give us these reports and these

9    reports here.

10              I don't know.  Do you have them in there?

11        Q    And -- and --

12        A    That's the -- if you want the names of

13   some of the people in admissions, it's on there.

14        Q    Okay.  So you're --

15        A    But I can't --

16        Q    -- referring just now to the document with

17   the number 466 at the bottom?

18        A    This one, yes, that's what I was referring

19   to.

20        Q    Okay.

21        A    Any document in there that has the --

22   these are the activity reports that we would get.

23        Q    Okay.  I also see some documents titled

24   "Ad Rep Performance Flash."

25        A    Yeah, and that's for like the lead to

```
 1   conversion rates on there.

 2        Q    Okay.

 3        MR. LEVY:  And we've provided those, the Bates

 4   number is on -- these are all marked.

 5   BY MS. YOUNG:

 6        Q    Okay.  Am I correct though that none of

 7   these documents say anything about compensation for

 8   the admissions representatives?

 9        A    I don't think it says.  The only

10   compensation is what you see on me.  Nobody else.

11        Q    Okay.  So --

12        A    And I don't have compensation documents on

13   anybody else but myself.

14        Q    Okay.  And you've not provided us with any

15   documents today that describe or explain how

16   admissions representatives were compensated; is that

17   right?

18        A    Other than what we have in here that we've

19   gone over.

20        Q    I'm talking about the documents you

21   brought with you to the deposition today.

22        A    No, this is -- the same stuff you have, I

23   have.

24        Q    Okay.  So other than the documents that

25   describe how you, Nyoka Lee, were compensated,
```

```
 1   you're not aware of any documents describing how

 2   other admissions representatives were compensated?

 3        A    No, I'm not aware of that.

 4        Q    And are you aware of any documents

 5   explaining how directors of admissions would be

 6   compensated by Corinthian?

 7        A    No.

 8        Q    We've discussed various communications

 9   you've had with other individuals at this school.

10   Other than what we've already discussed up until

11   now, are you aware of any discussions among anyone

12   at Corinthian about how admissions representatives

13   were compensated?

14        A    No, I'm not.  All I'm aware of is that if

15   you wanted a raise, like I say, you have to have

16   your numbers.  And they give you -- I don't think

17   that document is in here, but they give you a line

18   of how many starts you have to have per year,

19   annually, if you want -- if you're getting a raise.

20            It lists how many starts you need and how

21   many enrollments and all that. There's a form.  I

22   don't know if it's in here or not, but I'm sure you

23   must have it.

24        Q    You're referring to a document?

25        A    Well, it's in writing, yes.  It's a
```

```
 1    document.

 2         Q    Okay.

 3         A    It lists all the starts that you need to

 4    make from campus to -- to senior to master.

 5         Q    Okay.  And it lists other things that you

 6    need to do to get a promotion as well; right?

 7         A    Yes, which are some of the documents you

 8    gave me.

 9         Q    Like meeting minimum standards of

10    performance?

11         A    Yeah, that's all I know.  I don't know

12    about any other documents.

13         Q    Okay.  And getting a certain score on your

14    performance evaluation; right?

15         A    No, I don't know about any other documents

16    other than what we have here.

17         Q    Okay.  Are you aware, other than what

18    we've already talked about, of discussions among

19    anyone at Corinthian about how to evaluate the

20    performance of admissions representatives?

21         A    No.

22         Q    Okay.  And again, other than what we've

23    already talked about, are you aware of discussions

24    among anyone at Corinthian about how directors of

25    admissions would be compensated?
```

```
 1        A    No, other than conversations I would have

 2   with Cary Kaplan.

 3        Q    Okay.

 4        A    He is a -- he was a director.  He would

 5   say, "Well, if you have X amount of numbers, I'll

 6   get so much," you know.  He got paid on his -- his

 7   numbers.

 8        Q    Okay.

 9        A    He would get paid, you know, and get

10   compensated if the admissions department made a

11   certain amount of enrollments and starts and

12   numbers.  It's all about numbers.

13        Q    Okay.

14        A    Then he would get -- if he was at a

15   certain bracket, he would get a raise.

16        Q    And Mr. Kaplan was your director of

17   admissions up until 2004; correct?

18        A    Yeah, when I was working at Bryman.

19        Q    Okay.  You didn't work with him after

20   2004; is that right?

21        A    No, I did not.  No, I did not.

22        Q    And your only knowledge of how directors

23   of admissions were compensated other than your own

24   experience as a director of admissions was what you

25   heard secondhand from Mr. Kaplan; is that right?
```

1      A    Yes.

2      MR. LEVY:  Objection; form.  She heard it

3  firsthand from Mr. Kaplan.

4      THE WITNESS:  That's what you said; right?

5  BY MS. YOUNG:

6      Q    Well, you heard it secondhand from

7  Mr. Kaplan?

8      A    Yeah, well, firsthand, just like I'm

9  talking to you.  I would have -- he would have a

10 conversation with me, that's firsthand; right?

11     Q    Okay.  But you had a conversation with

12 Mr. Kaplan and your only knowledge about how

13 directors of admissions were compensated other than

14 when you were a director of admissions is based on

15 what Mr. Kaplan told you; right?

16     A    That's true.

17     Q    Okay.  Can you identify by name any

18 admissions representative for Corinthian who got a

19 salary increase or a promotion after January 1st,

20 2005?

21     A    No.

22     Q    Can you identify by name any director of

23 admissions for the school who got a salary increase

24 or a bonus after January 1st, 2005?

25     A    I never saw any of those people when I

```
 1    left, or talked to them.  So I couldn't -- I can't
 2    identify anybody like that.
 3         Q    Okay.  So you -- you can't identify any
 4    admissions representative who worked for Corinthian
 5    after you were terminated in May of 2005?
 6         A    No.
 7         Q    You can't identify any director of
 8    admissions who worked for the school after you were
 9    terminated in May of 2005; is that right?
10         A    Well, I think Cary is working somewhere.
11    I don't know.  I haven't talked to him.  I heard
12    through the grapevine he was working at Heald.
13         Q    But you don't have direct knowledge of --
14         A    No, I don't.  I haven't been to Heald and
15    I haven't gone into his office and sat down and
16    said, "How are you doing, Cary?"  I haven't done
17    that, no.  I haven't seen him.
18         Q    You don't have direct knowledge of the
19    name of any director of admissions who was working
20    at Corinthian after you were terminated in May of
21    2005?
22         A    No.
23         Q    And can you name a school president who
24    held that position after May of 2005?
25         A    I don't know the name of the lady that
```

1    took over for Mr. Plant.  I don't know her name.

2         Q    Okay.  Can you name --

3         A    I don't need to know that.

4         Q    Can you name any regional director who

5    held that position after May of 2005?

6         A    I don't know any of those people and I

7    don't know their names, no.

8         Q    Okay.  And have we discussed all the job

9    responsibilities that you had at Corinthian during

10   the time periods you worked for Corinthian?

11        A    All the ones that were listed on here.  I

12   didn't have any other job responsibilities for

13   Corinthian other than what was listed in here.

14        Q    And -- and you've described for me all the

15   responsibilities that you had in the various

16   positions you held during your tenure at Corinthian;

17   is that right?

18        A    Yes, I -- yes, I did.

19        Q    Okay.  So you had no involvement in

20   designing compensation programs for admissions

21   representatives; is that correct?

22        A    Designing?  What are you saying?

23        Q    Did you help put together the compensation

24   program that governed how admissions representatives

25   would be paid?

```
 1         A    No, I wasn't hired to do that.
 2         Q    Okay.  So you didn't participate --
 3    participate in any discussions about how to design
 4    the written program for admissions representatives?
 5         A    No, I didn't do any curriculum design or
 6    any of that.
 7         Q    Okay.
 8         A    I was an admissions rep and that's what I
 9    did when I worked for Bryman.  I didn't do any
10    designing for them.
11         Q    Okay.  And that includes --
12         A    I did that for myself.
13         Q    Uh-huh.  And so you didn't play any role
14    in developing the written materials that were part
15    of the --
16         A    No.
17         Q    -- compensation programs for admissions
18    representatives?
19         A    No, I did not.  Corporate did all that.
20         Q    And you have no knowledge, I take it,
21    about how that compensation program was designed; is
22    that right?
23         A    No.  No, I do not.  All I did was read it
24    when they gave it to me.
25         Q    Okay.  Do you know who designed the
```

VALERIE RASMUSSEN COURT REPORTING    **949.888.7858**              156

**0117**

1   compensation program for admissions representatives?

2       A    I should ask you that or somebody working

3   here.  I don't know.

4       Q    You don't know?

5       A    Huh-uh.

6       Q    And you don't know what factors they took

7   into account --

8       A    No.

9       Q    -- to design the compensation program?

10      A    No, I could find something that they might

11  want to take part in, though, but I didn't know

12  anything like that.

13      Q    Okay.  And you don't know what their

14  intent was in designing the written compensation

15  program?

16      A    No, I didn't work with that team.  That

17  was all done through corporate.

18      Q    And we looked earlier at some performance

19  evaluation forms.  Did you have any involvement in

20  designing what the performance evaluation forms

21  would look like?

22      A    No.

23      Q    Okay.  Do you know how they were

24  developed?

25      A    Corporate.  It's like I say, I've got that

```
 1    stuff from corporate and that's it.  I don't know

 2    anything about it.

 3         Q    You don't know what factors --

 4         A    No.

 5         Q    -- were taken into account in figuring out

 6    how to design that form, do you?

 7         A    No.

 8         Q    You don't know what the intent was --

 9         A    No, I don't.

10         Q    -- in designing the performance evaluation

11    form, do you?

12         A    No.

13         Q    And did you participate in any discussions

14    about how the performance of admissions

15    representatives should be evaluated?

16         A    No, I did not.

17         Q    I take it you also had no involvement in

18    designing the compensation or bonus programs for

19    directors of admission?

20         A    No, I did not.

21         Q    Okay.  And you didn't participate in any

22    discussion about how to design those programs?

23         A    No, I did not.

24         Q    You didn't develop any of the written

25    materials for those programs?
```

1      A    No, I did not.

2      Q    You don't know what factors were

3   considered in designing those programs?

4      A    No, I did not.  The only thing I did was

5   this sheet when I was a director, design a plan for

6   the -- for the admissions team to get their numbers.

7      Q    Okay.  And by that --

8      A    That was my job.

9      Q    By that you were referring to that "Week

10  Four" agenda we looked at earlier?

11     A    Yeah.  Yes, that's the only thing.

12     Q    Okay.  And that's not --

13     A    I wouldn't say that I designed it.  I just

14  wrote it up how it was given to me when I was in

15  admissions for them.

16     Q    Okay.  So you don't know what the intent

17  was in designing the overall bonus program that

18  applied to directors of admissions; is that right?

19     A    No.  I didn't delve off into that area.

20     Q    Okay.

21     A    That wasn't my job.

22     Q    Am I correct that the only

23  management-level position you held was for that

24  roughly two-month time period --

25     A    That's it.

```
 1      Q    -- where you were a director of admissions
 2  at Hayward?
 3      A    Yes, that's the only one.
 4      Q    Okay.  Did you ever personally participate
 5  in meetings involving school executives?
 6      A    Yes, I did.
 7      Q    Okay.  How often did you participate in
 8  meetings like that?
 9      A    I'm not sure how many times corporate came
10  down to the school, but they would always have
11  admissions meetings and bring all the admissions
12  teams in.  And the corporate people would help them
13  write the scripts, change the scripts.  I guess they
14  designed them, too.  I don't know.
15           But they would tell us -- give us
16  information on how to change the scripts.  If the
17  enrollments weren't up or if the enrollments were
18  down, they would tell us how to change the scripts.
19      Q    And by "scripts," you mean what you use to
20  communicate with potential students?
21      A    That's what I mean.
22      Q    Okay.  And was anything else discussed
23  during those meetings?
24      A    No, that was basically it.  They would
25  come up and have those meetings and fire us up.
```

1       Q     So it was to get you sort of --

2       A     That's what they used, the words "fire us

3   up."

4       Q     -- get you excited about your job?

5       A     Uh-huh, uh-huh.

6       Q     And to work on the script that you would

7   use when communicating with students?

8       A     Yeah, and how to change it and stuff like

9   that.

10      Q     Okay.  And that was the extent of

11  discussions that you had with corporate executives

12  about admissions?

13      A     Yeah, I would be in a meeting with a bunch

14  of people.  I wouldn't have a direct conversation

15  with them.

16      Q     Okay.  Were you ever personally in a

17  position to observe a meeting between school

18  executives other than the ones that you participated

19  in yourself?

20      A     Like what?  You mean like -- give me an

21  example of what you're talking about.

22      Q     Well, if you attended a meeting where

23  other executives were talking to each other --

24      A     No.

25      Q     -- other than the meetings you just

```
 1   described?
 2       A    Huh-uh, no.
 3       Q    David Moore is one of the defendants in
 4   this case.  Do you know who he is?
 5       A    He was at the University of Phoenix,
 6   wasn't he?
 7       Q    I'm just asking if you know who he is.
 8       A    Oh, I'm trying to figure out if I do.  I
 9   think he was at the University of Phoenix.  I'm not
10   sure.
11       Q    He's not somebody you know personally?
12       A    No.
13       Q    You don't even know if he worked for
14   Corinthian?
15       A    Well, I saw -- I don't know where he's
16   working now, but I saw the corporate page.  And I
17   think he got transferred over here from the
18   University of Phoenix.  I don't know.  That's a
19   question you have to ask David Moore because I don't
20   know the answer to that.
21       Q    Okay.  You've never met him in person?
22       A    I might have seen him on the Web page, but
23   I have never met him in person.
24       Q    And you never communicated with
25   David Moore; is that right?
```

```
 1        A    Not like I'm communicating with you.

 2        Q    I'm asking if you've ever communicated --

 3        A    No, I haven't.

 4        Q    -- with David Moore?

 5        A    No.

 6        Q    And have you ever been in a meeting in

 7   which he was present?

 8        A    Oh, I think he might have spoken at some

 9   of those University of Phoenix meetings.  I'm not

10   sure.

11        Q    Okay.  You don't recall a meeting --

12        A    No.

13        Q    -- at -- at Corinthian --

14        A    I had no meetings with David Moore.

15        Q    Okay.  And you don't recall him speaking

16   at any meeting at Corinthian; is that correct?

17        A    No.

18        Q    Is that correct?

19        A    That's correct.

20        Q    Another one of the defendants is someone

21   named Jack Massimino.  Do you know who that is?

22        A    I think he was with the University of

23   Phoenix.  I can't remember the names.

24        Q    Okay.

25        A    But he might have been with the University
```

```
 1   of Phoenix.
 2        Q    Okay.  You've never --
 3        A    I think he was the president over there or
 4   something.  I'm not sure.
 5        Q    And you never met him in person?
 6        A    I can't remember meeting him in person.
 7        Q    Okay.  And I take it you don't recall
 8   communicating with him?
 9        A    No.
10        Q    Do you know what a "program participation
11   agreement" is?
12        A    No.  What is that?
13        Q    I'm just asking whether you know what it
14   is.
15        A    No, I don't.
16        Q    Never heard of it before?
17        A    Program participation?
18        Q    A program participation agreement.
19        A    Okay.  No.
20        Q    Is today the first day you've heard that
21   word?
22        A    As far as I know in relationship to
23   Corinthian.
24        Q    Have you ever heard of a program
25   participation agreement in relation to anything
```

```
 1    else?
 2         A    No.
 3         Q    Okay.  Have you ever seen any agreements
 4    that Corinthian has with the government, the U.S.
 5    government?
 6         A    Like what?
 7         Q    Any agreements of any kind.  Have you ever
 8    seen any agreements that Corinthian has with the
 9    government?
10         A    Not that I know of, no.  I would have to
11    say no to that.
12         Q    Uh-huh.  Are you aware that -- whether or
13    not Corinthian --
14         A    It says right here on this one, "comply
15    with government regulations."  Are you talking about
16    that kind of --
17         Q    No, I'm just -- I'm not asking you
18    questions about anything that's in a document.  I
19    just want to know what you know sitting here today.
20         A    I don't know anything about that, what
21    you're asking me.
22         Q    Okay.  So -- so you don't know whether or
23    not Corinthian has any agreements with the
24    government; is that right?
25         A    No, I don't know for sure.  They probably
```

```
 1    do, though.
 2        Q    Okay.  But you don't know one way or
 3    another?
 4        A    No, I wouldn't even need to know that.
 5        Q    Okay.  I want to ask you about financial
 6    aid.  And by that I mean any federal government or
 7    state government assistance that's given to a
 8    student to help finance their education.  So that
 9    could be a grant, it could be a loan.
10             As an employee of Corinthian, did you have
11    any responsibility for helping students submit
12    financial aid applications?
13        A    I didn't work in financial aid, I worked
14    in admissions.
15        Q    Okay.
16        A    That's what I did.  I didn't mess around
17    with financial aid.
18        Q    Okay.  Have you ever prepared a financial
19    aid application for a Corinthian student?
20        A    No, I have not.
21        Q    Have you ever submitted a financial aid
22    application for a Corinthian student?
23        A    No.
24        Q    Have you ever communicated with the
25    federal government on behalf of Corinthian?
```

```
 1        A    No.
 2        Q    Did you ever see or hear any
 3  communications between a representative of
 4  Corinthian and the government?
 5        A    No.
 6        Q    Did you ever submit any claim for payment
 7  to the federal government on behalf of Corinthian?
 8        A    No.
 9        Q    Did you ever see any claim for payment to
10  the federal government that was made by Corinthian?
11        A    No.
12        Q    Is the same true for state governments as
13  well?
14        A    I didn't delve off into that area.  That's
15  true.
16        Q    You never communicated with state
17  governments?
18        A    No, except for myself and as a student I
19  did that for myself.
20        Q    But on behalf of --
21        A    It wasn't with Corinthian.  So...
22        Q    On behalf of Corinthian --
23        A    No, I didn't.
24        Q    -- you never communicated with a state
25  government?
```

```
 1              And you never submitted a claim for

 2    payment to any state government on behalf of

 3    Corinthian?

 4         A    No, I did not.

 5         Q    You never saw a claim for payment --

 6         A    No, I haven't.

 7         Q    -- to a state government on behalf of

 8    Corinthian?

 9              And you never saw or heard any

10    communications between any representative of the

11    school and any state government; is that right?

12         A    No.

13         Q    I'm correct?

14         A    That's correct.

15         Q    Okay.  Just a few more questions here.

16         A    Uh-huh.

17         Q    When you were recruiting students as an

18    admissions representative for the school, did you

19    ever lie to them?

20         A    No.

21         Q    Did you ever mislead them?

22         A    No.

23         Q    You were honest with them; right?

24         A    Yes.

25         Q    And you did your best to provide
```

```
 1  prospective students with accurate information?

 2       A    Yes, I did.

 3       Q    What was the pitch that you would give

 4  prospective students who you were trying to recruit

 5  to Corinthian?

 6       A    The pitch?

 7       Q    Well, what would you -- well, what would

 8  you tell them when you were trying to recruit them

 9  to the school?

10       A    I told them all kinds of things, you know.

11  I can't remember what I told them.  I followed the

12  script that Corinthians gave me.

13       Q    Okay.

14       A    That's what I did.

15       Q    And you believed that what you were

16  telling those students or prospective students was

17  true; is that right?

18       A    That's right because I wouldn't be telling

19  them a lie.

20       Q    When you were a director of admissions,

21  did you ever tell the admissions representatives

22  that you supervised to mislead students in any way

23  that they were trying to recruit?

24       A    That I what?

25       Q    When you were a director of admissions,
```

```
 1    did you ever tell the admissions representatives

 2    that you were responsible for supervising to mislead

 3    prospective students that they were trying to

 4    recruit to the school?

 5         A    No.

 6         Q    Okay.  And did you personally comply with

 7    the school's policies and procedures at the time

 8    that you were employed at the school?

 9         A    Yes, I did.

10         Q    You never purposely violated any of those

11    procedures?

12         A    No.

13         Q    And you did your best to follow the

14    policies and the procedures of the school?

15         A    Yes, I did.

16         Q    Did you ever tell any other employees of

17    the school that they should violate the school's

18    written policies and procedures?

19         A    No, I did not.

20         Q    Were you ever told that you should violate

21    the school's written policies and procedures?

22         A    Regarding enrollments, no, I -- no one

23    told me to do that.

24         Q    Okay.  And are you aware of any legal or

25    regulatory requirements that relate to recruiting or
```

```
 1    the compensation of recruiters?

 2         A    Repeat that, please.

 3         Q    Are you aware of any legal or regulatory

 4    requirements that relate to recruiting or

 5    compensating recruiters?

 6         A    No.

 7         Q    Have you ever heard of the Higher

 8    Education Act?

 9         A    Yes, I have.

10         Q    Okay.  When -- what is your understanding

11    of the Higher Education Act?

12         A    I don't know.  I can't tell you right now.

13         Q    When was the first time you heard of the

14    Higher --

15         A    I don't want to make an error in telling

16    you that.  So I don't want to tell you that.

17         Q    Okay.

18         A    It's not in my brain right now.

19         Q    Okay.  When was the first time you heard

20    of the Higher Education Act?

21         A    Well, I heard about it when I was at

22    Bryman.  I think it has something to do with

23    financial aid.

24         Q    Okay.  Have you ever heard of a provision

25    in the Higher Education Act that prohibits schools
```

```
 1    from paying incentive compensation to people who are

 2    involved in recruiting activities?

 3         A    I read something about that.

 4         Q    Okay.  Where did you read something about

 5    that?

 6         A    I probably read it online.

 7         Q    Okay.  When was the first time you heard

 8    about that?

 9         A    Since I've been away from Corinthians,

10    since I got fired.

11         Q    Okay.  So the first you heard of the

12    provision I just described was after you were

13    terminated from Corinthian?

14         A    I probably heard about it when I was

15    working there, but I was focused on something else.

16         Q    Okay.

17         A    I couldn't like outline everything that's

18    in there for you right now if you asked me to.  I

19    couldn't do that, so I'm not going to tell you that

20    I can.

21         Q    Okay.  And you became aware of this

22    prohibition against paying incentive compensation to

23    people involved in recruiting by doing Internet

24    research?

25         A    Can you repeat that, please.
```

```
 1        Q    I'm just trying to understand how you

 2   became aware of the provision in the Higher

 3   Education Act I described.

 4        A    Well, I became aware of it since I've been

 5   working on this case with you.

 6        Q    Okay.  Before working on putting together

 7   this case, were you aware that there was a

 8   prohibition in the Higher Education Act against

 9   paying incentive compensation to employees involved

10   in recruiting?

11        A    No, no.  Well, they didn't tell me that

12   when I got hired at Corinthians, no.

13        Q    Okay.  So the first time you became aware

14   of the provision in the Higher Education Act that

15   prohibits the payment of incentive compensation to

16   people involved in recruiting was when you started

17   to put together this lawsuit; is that right?

18        A    I didn't put this lawsuit together.  I'm

19   just involved in it.  But I heard of it then, yes.

20        Q    When you became involved in the lawsuit?

21        A    Yes.

22        Q    Okay.  Who put this lawsuit together?

23        A    This is my lawyer, Scott Levy.

24        Q    Okay.  Just a few more questions here and

25   then we can break for lunch.
```

```
 1              How did Mr. Levy become your lawyer?

 2        A    How did he become my lawyer?

 3        Q    Right.

 4        MR. LEVY:  Are you asking for attorney-client

 5   communications?

 6        MS. YOUNG:  No.

 7        MR. LEVY:  Because it sounds like you're --

 8   you're getting close to asking that.

 9        MS. YOUNG:  I am not asking for that.

10        Q    I want to know how it came to be that

11   Mr. Levy is your lawyer, given that he's in Houston

12   and you're in the Bay Area.

13        A    He was recommended to me and I was -- and

14   I met him.

15        Q    Okay.  Who recommended Mr. Levy to you?

16        THE WITNESS:  What's that person's name, Scott?

17   I don't really need to answer that, do I?

18   BY MS. YOUNG:

19        Q    You do.  It's not privileged.

20        A    I do.  Well, I don't know the person's

21   name because I'm not -- I met that person one time

22   and I haven't seen that person in several years, so

23   I can't even remember the name.

24        Q    How did you meet this person?

25        A    I met that person having dinner one time.
```

```
 1        Q    Male or female person?

 2        A    She was a female.

 3        Q    What was the subject of your dinner

 4   conversation?

 5        A    I can't remember that.  How good the

 6   potatoes were.  I don't know.

 7        Q    Why did you have dinner with her?

 8        A    Well, she invited me.

 9        Q    So this is a person you've never met

10   before in your life and she invites you to dinner.

11   Did she say why?

12        A    She wanted to get to know me.

13        Q    Did she -- I mean, if I got a call like

14   that, I would want to know why.  Did you ask her why

15   she wanted to get to know you?

16        A    No, I didn't.  I just went to dinner.  I

17   had dinner with her.

18        Q    What did you discuss during that dinner?

19        A    Well, I can't remember.  It's been a

20   while.  I can't remember everything I discussed with

21   her.

22        Q    Can you remember in general what you

23   talked about?

24        A    Yes, I do.  Admissions.

25        Q    Can you be more specific?
```

1      A     Just stuff about admissions, her job or
2  whatever.
3      Q     Was this person an admissions
4  representative at Corinthian?
5      A     Maybe.  I'm not sure.  I didn't ask her
6  whether she was in admissions.  I didn't ask.
7      Q     How did it come to be that she gave you a
8  reference to Mr. Levy?
9      A     I think she might have worked with him
10  before.  I'm not sure.
11      Q     Was that what she told you?
12      A     She didn't tell me that because I didn't
13  ask her that because I don't get in people's
14  business.  I didn't ask her.
15      Q     So you said she contacted you.  Do you
16  know how she got your information?
17      A     No, I don't.
18      Q     When did she contact you?
19      A     I'm not sure of the date.
20      Q     So this lawsuit was filed in 2007 -- I'm
21  sorry.  We have a -- we have a communication that we
22  know happened between you and Mr. Levy on
23  October 7th, 2006.
24      A     Uh-huh.
25      Q     Did this woman contact you around that

```
 1        Q     Was the purpose of the meeting to talk
 2   about anything?
 3        A     Not necessarily.
 4        Q     So who contacted you to set up the
 5   meeting?
 6        A     Who contacted me to set it up?
 7        Q     Correct.
 8        A     The meeting was already set up when I got
 9   there.
10        Q     How did the meeting get set up?
11        A     I'm not sure because I didn't set it up.
12        Q     Who set up the meeting?
13        A     I'm not sure.  I didn't set it up.
14        Q     How did you know to go to the
15   restaurant -- you were at a restaurant for this
16   dinner meeting?
17        A     I was at a restaurant, yes.
18        Q     How did you know to go to the restaurant
19   for the meeting?  Did somebody call you and say that
20   a meeting was going to happen?
21        A     Someone called me.
22        Q     Who told you?
23        A     Talala called me.
24        Q     And what did he say to you?
25        A     And I didn't know what was happening until
```

 1    I got there.  I didn't know what the meeting was all

 2    about and I just had dinner and left.

 3         Q    What did Talala say to you when he called

 4    you about this meeting?

 5         A    What did he say to me?

 6         Q    Uh-huh.

 7         A    This has been a while.  I can't tell you

 8    exactly what he said to me.  He asked -- told me he

 9    was having dinner and to come over.  So I went over

10    there to the restaurant.

11         Q    Okay.  Who paid for dinner?

12         A    Who paid?

13         Q    Uh-huh.

14         A    I don't know.  Probably one of those

15    people that was with me.  I didn't pay.  I'm not

16    sure who paid because I didn't -- I wasn't paying

17    that close of attention who paid, but I didn't pay.

18         Q    So was there any discussion at this dinner

19    meeting about bringing a lawsuit against Corinthian?

20         A    Repeat that.

21         Q    Was there any discussion at this dinner

22    meeting about bringing a lawsuit against Corinthian?

23         A    It could have been.  I'm not sure.

24         Q    Had you thought about bringing a lawsuit

25    against Corinthian before that dinner meeting?

```
 1       A    No, I hadn't.  I didn't know anything
 2  about a lawsuit with Corinthians.
 3       Q    Had you ever thought that Corinthian might
 4  have been defrauding the government before that
 5  dinner meeting?
 6       A    In terms of defrauding them?
 7       Q    You're bringing a claim for fraud in this
 8  lawsuit.  Do you understand that?
 9       A    Yes, I do.
10       Q    Okay.
11       A    But you have to be specific when you ask
12  me a question.
13       Q    Did you --
14       A    Defrauding them in terms of?
15       Q    It's a broad question.  Did you believe
16  that --
17       MR. LEVY:  It's 1:00 o'clock, too, so make this
18  your last one.
19       MS. YOUNG:  Well, I'm going to wrap up this
20  line of questioning.
21       Q    Before you had this dinner meeting --
22       A    Uh-huh.
23       Q    -- did you believe that Corinthian had
24  engaged in any fraud against the government?
25       A    No.  I would have to say no to that.
```

```
 1        Q    And before attending this meeting, did you
 2   believe that Corinthian had done anything improper
 3   in the way it compensated admissions
 4   representatives?
 5        A    No.
 6        MS. YOUNG:  Okay.  That's all I have.  Let's
 7   break for lunch.
 8        THE VIDEOGRAPHER:  The video deposition is now
 9   going off record at 1:02 p.m.
10             (A recess was taken from 1:02 p.m. to
11   2:32 p.m.)
12        THE VIDEOGRAPHER:  The video deposition is now
13   returning to record at 2:32 p.m.
14   BY MS. YOUNG:
15        Q    Okay.  Ms. Lee, we're returning after a
16   lunch break and you understand that you are still
17   under oath?
18        A    Yes, I do.
19        Q    Okay.  And is there anything that you
20   would like to amend in terms of your testimony
21   earlier today?
22        A    Not that I know of at this moment.
23        Q    Okay.  Before the break we were talking
24   about a dinner that you attended with Mr. Levy and
25   Mr. and Mrs. Mshuja.
```

```
 1              Am I saying that correctly, by the way,
 2    Talala --
 3         A    Ask him.  It's his name.
 4         Q    Unfortunately, the only person that I'm
 5    supposed to be asking questions of is you.  And
 6    so --
 7         A    Okay.
 8         Q    How do you pronounce his name?
 9         A    Mshuja.
10         Q    Mshuja?
11         A    Mshuja.
12         Q    Mshuja.  Okay.
13              So we were talking about this dinner that
14    you attended with Mr. Mshuja -- Mshuja and Mr. Levy
15    and Mr. Labaton and another woman.
16         A    Uh-huh.  Yes.
17         Q    Do you have that in mind?
18         A    Uh-huh.
19         Q    And you say that Mr. Mshuja called you
20    about the dinner to tell you to come to it?
21         A    Yes, he did.
22         Q    Okay.  What is your relationship with
23    Mr. Mshuja?
24         A    What's my relationship?  I worked with him
25    at Corinthians.
```

```
 1        Q    Okay.  Do you have any familial

 2   relationship with him?

 3        A    Do I have what?

 4        Q    Any familial relationship with him?  Is he

 5   part of your family?

 6        A    He's my brother.

 7        Q    Okay.  And you also worked with him at

 8   Corinthian?

 9        A    Yes, I did.

10        Q    In what way did you work with him at

11   Corinthian?

12        A    Well, he worked there the same time I did.

13   I didn't work in the same -- you know, I didn't work

14   with him, but he worked there when I was working

15   there.

16        Q    Okay.  Okay.  And what did Mr. Mshuja do

17   at Corinthian?

18        A    He was at one time the test proctor.

19        Q    You said "at one time."  During what time

20   period was he a test proctor for Corinthian?

21        A    I'm not sure because I took care of my

22   business and that's it.  I'm not sure of the dates

23   on that.  So you can't ask me that.  I'm sorry.

24        Q    Okay.  He overlapped with you a little bit

25   at Corinthian?
```

```
1        A    Well, he was the proctor when I was in

2   admissions.

3        Q    So at the same time that you were in

4   admissions, he was employed as a test proctor; is

5   that correct?

6        A    Yes.

7        Q    Do you know if he worked for Corinthian

8   after you stopped your employment there?

9        A    I wish you could ask him those questions

10  because I don't get in people's business, but I was

11  there and I left and I was gone.  So I don't know

12  what he did.  You'd have to ask him these questions.

13       Q    Okay.

14       A    Okay.  If you don't mind.

15       Q    We will have an opportunity to do that

16  tomorrow.

17       A    Okay.  Okay.

18       Q    But we are entitled to what you know

19  today.  So if you --

20       A    About him?

21       Q    Correct.

22            Are you aware of him continuing to work

23  for Corinthian after you left your employment there

24  in 2005?

25       A    Okay.  I think he left before I did.  I'm
```

```
 1    not sure.

 2         Q    Okay.  And are you aware of him having any

 3    position at Corinthian other than as a test proctor?

 4         A    No, I'm not.

 5         Q    How frequently would you communicate with

 6    him about or -- strike that.

 7              Did you communicate with Mr. Mshuja about

 8    your work for Corinthian?

 9         A    No.

10         Q    Are you aware of anybody else who

11    communicated with Mr. Mshuja about their work at

12    Corinthian?

13         A    No.

14         Q    Did you ever see him visit anyone in

15    admissions -- the admissions department at

16    Corinthian?

17         A    Visit?

18         Q    Correct.

19         A    Well, I mean, he had to walk around the

20    admissions department and give everybody their test

21    scores.  And he gave me mine when I had schooling

22    and got tested, but I wasn't like trying to figure

23    out where he was.  I wasn't doing that.

24         Q    Okay.

25         A    Uh-huh.
```

```
 1        A    Not that I know of.
 2        Q    Okay.  So when Mr. Mshuja called you about
 3   this dinner, did you ask him who would be at this
 4   dinner?
 5        A    No, I did not.
 6        Q    Did he tell you who would be at this
 7   dinner?
 8        A    No.
 9        Q    Did you ask him why --
10        A    I didn't ask any questions.  I'm not a
11   question asker.
12        Q    Okay.  What did he tell you about the
13   dinner when he called you?
14        A    He said, "I want you to come over and meet
15   me for dinner" and I did.
16        Q    That was all he told you about it?
17        A    That's what he told me and that's what I
18   did.
19        Q    Okay.  And then you went to the dinner.
20   We talked about who was there.
21             And at that point were you introduced to
22   Mr. Levy?
23        A    Yes, I was.
24        Q    And what -- how were you introduced to
25   him?
```

```
 1        A     Like you introduce somebody.  "This is
 2   Scott Levy" and "I'm Nyoka."  I introduced myself to
 3   him.
 4        Q     Did he tell you at that time that he was a
 5   lawyer?
 6        A     Probably.  I'm sure he did.  I can't
 7   remember.
 8        Q     Did you understand that you were meeting
 9   with a lawyer at that dinner?
10        A     Well, after I got there I did, but I
11   didn't know that before I got there.
12        Q     Okay.  And what about Mr. Labaton, was he
13   introduced to you as a lawyer?
14        A     Yes, he was.
15        Q     Were you told anything about why lawyers
16   were at this dinner?
17        A     I didn't ask, I just had dinner.
18        Q     Okay.  That wasn't my question.
19              I was asking were you told anything about
20   why lawyers were at this dinner?
21        A     Told like -- I was told who they were,
22   introduced to them, and then there was a
23   conversation going on that I was involved in because
24   I was there, you know, and I was listening.
25        Q     And the conversation, did it discuss
```

```
 1    bringing a legal action or a lawsuit against
 2    Corinthian?
 3        A    I can't remember now at that time.
 4        Q    Did it discuss any potential wrongdoing
 5    that might have been going on at Corinthian?  Was
 6    that a subject of discussion at this dinner?
 7        A    No.  Because I didn't see this person for
 8    a few years until yesterday.
 9        Q    So after the dinner that took place that
10    we've just been discussing, you haven't seen
11    Mr. Levy until yesterday?
12        A    Yeah, I didn't see him for years.
13        Q    Okay.  At the dinner, was there any
14    discussion about how you might benefit from bringing
15    a lawsuit against Corinthian?
16        A    No.
17        Q    Do you have an understanding of whether --
18    what you might stand to gain by bringing a lawsuit
19    against Corinthian?
20        A    Do I have an understanding of what
21    might -- what I might be able to gain?  Not at this
22    moment.
23        Q    Okay.  Did you have an understanding after
24    you went to that dinner about what you might have to
25    -- might stand to gain from bringing a lawsuit
```

SER 0163

1    against Corinthian?

2        A    Gain in terms of?  You have to be specific

3    when you talk to me.

4        Q    An award of money as a result of a

5    lawsuit?

6        A    No, I didn't have an understanding of any

7    kind of money at that point.

8        Q    That wasn't a subject that you discussed

9    at the dinner?

10       A    No.

11       Q    Did you bring any documents with you to

12   the dinner?

13       A    No, I did not.  I brought my bag and my

14   body.  That's it.

15       Q    And did you get any documents at the

16   dinner?

17       A    No, I did not.

18       Q    Were you shown any documents at the

19   dinner?

20       A    No.

21       Q    At some point did you sign an agreement to

22   retain Mr. Levy as your lawyer?

23       A    Yes, I did.

24       Q    Do you recall when you did that?

25       A    No, I don't.

1      Q    Let me show you a document that may help

2  refresh your memory on that.

3      A    I don't know dates like that on that.

4      MS. YOUNG:  We're going to mark this as

5  Exhibit 13.

6      MR. LEVY:  15.

7      MS. YOUNG:  Exhibit 15.  That's right.  I'm

8  sorry.

9              (Defendants' Exhibit 15 was marked

10  for identification by the deposition officer and is

11  bound under separate cover.)

12  BY MS. YOUNG:

13      Q    So this is a privilege log that was

14  provided to us by your attorney recently.

15      A    Uh-huh.

16      Q    And if you could turn to the second page

17  of this document.

18      A    Okay.

19      Q    There are various entries in this log that

20  are listed by date.  The first column is labeled

21  "Date."  And I'm looking at an entry which is the

22  second-to-last one from the bottom of page 2 --

23      A    I see that.

24      Q    -- dated October 10th, 2006.  And it's

25  described as a "Retainer Agree" letter, authored by

```
 1  Mark Labaton and received by Nyoka Lee, Talala

 2  Mshuja, Susan Newman and John Chacon.

 3          Do you see that?

 4      A   I see this right where it is.

 5      Q   Is that the retainer agreement that you

 6  signed?

 7      A   Well, it could have been.  I'm not sure

 8  because that's the first time I've seen this

 9  document.

10      Q   Okay.

11      A   It says it right here, but I haven't seen

12  this document.

13      Q   Okay.  And I think you said earlier that

14  you don't know who Susan Newman and John Chacon are?

15      A   I don't know those people and I didn't

16  know them when I showed up.  I don't know those

17  people now.  I see their names on this piece of

18  paper, but I don't know them.

19      Q   Okay.  And you personally have never

20  communicated with Susan Newman or John Chacon to

21  your knowledge?

22      A   I don't know those people.

23      MR. LEVY:  Other than at the dinner; correct?

24      MS. YOUNG:  Well, I believe the testimony is

25  she doesn't recall the names of the people who were
```

```
 1    at the dinner.

 2        Q    Do you want to change that?

 3        MR. LEVY:  I -- I don't recall that being the

 4    testimony, but --

 5        MS. YOUNG:  Well, let me ask the question so

 6    the record is clear.

 7        THE WITNESS:  Yes.  Like I said, when I showed

 8    up, I didn't know either of those individuals.

 9    BY MS. YOUNG:

10        Q    Okay.  Did --

11        A    And I don't know them now.  I don't know

12    where they are.  I don't talk to them.  I mean, what

13    do you consider "know them"?  I don't talk to them.

14        Q    Have you ever met any of these people,

15    Susan Newman or John Chacon, ever?

16        A    They were at the dinner.

17        Q    They were both at the dinner?

18        A    Yeah.

19        Q    Okay.

20        A    But I didn't really engage in a

21    conversation with them even at the dinner.

22        Q    Okay.

23        A    I wasn't like, "Hey, how are you doing?"

24    I didn't do that.

25        Q    Okay.  How --
```

```
 1        A    They were just there and I was there.
 2        Q    You said that a woman who attended the
 3   dinner recommended that you hire Mr. Levy as your
 4   lawyer?
 5        A    I didn't say that.  No, I didn't say that.
 6        Q    You didn't say that?
 7        A    No, nobody recommended me to do that.
 8        Q    Why did you hire Mr. Levy as your counsel?
 9        A    Because he was interested in working with
10   me.  Okay.
11        Q    Did --
12        A    So I was interested in what he had to say
13   and that's how he -- that's how we came together.
14        Q    Did he tell you why he was interested in
15   working with you?
16        A    Yes, of course.
17        Q    Why was that?
18        A    Because he felt at that particular time
19   that Corinthian Colleges was involved in some
20   default or whatever, and that he wanted to defend
21   this case right now while we're sitting here.
22        Q    Okay.  Prior to that time, the idea that
23   Corinthian was in default of something was not an
24   idea that had occurred to you; is that right?
25        A     Well, I saw some malpractices when I was
```

```
 1   else about what happens if --
 2        A    Not at this time.  I don't.
 3        Q    Please let me finish my question.
 4             Do you have an agreement with anybody else
 5   about what happens if you win an award in this case?
 6        A    I don't have an agreement.
 7        Q    Do you have an understanding with
 8   Mr. Mshuja about what happens if you win an award in
 9   this case?
10        A    I wouldn't have an understanding with him
11   about that, no, I don't.
12        Q    Okay.  Do you have an agreement with
13   Mr. Levy or Mr. Labaton about what happens if you
14   win an award in this case?
15        A    I don't have an agreement with them.
16        Q    Looking back at this document that we've
17   marked as Exhibit 15, this privilege log.
18        A    Uh-huh.
19        Q    I understand that you didn't prepare it.
20   Did you look at this document before it was --
21        A    No.
22        Q    -- finalized?
23        A    I have never seen this document before.
24        Q    Please look at an entry -- it's the third
25   one from the top on the first page.
```

```
 1        A    On the right-hand side?
 2        Q    Well, they go from left -- the description
 3   goes from left to right.  So what I'm looking at is
 4   a document dated 10/20/2006.  The author is noted as
 5   Mark Labaton.
 6        A    Uh-huh.
 7        Q    The recipient is Gary Plessman, Assistant
 8   U.S. Attorney.  And it's described as a letter,
 9   "Regarding:  Draft complaint Re IBT."
10             Do you see that?
11        A    No, I don't.
12        Q    Okay.  It's -- it's this one right here
13   (indicating).  I'm looking at the third entry down.
14        A    I see that, "Re:  Draft complaint."
15        Q    Are you with me?
16        A    Yeah.
17        Q    Regarding the draft complaint re IBT.  Do
18   you see that?
19        A    I see that, uh-huh.
20        Q    Do you know what that refers to, "Draft
21   complaint Re IBT?
22        A    No, I don't know anything about IBT.
23        Q    Okay.  You don't know what IBT is?
24        A    Well, I know what it is, but I don't know
25   anything about IBT.  I never worked there, so...
```

```
 1        Q    What is IBT?

 2        A    International business something, I guess.

 3   International Business Technology, maybe.  I don't

 4   know.

 5        Q    Okay.

 6        A    I don't work -- I didn't work for IBT, so

 7   I can't answer any questions about them.

 8        Q    Okay.  Okay.  Do you know if they're a

 9   for-profit school or --

10        A    I don't know about them.

11        Q    Okay.

12        A    I didn't work for them.

13        Q    Okay.

14        A    So I can't discuss it.

15        Q    Okay.  Let's put this aside for now.

16        A    Okay.  Look how many papers I had.

17        Q    You mentioned before that you felt like it

18   was all about the numbers.  I think I heard you say

19   that many times.

20        A    Yes, it was.

21        Q    And I just want to try to understand what

22   numbers you're talking about.  So if you can look at

23   Exhibit 13, what we marked as Exhibit 13.

24            In this document, if you -- this is the

25   campus-based admissions representative minimum
```

```
 1    standards of performance.  If you look on page 2,
 2    under No. 18, do you see where it says, "Start the
 3    established annual minimum performance targets
 4    required of each admissive" -- "admissions
 5    representative classification as described below"?
 6         A    Yes, I see that.
 7         Q    Okay.  And then it has descriptions of
 8    different titles of admissions representative.  And
 9    the first one is associate campus admissions
10    representative.
11              Do you see that?
12         A    Yes, I do.
13         Q    And then it says that the requirement is
14    to "Achieve a minimum of 100 starts (net of
15    reversals) in the four most recent company defined
16    fiscal" -- "fiscal quarters."
17              Do you see that?
18         A    Yes.
19         Q    And then it goes on for campus admissions
20    representative to say "Achieve a minimum of 120
21    starts"?
22         A    I see that.
23         Q    Okay.  And it goes on and it's got
24    different numerical requirements, increasing as you
25    go from one level to the next?
```

```
 1        A    Yes, I see that.

 2        Q    When you said it was all about the

 3   numbers, are these the numbers that you were

 4   referring to?

 5        A    Yes.

 6        Q    And these are the numbers you understood

 7   admissions representatives would have to hit or they

 8   would be terminated?

 9        A    Yes.  And they would have to accomplish

10   that in order to get a raise.

11        Q    Okay.  They would also have to hit those

12   numbers in order to get a raise?

13        A    Yeah, you got to hit them numbers.

14        Q    Did you ever express a concern to anybody

15   at Corinthian about how admissions representatives

16   were being compensated?

17        A    In terms of hitting these numbers or just

18   in general?

19        Q    In general, did you express a concern to

20   the school about anything related to how admissions

21   representatives were being compensated?

22        A    Well, I don't -- I remember having had --

23   having a conversation with Mr. Plant about my

24   numbers when he was supposedly giving me my annual

25   raise.  He didn't give me my raise and he said I
```

```
 1   didn't hit my numbers, and I told him that I did.

 2   So we had a discussion about that.

 3            And he checked with corporate because I

 4   told him he needed to check with corporate because

 5   he would discover that I had hit those numbers and

 6   he needed to give me my raise.  I had a conversation

 7   with Plant about that.

 8       Q    And that was in what time period?

 9       A    I'm not sure what time period it was, but

10   it was one time when I was getting my raise.  I

11   don't know the exact year or whatever, but one time

12   that did happen.  And I had my files on the numbers

13   that I had hit and I presented it to him.  And he

14   had to give me my raise.

15       Q    Okay.  And that was before January 1st of

16   2005; correct?

17       A    Yes.  Excuse me.

18       Q    And you don't know what other factors

19   Mr. Plant or anyone else might have considered in

20   deciding whether you should get a raise?

21       A    Other than those numbers, you got to hit

22   those numbers.  If you hit them, they have to give

23   you a raise because that's what they said.

24       Q    But -- but you don't know what Mr. Plant

25   was thinking about, whether you should get a raise
```

```
 1    or whether there were any other factors that should

 2    determine whether you should get a raise?

 3         A    I never discussed that with Plant.  I

 4    didn't discuss that with him ever.  The only time

 5    Mr. Plant spoke to you is when you made your

 6    numbers.

 7         Q    Okay.  So other than this one conversation

 8    with Mr. Plant that happened sometime prior to

 9    January 1st, 2005 --

10         A    Uh-huh.

11         Q    -- did you ever express a concern to

12    anybody at the school about how admissions

13    representatives were being compensated?

14         A    No, I did not.

15         Q    Okay.  Did you ever express concern to

16    anybody at the school about how directors of

17    admissions were being compensated?

18         A    No, I did not.

19         Q    Now, you filed a complaint in this case on

20    March 26th, 2007; is that right?

21         A    You have it.

22         Q    I do.  I'm just asking do you remember

23    when the complaint was filed?

24         A    Well, it depends on which one it was.  I

25    filed several complaints.
```

1      Q    Okay.

2      A    You have to tell me which one you're

3  talking about.

4      Q    I'm talking about the very first one.

5      A    Oh, which one is that?  What does it say?

6      Q    It's the first complaint that was filed in

7  this case.  Do you recall when it was filed?

8      A    No, I do not.  That's why I'm asking you

9  to refresh my memory.

10     Q    Okay.  Let's -- well, we can take a look

11  at it to see if it will refresh your memory.

12     A    Okay.

13     MS. YOUNG:  We'll mark this as Exhibit 17.

14     THE WITNESS:  Oh, you're talking about the

15  court.  I thought you were talking against the

16  school.

17     THE REPORTER:  We're on 16.

18     MS. YOUNG:  Oh, are we on Exhibit 16?  I'm

19  sorry.  This is Exhibit 16.

20     MR. PHADKE:  Well, we numbered the last one 15.

21     MS. YOUNG:  Okay.

22             (Defendants' Exhibit 16 was marked

23  for identification by the deposition officer and is

24  bound under separate cover.)

25  ///

```
 1   BY MS. YOUNG:
 2        Q    So this is Exhibit 16.
 3             Before we look at this document, have you
 4   made any informal complaints against the school?
 5        A    I thought you meant when I was working at
 6   the school.
 7        Q    Okay.
 8        A    You know, if something went down or
 9   somebody had a disagreement or whatever, I would
10   document it and I thought you were talking about
11   that.
12        Q    Okay.  Well, let me ask you some questions
13   about that since you brought it up.
14             Did you make it a practice to document all
15   the complaints that you had against the school at
16   the time you were working there?
17        A    Uh-huh.  That's what you're supposed to
18   do.  Yeah, I did.
19        Q    Okay.  And you provided those complaints
20   to people at the school?
21        A    Yeah, to Mr. Plant or Cary or corporate or
22   whoever.
23        Q    Okay.  And did any of the complaints that
24   you documented have anything to do with how
25   compensation was being paid to admissions
```

```
 1   representatives?

 2       A    I don't remember that.

 3       Q    Okay.

 4       A    Nothing like that.

 5       Q    Have you provided us with all of the

 6   complaints that you made to the school while you

 7   were employed there?

 8       A    I'm not sure.

 9       Q    Do you still have all of the complaints?

10       A    I might have.  I would have to look --

11       Q    Okay.  Have you --

12       A    -- in my records.

13       Q    Have you provided all of those complaints

14   to your lawyer?

15       A    I don't know.  I had some papers I gave

16   him.  I don't know if they were in there or not.  As

17   far as I can see, I provided them.

18       Q    Okay.  Well, we'll get back to that later.

19            Okay.  So let's take a look at Exhibit 16.

20   This is the first complaint that was filed in this

21   lawsuit.  And if you look at the top, the date is

22   March 26, 2007.

23            Do you see that?

24       A    Yes, I see that.

25       Q    Okay.  Have you seen this document before?
```

```
 1      A    I probably have.  I saw a lot of
 2  documents.  I can't remember every single document
 3  that I've seen.
 4      Q    This is the complaint in which you're
 5  bringing this lawsuit and you don't recall if you've
 6  seen it?
 7      MR. LEVY:  Objection; form.  That's not what
 8  she said.
 9      THE WITNESS:  I saw a lot of documents.  I've
10  seen a lot of documents, a lot.
11  BY MS. YOUNG:
12      Q    But sitting here right now, you don't
13  recall if you've seen this or not?
14      A    Like I said, one document gives you
15  cross-eye if you're reading everything.  This is --
16  I'm sure I've seen this before.  I've seen a lot of
17  documents relating to this case.
18      Q    Okay.
19      A    Does that make you clear?
20      Q    No, because I want to know if you've seen
21  this document before.
22      A    I'm looking at it now.
23      Q    And if you -- if you can't answer the
24  question, that's fine.  If you don't know, that's
25  okay.  Just say so.
```

```
 1        MR. LEVY:  Objection to form.

 2        THE WITNESS:  Okay.  Okay.

 3   BY MS. YOUNG:

 4        Q    So this document was filed on March 26,

 5   2007.

 6        A    Okay.

 7        Q    Before that date, did you receive any

 8   information about Corinthian's compensation policies

 9   or practices from any source other than what we've

10   already talked about?

11        A    No.

12        Q    And before filing this complaint in

13   March 20 -- on March 26th of 2007, did you receive

14   any information about any complaints or lawsuits

15   against Corinthian?

16        A    I can't remember that.  There could have

17   been something online about Corinthians.  I don't

18   remember.

19        Q    Are you aware of any other complaints or

20   lawsuits against Corinthian?

21        A    I think I saw one online.  Somebody was

22   complaining of -- having a lawsuit against

23   Corinthians, but I didn't read all of it.  I wasn't

24   trying to dig up anything like that.

25        Q    Uh-huh.
```

```
1        A    But I saw something regarding complaints.

2        Q    Do you recall what the nature of the

3   complaint was against the school that you found on

4   the Internet?

5        A    I'm not sure.  Because every once in a

6   while I'll log on and see what's happening in

7   corporate or whatever, but I'm not -- after I left

8   Corinthians, I wasn't interested in doing any of

9   that stuff again.

10       Q    Okay.  Before you filed your complaint on

11  March 26, 2007, did you receive any information

12  about any complaints or lawsuits against other

13  for-profit schools?

14       A    I saw some stuff, some information

15  regarding University of Phoenix and some admissions

16  reps that filed against them.

17       Q    Where did you get that information from?

18       A    It was on- -- online.

19       Q    When did you get that information?

20       A    I'm not sure.  I'm not sure to be honest

21  with you.

22       Q    It was -- it was before you filed your

23  complaint?

24       A    I'm not sure.

25       Q    Okay.
```

**0166**

1      A      I'm not sure of that date.  Okay.

2      Q      Do you recall anything about the nature of

3   the allegations that admissions representatives were

4   making against these other for-profit schools?

5      A      They were making the same allegations I'm

6   making right now in terms of meeting the numbers and

7   that sort of thing that we've been talking about

8   here.  The same type of...

9      Q      And did you base your complaint in part on

10  what you read about these other lawsuits?

11     A      No, I did not.

12     Q      Before you filed your complaint on

13  March 26, 2007, other than this dinner meeting we've

14  discussed, did you talk with any nonlawyers about

15  your work as an admissions representative against

16  Corinthian or about bringing a lawsuit against

17  Corinthian?

18     A      No, I did not.

19     Q      Okay.  Have you ever communicated with the

20  United States government about your lawsuit?

21     A      No, I have not.

22     Q      Are you aware of something called a

23  "confidential disclosure statement"?

24     A      Yes.

25     Q      What do you understand that to be?

1      A    I understand that I was not supposed to

2  discuss this case with anybody, period, dot, except

3  for my lawyer, Scott Levy.

4      Q    Okay.  Are you aware of a document called

5  a "confidential disclosure statement" that was

6  provided to the United States government about your

7  case?

8      A    No, I'm not aware of that document.

9      Q    Are you aware of any documents that were

10  provided to the United States government about your

11  case?

12      A    Well, I probably have this one in my

13  files.  I have lots of documents, like I said,

14  regarding this case.

15      Q    I understand you have lots of documents.

16  I just want to know if you know about any documents

17  that were provided to the United States government

18  either by you or your attorney.

19      A    Well, I know that I don't know about that.

20      Q    Okay.

21      A    Okay.  So I don't know how else I would

22  know about anything like that.

23      Q    So you don't know if your attorney

24  provided any documents to the government before this

25  complaint was filed?

```
 1        A    No, I don't.
 2        THE VIDEOGRAPHER:  Counsel, can I ask you not
 3    to twist the wire of the mic.  Thank you.
 4    BY MS. YOUNG:
 5        Q    And did your counsel collect documents
 6    from you at some point before the lawsuit was filed?
 7        A    I know that they collected documents from
 8    me.  I don't know if it was before this date or not.
 9    I'm not sure what date it was.  I did send some
10    documents.
11        Q    Okay.  Was that recently or was it some
12    years ago?  Because this document is dated March of
13    2007.
14        A    It was a few years ago.
15        Q    Okay.  But you can't tell me sitting here
16    today if it was before or after March 26th, 2007?
17        A    No, I can't tell you that.
18        Q    And did you provide those documents along
19    with a cover letter or did you just send them to
20    your attorney?  How did you provide them to your
21    attorney?
22        A    I sent them in the mail.
23        Q    What documents did you provide to your
24    attorney?
25        A    Everything that I had that might be
```

1    pertinent.  All kinds of stuff that I had --

2         Q    Okay.

3         A    -- you know, when I was working at

4    Corinthians that was in my briefcase when I left.

5         Q    Is that -- is the universe of those

6    documents what you brought with you to your

7    deposition today?

8         A    I do believe so.  I think so.

9         Q    Okay.

10        MR. LEVY:  Do you mean Exhibit 14 or do you

11   mean the document production we gave you last week?

12        MS. YOUNG:  I mean Exhibit 14.

13        Q    So Exhibit 14 -- you can take a look at

14   it.

15        A    She has my documents over there.  Can I

16   have it?

17        Q    Oh, I have it.  I'm sorry.  Here's

18   Exhibit 14.

19        A    Oh, okay.

20        Q    Is Exhibit 14 the universe of documents

21   that you --

22        A    This whole packet.

23        Q    This whole packet that we marked as

24   Exhibit 14, which you brought with you to the

25   deposition today, is that the universe of documents

1    that you provided to your attorney some years ago?

2        A    Uh-huh.  When you say "universe," are you

3    saying all of them?

4        MR. LEVY:  Is that everything?

5    BY MS. YOUNG:

6        Q    Is that everything?

7        MR. LEVY:  She's asking if that's everything.

8        THE WITNESS:  Okay.  Well, she has to say what

9    she's asking and then I'll understand her.

10            "Universe" means everything?

11   BY MS. YOUNG:

12       Q    That means everything.

13       A    There were some more documents other than

14   this as far as I can tell.

15       Q    That you brought --

16       A    But I don't know where they are.

17       Q    Okay.  And you provided those documents to

18   your attorney?

19       A    Yes.

20       Q    Can you describe what the documents

21   consisted of?

22       A    No, because I don't have -- my memory is

23   not set up like that.

24       Q    Okay.

25       A    There are a lot of documents and I don't

```
 1    know each one.

 2        MR. LEVY:  And we provided all those documents

 3    to you.

 4    BY MS. YOUNG:

 5        Q    Do you know if the government received a

 6    copy of this complaint, Exhibit 16, before it was

 7    filed on March 26, 2007?

 8        A    How would I know that?  I don't know that.

 9        Q    Okay.  Did you help draft the document

10    that we marked as Exhibit 16?

11        A    No, I did not.

12        Q    And you've seen it before, I think you

13    said -- well, I'm not sure that you -- strike that.

14            Did you review the document before it was

15    filed on March 26, 2007?

16        A    I can't remember.

17        Q    Okay.  Exhibit 16 has an Exhibit A

18    attached to it.  It's toward the back of the

19    document.

20        A    Okay.

21        Q    You see this page marked as "Exhibit A"

22    toward the back?

23        A    Okay.  Hold on.

24            Yes, I see that.

25        Q    Okay.  For the record, Exhibit A, page 1,
```

```
 1    the heading says, "Corinthian Schools and Rhodes
 2    Colleges Adult Admissions Representative
 3    Compensation Program.  Updated:  July 6th, 2005."
 4            And by July 6, 2005, you were no longer
 5    employed at Corinthian; is that right?
 6        A    If I have this, I must have been employed
 7    there.  How else would I get this document?
 8        Q    Well, I'm not sure that -- did you -- did
 9    you get this document?  Is this a document that came
10    from you?
11        A    Somebody got it.
12        Q    But you don't know if it's a document that
13    came from you or somebody else?
14        A    Well, it had to come from me because I was
15    the one that worked at Corinthians.
16        Q    Well, Mr. Mshuja also worked at
17    Corinthian; right?
18        A    But he didn't work in admissions.
19        Q    Okay.  Well, how did you get a copy of
20    this document?
21        A    Like I said, someone at Corinthians gave
22    it to me, obviously.  How else would I get it?
23        Q    Do you know who gave it to you?
24        A    Somebody.  I don't know, whoever gives
25    these out.  It's a promotion probably from Cary
```

 1    Kaplan.

 2         Q    Okay.  So this says the document was

 3    created on July 5th, 2005.

 4              Do you see that at the bottom?

 5         A    I see that up here, right here

 6    (indicating).

 7         Q    And then at the very bottom of the first

 8    page --

 9         A    Uh-huh.

10         Q    If you'd look with me at the first page of

11    this Exhibit A, please.

12         A    Okay.  I got it.

13         Q    In -- in the margin at the bottom it says,

14    "Document Created:  July 5th, 2005."

15              Do you see that?

16         A    Okay.  Uh-huh.  Yes, I do.

17         Q    You were terminated as of May 2005;

18    correct?

19         A    You have that termination paper?  Whatever

20    date is on there, that's when I was terminated.

21         Q    I think we did look at it.  I think you

22    said a couple of --

23         A    Did it say 2004?

24         Q    No, I think it's May 2005.

25         A    Okay.  Then if it said May 2005, that's

```
 1   when it was because I signed it.  I'm sure I
 2   didn't...
 3       Q    Okay.  So how did you get a document that
 4   was created after you were terminated?
 5       A    Like I said, I must have got it before I
 6   was terminated because I couldn't get a document
 7   like this if I was terminated before this.
 8       Q    You were never compensated under the plan
 9   that's attached as Exhibit A to the complaint; is
10   that right?
11       A    This is Exhibit A (indicating); right?
12       Q    Correct.
13       A    I was never compensated?
14       Q    Correct.
15       A    What does that mean?  You mean in terms of
16   my raises or --
17       Q    Yeah, at that point you had been
18   terminated from the school, so you were never
19   compensated under this plan; correct?
20       A    Well, if I was terminated, there is no way
21   I could be.
22       Q    Right.  And there's no way you could be
23   promoted or receive a salary increase under this
24   plan that's attached as Exhibit A; right?
25       A    That's right.  Uh-huh.  I'm not sure where
```

1   this came from.  I didn't -- I don't remember having

2   it.

3        Q    Okay.  Do you recall seeing this document

4   at all?

5        A    Well, I've seen documents like this.

6        Q    Okay.

7        A    I don't know if it was this particular one

8   with this particular date on it.

9        Q    I'm actually asking about this particular

10  document because it is attached as an exhibit to the

11  complaint you filed.  And you don't recall --

12       A    If it was attached to that, then I

13  probably saw it because -- you know, I didn't read

14  every word from the pages of this document when I

15  received it, but I -- I skimmed it.  I was aware of

16  what was going on.

17       Q    Okay.  And am I correct that the --

18       A    I didn't -- I didn't notice those dates.

19       Q    Okay.  And am I correct that the

20  allegations in your complaint are based on the

21  experiences you had when you were employed as an

22  admissions representative at Corinthian?

23       A    Yes, that's correct.

24       MS. YOUNG:  I'm handing you what we'll mark as

25  Exhibit 17.

```
 1                  (Defendants' Exhibit 17 was marked
 2   for identification by the deposition officer and is
 3   bound under separate cover.)
 4   BY MS. YOUNG:
 5        Q    This is a copy of the first amended
 6   complaint that was filed in this action.
 7             Have you seen this document before?
 8        A    I'm sure I have.
 9        Q    Did you help to draft it?
10        A    No, I did not.
11        Q    Did you review it before it was filed?
12   And this document was filed on December 15, 2011.
13        A    It's a possibility I could have reviewed
14   it.  I'm not sure.
15        Q    And are the allegations in your first
16   amended complaint also based on your experiences --
17        A    Are you talking about this one
18   (indicating)?
19        Q    No, I'm talking about the new one that
20   we've marked as Exhibit 17.
21        A    Are they based on what?
22        Q    Are the allegations in the first amended
23   complaint --
24        A    Which is this one (indicating)?
25        Q    -- which is what we've marked as
```

```
 1   Exhibit 17 --
 2        A    Uh-huh.
 3        Q    -- based on your experiences that you had
 4   when you were employed as an admissions
 5   representative for Corinthian?
 6        A    Yes, I'm sure it is because I was employed
 7   at Corinthian's admissions.
 8        Q    Are the allegations in the first amended
 9   complaint based on any information different from
10   the information that formed the basis for your first
11   complaint?
12        A    That's a hard question because I don't
13   remember everything in each one of these documents.
14        Q    What I'm just trying to understand is are
15   they based on the same factual information?
16        A    Well, if it's the same case, I'm sure it
17   is.  It's the same case.
18        Q    It's the same case?
19        A    Right.
20        Q    Did you learn anything in between the
21   original complaint you filed and the filing of the
22   first amended complaint that changed any of the
23   allegations you're making in the lawsuit?
24        A    I'm not -- I don't think so.  I think it
25   was one thing, but I can't remember what it was.
```

1          Q      You think you learned something new in
2     between?
3          A      No, I didn't learn anything new.
4          MS. YOUNG:   I'm handing you what we'll mark as
5     Exhibit 18.
6                      (Defendants' Exhibit 18 was marked
7     for identification by the deposition officer and is
8     bound under separate cover.)
9     BY MS. YOUNG:
10         Q      These are the plaintiff's initial
11    disclosures that were filed in this lawsuit on
12    September 17th, 2012.
13                Have you seen this document before?
14         A      I'm sure I must have if you have it.
15         Q      So why do you say you must have seen this?
16         A      Because I have a lot of documents on my
17    computer.  I read some of them that my lawyer sent
18    me.  If this was one of them, I saw it because I
19    looked at everything, pretty much.
20         Q      Okay.
21         A      That's what I mean by that.
22         Q      Okay.  So if you turn to the second page
23    of this document, there's a list of 19 people here.
24    And these people were identified as people who are
25    likely to have information "that the disclosing

VALERIE RASMUSSEN COURT REPORTING   **949.888.7858**          226

**0179**

```
 1    party," which is you, "may use to support its claims

 2    and defenses."

 3              Do you see that?

 4       A    This is on the second page; right?

 5       Q    Yeah.

 6       A    Yes, I see it.

 7       Q    Okay.  Do you know how this list of names

 8    was created?

 9       A    No, I don't because I didn't create it.

10       Q    Does this list of names identify every

11    individual you are aware of who might have

12    information to support the claims you're asserting

13    in this lawsuit?

14       A    This list contains the names of people

15    that I worked with when I was at Corinthian

16    Colleges.  I worked with these people.

17       Q    Is there anybody else who has information

18    relevant to this lawsuit who is not listed among

19    these 19 names?

20       A    How could I know that?  I'm sorry.  I

21    can't answer that question.

22       Q    Well, you're bringing this lawsuit and

23    we're entitled to know who you think the relevant

24    witnesses are.

25       A    Well, I just said I don't know.
```

```
 1        A    I'm not sure.

 2        Q    Just -- just let me finish my question,

 3   please.

 4             Was Mr. Martin still working at the school

 5   at the time that you were rehired in San Jose?

 6        A    Like I said, I'm not sure.  I couldn't

 7   keep up with all them people because they was moving

 8   around pretty frequently.

 9        Q    Okay.

10        A    I couldn't keep up with everybody.  I

11   barely could keep up with myself.

12        Q    And were any of the 19 people listed here

13   at the dinner that you told us about earlier?

14        A    No.

15        Q    Okay.  And you've not had any

16   communications with any of these folks since 2005?

17        A    No.

18        THE VIDEOGRAPHER:  Counsel, is this a good time

19   for me to switch the tape?

20        MS. YOUNG:  Yes, let's switch the tape.  Thank

21   you.  Sorry.

22        THE VIDEOGRAPHER:  It will take five minutes.

23        MS. YOUNG:  Sure.  Five minutes for a

24   five-minute break.

25        THE VIDEOGRAPHER:  The video deposition is now
```

1      MS. YOUNG:  Has the disclosure statement been

2  provided to us?

3      MR. LEVY:  It has not.  It's 788 -- 789.

4  That's 789 pages Bates stamped.

5      MS. YOUNG:  Okay.  Let's look at some of the

6  documents that we received.  We'll mark this as

7  Exhibit 19.

8           (Defendants' Exhibit 19 was marked

9  for identification by the deposition officer and is

10  bound under separate cover.)

11  BY MS. YOUNG:

12      Q    Okay.  Exhibit 19 are documents from

13  November 5th, 2003 and from April and May 2005.

14           Do you see that?

15      A    Did you say 2003?

16      Q    Yes.  If you look at the top right-hand

17  corner of the document.

18      A    Oh, the top right.  Okay.  It's 2005,

19  November 3rd (sic) to -- what did you say the other

20  date was?

21      Q    Well, I'm looking at the top of these

22  documents and they're dated in 2003, April 2005 and

23  May of 2005.

24           Do you see that?

25      A    I see December -- I see November 2003 and

```
 1   November -- is this the same document you have?

 2   This one doesn't even have a date.

 3       Q    If you look at the very top line.

 4       A    April 2005 on that one, April 2005 on this

 5   one.

 6       Q    And I grouped these together because they

 7   look like the same type of document.

 8            Have you seen these documents before,

 9   Ms. Lee?

10       A    Yes, I've seen them.

11       Q    What are they?

12       A    These are conversion rates that Earon

13   Mackey gave me when I was in San Francisco.  Some

14   kind of rates.  Seventy-three leads -- leads and

15   interviews.

16       Q    Where are you looking?

17       A    Right here, leads, interviews

18   (indicating).  Leads, interviews, leads.

19       Q    Okay.  And you're looking at the page with

20   the number R 00023?

21       A    Well, this is on four, 24.

22       Q    Okay.  Whose handwriting is on these

23   documents?

24       A    That's Earon Mackey.  That's his

25   handwriting.
```

```
 1        Q    What was this report used for when you

 2   were an employee at Corinthian?

 3        A    To put pressure on you.  Okay.  To perform

 4   when they think you're not performing.  They want

 5   you to perform better or whatever.  They give you

 6   these documents so that they can compare you to

 7   everybody else who is enrolling students so you can

 8   look at them and bring your numbers up if they're

 9   down.

10        Q    Okay.

11        A    Okay.  Is that good?

12        Q    And you're not aware of these reports

13   being used for any other purpose?

14        A    I don't know what else they would be used

15   for.

16        Q    And you don't know how these reports were

17   used after you left your employment at Corinthian;

18   is that correct?

19        A    No.  Probably the same thing, but I don't

20   know.  I can't speculate on that because they were

21   always changing things up.

22        MS. YOUNG:  I'm handing you what we'll mark as

23   Exhibit 20.

24                  (Defendants' Exhibit 20 was marked

25   for identification by the deposition officer and is
```

```
 1   new.

 2        Q    But you don't know one way or another?

 3        A    No, I do not.

 4        MS. YOUNG:  I just handed you Exhibit 22.

 5             (Defendants' Exhibit 22 was marked

 6   for identification by the deposition officer and is

 7   bound under separate cover.)

 8   BY MS. YOUNG:

 9        Q    And your name is not anywhere on this

10   document.  Do you see that?

11        A    Oh, I'm looking right now.

12        Q    Yeah, take a look and...

13        A    This has somebody else's name up there.

14   Okay.

15        Q    Uh-huh.  And am I right that your name

16   doesn't appear anywhere on this document?

17        A    I don't see my name on there.

18        Q    Have you ever seen this document before

19   today?

20        A    No, I have not.

21        Q    Do you have any idea how it came to be in

22   the possession of your lawyer?

23        A    No.

24        MS. YOUNG:  Okay.  I'm handing you what we'll

25   mark as Exhibit 23.
```

```
 1              (Defendants' Exhibit 23 was marked

 2      for identification by the deposition officer and is

 3      bound under separate cover.)

 4      BY MS. YOUNG:

 5          Q    This is a series of documents with the

 6      header "Ad Rep Performance Flash."

 7          A    Uh-huh.

 8          Q    And they're from various dates in 2005.

 9      The first date being November 4th, 2005.  I'm

10      looking at the first page relating to San Jose.

11              Now, am I correct that you were not

12      employed at the San Jose campus of Corinthian in

13      2005, in November of 2005?

14          A    I don't think so.

15          Q    Okay.  Is there a way to tell from looking

16      at this document when this report was printed?

17          A    You're asking me that?

18          Q    I'm asking you that.

19          A    I'm not -- I have no idea.

20          Q    Okay.  Did you print these reports that

21      I've marked as Exhibit 23?

22          A    No.

23          Q    Have you seen them before?

24          A    I don't recall them.

25          Q    Okay.  And --
```

```
 1        A    We used to get this kind of report in San

 2   Francisco, but I don't remember seeing this

 3   particular one.

 4        Q    You've never seen this particular group of

 5   reports before; is that right?

 6        MR. LEVY:  Objection to form.

 7        THE WITNESS:  No, my name isn't on here.

 8   BY MS. YOUNG:

 9        Q    The reports I've placed in front of you,

10   you haven't seen before; is that correct?

11        A    I haven't seen this.  I don't know.

12        Q    Do you see the --

13        A    I'm not on here as an admissions rep.

14        Q    Okay.  And -- and do you see in the

15   right -- lower right-hand corner where it says

16   "mgreen"?

17        A    "mgreen"?

18        Q    Uh-huh.  Do you see that in the lower

19   right-hand corner?

20        A    Yes, I do.

21        Q    Do you know what that means?

22        A    No, I don't.

23        Q    Do you have an understanding of how this

24   group of documents came to be in the possession of

25   your lawyer?
```

```
 1        A     No, I do not.
 2        Q     You didn't provide these documents to your
 3    lawyer, did you?
 4        A     No.
 5        Q     If you look on every other page here,
 6    there's some handwritten notations.
 7              Do you see that?
 8        A     Over on the side?
 9        Q     There may be some notations in the margin,
10    but then on every even-numbered page there are also
11    pages with handwriting on them.
12              Do you see that?
13        A     Yes, I do.
14        Q     Do you recognize that handwriting?
15        A     No, I don't.  It's not mine.
16        Q     Okay.
17        A     And this isn't mine either (indicating).
18        MS. YOUNG:  I'm handing you what we'll mark as
19    Exhibit 24.
20              (Defendants' Exhibit 24 was marked
21    for identification by the deposition officer and is
22    bound under separate cover.)
23    BY MS. YOUNG:
24        Q     And in the upper left-hand corner of this
25    group of documents they say "CP Mar Flash Summary"
```

```
 1    and the date is April 7th, 2006 on the first page

 2    and the dates go back to July 30th, 2005 in the set

 3    of documents if you look toward the end.

 4            So you had already stopped working at the

 5    school by July of 2005; correct?

 6        A    I haven't seen these documents.

 7        Q    My -- my question was you had stopped

 8    working for the school by July of 2005; right?

 9        A    Yes.

10        Q    And you've never seen these documents

11    before?

12        A    No.

13        Q    Do you know how they were generated?

14        A    No, I do not.

15        Q    And do you know how they came to be in

16    your attorney's possession?

17        A    No, I don't.

18        Q    And you don't know what this -- these

19    documents were used for; is that correct?

20        A    I have never seen these documents.

21        Q    So you don't know what they were used for?

22        A    My name is not on there as an admissions

23    rep.

24        Q    You don't know what they were used for;

25    correct?
```

```
 1        A    No, I don't.  Actually, these aren't reps.
 2   This is something (inaudible).
 3        THE REPORTER:  I'm sorry.  I can't hear you.
 4   BY MS. YOUNG:
 5        Q    You have to speak loudly so that the court
 6   reporter can hear what you're saying.
 7        A    Oh, I was just saying this -- these aren't
 8   reps' names, they're cities.  I thought they were
 9   reps' names, but they're cities.
10        Q    Okay.  That still doesn't help you figure
11   out how these reports were used?
12        A    No, I'm not -- I don't know anything about
13   these documents.
14        Q    Okay.
15        A    It looks like budgets and something and
16   starts.
17        MS. YOUNG:  I'm handing you what we'll mark as
18   Exhibit 25.
19             (Defendants' Exhibit 25 was marked
20   for identification by the deposition officer and is
21   bound under separate cover.)
22   BY MS. YOUNG:
23        Q    At the top of this group of documents they
24   say "Quarterly Ad Rep Activity Report" and others
25   say "Daily Flash" at the top of them.  The dates on
```

```
 1    these documents are from 2006 and after September of

 2    2005.

 3            Have you seen any of these documents

 4    before?

 5        A    Have I seen -- these aren't my documents,

 6    no.

 7        Q    Okay.  Do you know whose handwriting is on

 8    these documents?

 9        A    No, I do not.  Not mine.

10        Q    And do you know how these documents came

11    to be in the possession of your attorney?

12        A    No, I do not.

13        Q    Do you know how these documents that we've

14    marked as Exhibit 25 were used by the school or by

15    anyone at the school?

16        A    Well, it's a daily flash and it's got all

17    the names of the schools that are under the umbrella

18    of Corinthians.

19        Q    But -- but you weren't at the school at

20    the time, so you don't know how this -- these

21    particular documents were used by the school?

22        MR. LEVY:  Objection --

23        THE WITNESS:  Well, that's the same document

24    that they gave me when I was there.

25        MR. LEVY:  Objection to form.
```

```
 1      THE WITNESS:  So I'm just telling you on that
 2  aspect.
 3  BY MS. YOUNG:
 4      Q    Okay.  But you would have to speculate as
 5  to --
 6      MR. LEVY:  Objection to form.
 7  BY MS. YOUNG:
 8      Q    -- how this group of documents was used by
 9  the school?
10      A    What I'm saying to you, Angie -- no.
11      Q    Blanca.
12      A    -- Blanca, is that this same form was used
13  when I was working there.  So I recognize the form,
14  but I don't recognize this document here.
15      Q    Okay.  You don't know if the form
16  continued to be used the way it was at the time --
17      A    No, I don't know all of that.
18      Q    Please, please let me finish my question.
19           You don't know how the form continued to
20  be used after you left your employment at the
21  school; is that correct?
22      MR. LEVY:  Objection to form.
23      THE WITNESS:  That's correct.  I don't know how
24  it was used.  This is -- this particular document is
25  an activity report that was used when I was there.
```

```
 1    So maybe it was used after I left.  I'm sure it was,

 2    but I don't recognize any of those people on there

 3    as -- as admissions reps.

 4    BY MS. YOUNG:

 5        Q    Okay.  And you don't know how the activity

 6    report was used after you left your employment at

 7    the school; is that correct?

 8        A    Well, it was probably used the same way

 9    because it's the same form.  So...

10        Q    But you don't know that for a fact, do

11    you?

12        A    No, I don't know that because I'm not

13    employed there.  So I'm just giving you the ups on

14    it's probably still being used.  I don't know.

15        MS. YOUNG:  Okay.  I'm handing you what we'll

16    mark as Exhibit 26.

17            (Defendants' Exhibit 26 was marked

18    for identification by the deposition officer and is

19    bound under separate cover.)

20        THE WITNESS:  Thanks.

21    BY MS. YOUNG:

22        Q    Have you seen these documents before?

23        A    No.  No, I haven't.

24        Q    Okay.  And do you know how they came to be

25    in the possession of your attorney?
```

```
 1        A    No, I don't.

 2        Q    And you don't know how they were used by

 3   anyone at the school; is that correct?

 4        A    No.  That's correct.

 5        MS. YOUNG:  I apologize for the thickness of

 6   this document.  We'll mark this as Exhibit --

 7        THE REPORTER:  27.

 8        MS. YOUNG:  -- 27.

 9             (Defendants' Exhibit 27 was marked

10   for identification by the deposition officer and is

11   bound under separate cover.)

12   BY MS. YOUNG:

13        Q    And this is a very lengthy document, but

14   at the top of the document it says the run date is

15   September 8th, 2006.

16             Do you see that?

17        A    Yes.

18        Q    And this is a stat- -- it looks like a

19   status report for San Jose north.

20             Do you see that?

21        A    Uh-huh.

22        Q    Have you seen this document before?

23        A    I've seen documents like this, yes.

24        Q    Have you seen this particular document

25   before?
```

```
 1        A    I don't think so.  If my name is on it, I
 2   probably have, but I don't see my name.
 3        Q    There are some handwritten notations
 4   toward the back of the document on a number of the
 5   pages.
 6             Do you see those?
 7        A    Yeah, some Xs.
 8        Q    Do you know whose handwriting that is?
 9        A    No, I don't.
10        Q    That's not your handwriting?
11        A    No.
12        Q    Okay.  And do you know how this document
13   came to be in the possession of your attorney?
14        A    No, I don't.
15        Q    And this particular report, you don't know
16   how it was used by people at the school; is that
17   correct?
18        A    Well, it looks like an end-of-year report
19   to me maybe on how many leads you got and -- you
20   know, these are lead reports, looks like to me.
21        Q    Okay.  But you don't know how this report
22   was used by the school after you left your
23   employment there; is that right?
24        A    No, I don't.  How could I know that?  No,
25   I do not.
```

```
 1          MS. YOUNG:  I'm handing you what we'll mark as
 2     Exhibit 28.
 3                    (Defendants' Exhibit 28 was marked
 4     for identification by the deposition officer and is
 5     bound under separate cover.)
 6     BY MS. YOUNG:
 7          Q    These are a series of documents that
 8     relate to an employee named Melissa Wong.
 9               Do you know who that person is?
10          A    No.
11          Q    The date on the first document is
12     October 17th, 2005.  That was after you left your
13     employment at Corinthian; correct?
14          A    Yes.
15          Q    Okay.  On the cover page of this document
16     it mentions Gina Zappariello.  Do you know who that
17     is?
18          A    No, I do not.
19          Q    Have you ever seen these documents before?
20          A    No.
21          Q    Do you know how they came to be in the
22     possession of your lawyer?
23          A    No, I do not.
24          Q    All right.  Have you ever communicated
25     with anyone associated with or employed by the law
```

```
 1    firm of Milberg Weiss Bershad & Schulman?
 2         A    No.
 3         Q    Have you ever heard of that law firm?
 4         A    No, I haven't.
 5         Q    Have you ever heard of an attorney named
 6    Jeff Westerman?
 7         A    No, I haven't.
 8         Q    Have you ever heard of an attorney named
 9    Karen Rogers?
10         A    No.
11         Q    Have you ever heard of an attorney named
12    Sabrina Kim?
13         A    No, I haven't.
14         Q    Have you ever communicated with a
15    representative of Congress named Maxine Waters?
16         A    No.
17         Q    Have you ever communicated with anyone on
18    her staff?
19         A    No.
20         Q    Do you know a former employee of
21    Corinthian named Paula Dorsey?
22         A    No, I don't.
23         Q    Have you ever communicated with a
24    government accounting office or the Government
25    Accountability Office about anything relating to
```

 1   Corinthian?

 2        A    Accountability?

 3        Q    The Government Accountability Office, have

 4   you ever communicated with that federal office about

 5   your employment at Corinthian?

 6        A    No.  No, I haven't.

 7        Q    Did you ever communicate with the

 8   Department of Education about anything?

 9        A    Oh, about Corinthians?

10        Q    Correct.

11        A    Well, I was a proctor, so I had to

12   communicate with the Department of Education.

13        Q    By "Department of Education," I mean the

14   federal agency of the Department of Education.

15        A    Well, that's the one I'm talking about

16   because they're over the proctoring.

17        Q    Okay.  So in what way did you communicate

18   with the Department of Education when you were a

19   test proctor in 1999?

20        A    Well, just gave them various forms that

21   they needed to certify me.  That's it.  I didn't

22   really communicate with them.  I had to go through

23   them to get certain forms to become certified.

24        Q    Okay.

25        A    So then -- then I communicated with them.

```
 1        Q     And the extent of that communication was
 2   in connection with your responsibilities as a test
 3   proctor for Corinthian; is that correct?
 4        A     Not responsibilities, just the forms that
 5   you need to fill out to become certified.
 6        Q     Okay.  And that was in the 1999 through
 7   2000 time period?
 8        A     Yes.
 9        Q     And other than that, you've had no
10   communications with anyone at the Department of
11   Education?
12        A     No.
13        Q     Have you ever provided testimony at a
14   congressional hearing?
15        A     No, I haven't.
16        Q     Have you ever spoken to anybody who
17   provided testimony at a congressional hearing?
18        A     No.
19        Q     Have you filed any other lawsuits or
20   complaints alleging a violation of the ban on
21   incentive compensation?
22        A     No, I haven't.
23        Q     Have you ever filed a complaint against
24   any other educational institution other than
25   Corinthian?
```

VALERIE RASMUSSEN COURT REPORTING    **949.888.7858**                261

**0199**

```
 1        A    No, I have not.
 2        Q    Have you communicated with anyone from the
 3   attorneys general -- Attorney General's office in
 4   any state?
 5        A    Not that I know of.
 6        Q    Okay.  Have you had any meetings with
 7   anyone out of an Attorney General's office in any
 8   state?
 9        A    I had -- had a meeting.  I'm not sure.
10        THE WITNESS:  Was that the Attorney General?
11             I'm not sure if that was him or not, but I
12   did have a meeting with -- in Los Angeles several
13   years ago with someone from -- maybe it was the
14   Attorney General's office.  I'm not sure.  I can't
15   remember.
16   BY MS. YOUNG:
17        Q    Do you recall, was it a meeting with
18   someone in the United States Attorney's Office?
19        A    Yes, I think it was.  I'm not sure.
20        Q    Do you recall the name of the person with
21   whom you met?
22        A    No, I do not.
23        Q    Was it Abraham Meltzer by any chance?
24        A    I don't recall the name.
25        Q    Okay.  I'm just trying to see if I can
```

1    help you remember by providing some names about who

2    it may have been.

3           Do you remember meeting with anybody named

4    Jay Majors?

5       A    Huh-uh, no, ma'am.

6       Q    And you said the meeting took place in Los

7    Angeles?

8       A    Yes.

9       Q    And you said it was some time ago.  Can

10   you give me a time frame?  Like five years ago, ten

11   years ago?

12      A    Maybe four or five years ago.

13      Q    Do you know if that meeting took place

14   before or after you filed your original complaint in

15   this case?

16      A    After.

17      Q    Who else was at that meeting?

18      A    Mr. Mshuja was there.  I can't remember if

19   Scott was there.  I can't remember.

20      Q    You don't remember if Mr. Levy was there?

21      A    No, I can't remember.

22      Q    Was Mr. Labaton there?

23      A    I don't think so.

24      Q    Do you recall anyone else being present at

25   that meeting?

```
 1        A     No.

 2        Q     What was discussed at that meeting?

 3        A     Different -- Jesus.  We were talking

 4   about -- see, you're making me really reach back.  I

 5   can't even remember.  It's -- you know, it's been a

 6   while.

 7        Q     Uh-huh.

 8        A     I don't recall the conversation, but it

 9   was about this case right here.

10        Q     Okay.

11        A     So I don't remember all the different --

12        Q     Do you remember the general subjects you

13   discussed?

14        A     No, I don't.

15        Q     Aside from that one meeting in Los Angeles

16   after your complaint was filed, did you have any

17   other meetings --

18        A     No, I didn't.

19        Q     -- with anyone who you understood to be

20   working for the United States Attorney's Office?

21        A     No.

22        Q     And was that an in-person meeting you had?

23        A     In person?

24        Q     Was it in person in Los Angeles?

25        A     Oh, it was in person, yes.
```

```
 1    numbers was high -- were high.  So he would get paid
 2    more money.
 3         Q    And if I'm correct, Mr. Kaplan was your
 4    director of admissions the first time you were
 5    employed at the San Francisco campus; correct?
 6         A    Yes, for several years, yes.
 7         Q    Okay.  And he was not your director of
 8    admissions the second time that you were employed in
 9    San Francisco; correct?
10         A    No.  No, he was not.
11         Q    So he never acted as your director of
12    admissions at any time after January 1st, 2005; is
13    that correct?
14         A    No, only in San Francisco the first time.
15         Q    Okay.  So am I correct that after
16    January 1st, 2005 Mr. Kaplan never acted as your
17    director of admissions?
18         A    That's -- that's correct.
19         Q    Okay.  So you said your understanding was
20    that you would get some sort of an increase or a
21    raise to your salary if you met certain numbers;
22    right?
23         A    Well --
24         MR. LEVY:  Objection to form.
25         THE WITNESS:  It was written if you wanted to
```

VALERIE RASMUSSEN COURT REPORTING   **949.888.7858**          352

**0203**

```
 1    get a raise from campus to senior to master, how

 2    many starts you had to get.

 3    BY MS. YOUNG:

 4        Q    Okay.  So again, you're just basing this

 5    off of what was in the written compensation plans

 6    that governed your compensation; is that right?

 7        A    Everybody's compensation.  If you get

 8    20 -- 120 starts or exceed that, you go from one

 9    level to the next.  It stated that in one of these

10    documents that we read.  I don't know which one.

11        Q    All right.  So you're -- when you say you

12    had to meet numbers, you're referring to the written

13    programs that the school had in place that described

14    how people were going to be compensated; is that

15    right?

16        MR. LEVY:  Objection to form.

17        THE WITNESS:  No, not necessarily.  I'm

18    referring to how many students we enrolled per year.

19    BY MS. YOUNG:

20        Q    Right.  Okay.

21        A    Okay.

22        Q    And what's your understanding of how often

23    you could get a raise?

24        A    It's once a year, uh-huh.

25        Q    And the same thing with promotions?
```

```
 1        A     Yeah, and they would add up all your
 2  numbers and if you met your numbers, you could go
 3  from one level to the next.
 4        Q     And to figure out if you had met those
 5  numbers, you would refer to the written program that
 6  the school had put in place; is that right?
 7        A     Yeah, yeah.  That's all we had to refer
 8  to.
 9        Q     Okay.  And that same document would govern
10  other factors that went into whether or not you
11  would get a raise; is that right?
12        A     Yes.
13        MR. LEVY:  Objection to form.
14  BY MS. YOUNG:
15        Q     Did you ever act (sic) with Jim Martin
16  after you left the San Francisco campus the first
17  time around?
18        A     Did I ever act with him?
19        Q     Interact with Jim Martin after you left
20  San Francisco?
21        A     No, I haven't seen Jim Martin in almost,
22  say, 20 years, but a long time since I left Bryman.
23  I don't see Jim Martin.
24        Q     Okay.  And so the second time you came
25  back to the Bryman campus in San Francisco, you
```

```
 1        A    Yes.
 2        Q    Did it surprise you that you were
 3   receiving reports that talked about how you were
 4   doing in terms of recruiting people to come to
 5   Corinthian?
 6        A    Did it surprise me?
 7        Q    Uh-huh.
 8        A    In terms of what?
 9        Q    Well, did it come as a surprise --
10        A    It was -- it was a weekly thing that
11   happened.
12        Q    Uh-huh.  Were you surprised to see that
13   your performance in terms of recruiting people to
14   the school was being tracked?
15        A    No, I wasn't surprised.
16        MR. LEVY:  Objection to form.
17   BY MS. YOUNG:
18        Q    That's what you were hired to do; right?
19        A    Yeah, I wasn't surprised.  I was surprised
20   when I was on top.
21        Q    Mr. Levy asked you earlier what did you
22   have to do to get a raise and your response was you
23   had to make your numbers.  Do you recall that?
24        A    Yes, that's true.
25        Q    And in responding to that question, you
```

```
 1    referred to the paper that identified what those
 2    numbers were.  Do you recall that?
 3         A    No, I didn't have that paper, not then,
 4    but I discussed it with you when you were talking to
 5    me.
 6         Q    Right.  So I just wanted to clarify.  The
 7    numbers that you believed you had to meet in order
 8    to get a raise, those were numbers that were laid
 9    out in the written compensation programs that you
10    received from the school; is that right?
11         A    Uh-huh.
12         Q    Is that a "yes"?
13         A    Yes.  Excuse me.
14         Q    Okay.  Thank you.
15              And Mr. Levy asked you whether you were
16    evaluated on anything other than the numbers of
17    students you recruited to the school.  Do you recall
18    that question?
19         A    Well, I recall that question earlier, yes.
20    Uh-huh.
21         Q    Okay.  And I asked you earlier -- we went
22    through those minimum standards.  Do you remember
23    that?
24         A    Yes.
25         Q    And there were something like 18 of them
```

1    in the document; right?

2        A    Uh-huh.

3        Q    Do you recall that?

4        A    Yes, I recall that.

5        Q    And we went through a number of them and I

6    asked you whether you understood that your

7    performance was being evaluated on whether you

8    complied with each of those 18 standards.

9            Do you recall that?

10       A    Part of my performance.

11       MR. LEVY:  Objection to form.

12       THE WITNESS:  Part of my raise was considered

13   in that, but it was -- the bottom line was numbers.

14   BY MS. YOUNG:

15       Q    Okay.  But part of your raise --

16       MR. LEVY:  Objection to form.

17   BY MS. YOUNG:

18       Q    Part of your raise depended on some of the

19   other things, including what we looked at --

20       A    Getting to work on time and all that

21   stuff, naturally.

22       Q    Okay.  Including what we --

23       A    And how I interacted with other people and

24   stuff like that.

25       Q    Okay.  So -- so part of your raise

1    depended on how you interacted with other people?

2        A    According to that paper that they gave me

3    those fours and fives on, it did, but, you know --

4        Q    Okay.  And was that --

5        MR. LEVY:  Let her finish her answer.

6    BY MS. YOUNG:

7        Q    Go ahead.

8        A    And, you know, I never understood how I

9    got fours and fives.  Nobody said, "Well, you did

10   this and that's why I gave you a five" or "You did

11   this and this and this and that's why you got a

12   four."  I didn't get that information.

13       Q    Right.  So you had no personal insight

14   into how --

15       A    I was evaluated.

16       Q    -- that performance evaluation form was

17   filled out; correct?

18       A    No.  No, I did not.

19       MR. LEVY:  Objection to form.

20       THE WITNESS:  And I didn't go up and say,

21   "Well, why did you give me a four or five?"  I

22   didn't do that.

23       MS. YOUNG:  Okay.  I have nothing further.

24   Thank you so much for your time.

25       THE WITNESS:  Okay.  You're welcome.  Thank

```
1              CHANGES AND SIGNATURE (Continued)

2    PAGE    LINE    CHANGES                    REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14

15

16                        -oOo-

17        I certify, under penalty of perjury under

18   the laws of the United States of America, that the

19   foregoing is true and correct, with the exceptions,

20   if any, noted above.

21

22   Executed at _____ on _____, 2013.
                    (Place)              (Date)
23

24                        _____
                                (Signature of Deponent)
25
```

```
 1  STATE OF CALIFORNIA )

 2                      ) SS.

 3  COUNTY OF ORANGE    )

 4

 5          I, KIMBERLY C. REICHERT, Certified Shorthand

 6  Reporter, Certificate No. 10986, for the State of

 7  California, hereby certify that:

 8          I am the deposition officer that

 9  stenographically recorded the testimony in the foregoing

10  deposition;

11          Prior to being examined, the deponent was by

12  me first duly sworn;

13          The foregoing transcript is a true record of

14  the testimony given.

15          I further certify that I am neither counsel

16  for, related to, nor employed by any of the parties or

17  attorneys in the action in which this proceeding was

18  taken, and further certify that I am not financially or

19  otherwise interested in the outcome of the action;

20          Pursuant to information given to me at the

21  time said testimony was taken, the appearance page

22  includes counsel for all parties of record;

23          Before completion of the deposition, review of

24  the transcript {  X  } was  {    } was not requested.

25              If review and signature was requested, the
```

1  noticing letter was send to the witness or to the

2  attorney for the witness for examination, for review,

3  corrections and signature;

4        That any changes made by the deponent,

5  according to the FRCP, and provided to the reporter

6  during the period allowed, are appended hereto.

7

8  Dated:  January 4, 2013.

9

10

11                              _____

                                KIMBERLY C. REICHERT
12                              CSR NO. 10986

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4

5

6    UNITED STATES OF AMERICA,          )
     Ex Rel. NYOKA LEE and              )
7    TALALA MSHUJA,                     )
                                        )
8               Plaintiff,              )
                                        )
9     vs.                               ) Case No.
                                        ) CV 07-01984 PSG
10   CORINTHIAN COLLEGES INC.;          )  (MANx)
     ERNST & YOUNG, LLP; DAVID MOORE;   )
11   and JACK D. MASSIMINO,             )
                                        )
12              Defendants.             )
     _____)

13

14

15

16        VIDEOTAPED DEPOSITION OF:  TALALA MSHUJA

17

18

19        Tuesday, December 18, 2012, 9:14 a.m.

20               Santa Ana, California

21

22

23

24   REPORTED BY:
     VALERIE E. RASMUSSEN
25   CSR 8900

**0213**

```
 1                IN THE UNITED STATES DISTRICT COURT

 2             FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4                        WESTERN DIVISION

 5

 6

 7     UNITED STATES OF AMERICA,          )
       Ex Rel. NYOKA LEE and              )
 8     TALALA MSHUJA,                     )
                                          )
 9                  Plaintiff,            )
                                          )
10      vs.                               ) Case No.
                                          ) CV 07-01984 PSG
11     CORINTHIAN COLLEGES INC.;          )  (MANx)
       ERNST & YOUNG, LLP; DAVID MOORE;   )
12     and JACK D. MASSIMINO,             )
                                          )
13                  Defendants.           )
       _____)

14

15          The videotaped deposition of TALALA MSHUJA, taken

16     on behalf of Defendants, before Valerie E. Rasmussen,

17     Certified Shorthand Reporter 8900 for the State of

18     California, commencing at 9:14 a.m., Tuesday, December 18,

19     2012, at 6 Hutton Centre Drive, 2nd Floor, Santa Ana,

20     California.

21

22

23

24

25
```

```
 1        Q    Okay.  And sorry, just to step back.  You had

 2   mentioned a couple of other people.

 3             Where did John Chacon work?

 4        A    He worked at Bryman College in San Jose.

 5        Q    And is that where you talked to him?

 6        A    No.

 7        Q    Okay.  Where did you talk to John Chacon?

 8        A    Outside of --

 9        Q    Outside of?

10        A    Yeah, outside of the college.

11        Q    Where was that?

12        A    At his home and at a restaurant.

13        Q    Do you remember what restaurant that was?

14        A    It was in San Mateo.  I can't remember the name

15   of it.  I think it was Van.

16        Q    And do you remember when you talked to him at

17   that restaurant?

18        A    What year?

19        Q    Yes, what year.

20        A    2005.  I'm not sure of the exact -- 2005 or 2006.

21        Q    2005 or 2006?

22        A    Yeah.

23        Q    And do you remember when you talked to him at his

24   home?  Was it around the same time?

25        A    Yes.
```

```
 1      Q    Okay.  And so you didn't talk to John Chacon when
 2   he -- when he was working at Bryman in San Jose --
 3      A    No.
 4      Q    -- okay -- about -- about anything?
 5      A    Not when he worked at --
 6      Q    Okay.
 7      A    -- I mean, as after -- after he worked at San
 8   Jose.
 9      Q    Okay.  So you talked to John Chacon after he
10   worked at San Jose?
11      A    Yeah.  I'm not sure if he was still working there
12   or -- I'm not sure if he was still working there at the
13   time.  I can't remember.
14      Q    And where did Susan Newman work?
15      A    Institute for Business & Technology.
16      Q    When was that?
17      A    That was in 2006.
18      Q    It was in 2006?
19      A    Yeah.
20      Q    Is that when you talked to her?
21      A    Yes.
22      Q    And where did you talk to Susan Newman?
23      A    I talked to her -- I mean, we worked together.  I
24   worked at the Institute for Business & Technology.
25      Q    Oh, you did?
```

```
 1      A    Yeah.  And I talked to her at the restaurant and
 2  I talked to her at -- at her home.
 3      Q    So you talked to her at that same restaurant in
 4  San Mateo?
 5      A    And another restaurant in San Jose.
 6      Q    And another restaurant --
 7      A    Yeah.
 8      Q    -- in San Jose?
 9      A    Yes.
10      Q    How do you know Susan Newman?
11      A    I met her at IBT, Institute for Business &
12  Technology.
13      Q    Okay.  And when -- you met her in 2006?
14      A    Yes, she -- was her idea.
15      Q    Okay.  And how do you know John Chacon?
16      A    Through Susan.
17      Q    Through Susan?
18      A    Yeah.
19      Q    And how do you know -- Dawn Rain, is it?
20      A    She was admissions director at WyoTech campus in
21  Fremont.
22      Q    Can you spell that for me -- her name?
23      A    D-A-W-N.
24      Q    Okay.  And the last name?
25      A    Rain, R-A-I-N.
```

```
 1        MR. LEVY:  Objection to form.

 2   BY MR. PHADKE:

 3        Q    Is it all right if you wait for a one-second

 4   pause after I --

 5        A    Yes.

 6        Q    So what -- what -- what were -- what was in this

 7   research that your attorney sent you?

 8        A    About nonprofit schools -- profit schools, and

 9   education, and a variety of issues related to education

10   and schools.

11        Q    Okay.  And did it involve claims about ad reps or

12   admission staff being paid by -- paid incentive

13   compensation?

14        A    Yeah, other schools that had been sued.

15        Q    And when did your attorney send you this

16   information?

17        A    Over the last four or five years.

18        Q    Did he start sending you this information in --

19   in 2006?

20        A    Yes.

21        Q    And did he send you this information before you

22   filed the first Complaint in March 26, 2007?

23        A    No, I didn't -- I didn't know him then.

24        Q    In 2007, I said.

25        A    Oh, in 2007?
```

```
 1        Q    Before March --

 2        A    Yeah.

 3        Q    -- 2007 --

 4        A    Uh-huh.

 5        Q    -- did he send you this information?

 6        A    Yes, he did.

 7        Q    He did.

 8        A    I'm sorry.

 9        Q    Yeah.  All right.  Just a second.

10        MR. PHADKE:  You're catching this; right?  When I ask

11   a question, he's interrupting, we'll go -- we'll have my

12   full question?

13        THE REPORTER:  It depends.  One at a time.

14        THE WITNESS:  Okay.

15        MR. PHADKE:  All right.  I'll ask the question again.

16        Q    And I ask that you not interrupt.  Thanks.

17        A    Okay.

18        Q    Your attorney sent you this research on other

19   for-profit colleges in the claims that have been brought

20   against them, before you filed your first Complaint in

21   this case in March 2007; correct?

22        A    Yes.

23        Q    And then he continued sending this information to

24   you after March 2007?

25        A    Yes.
```

```
 1        Q     How often did he send you this information?

 2        A     I can't remember exactly how often, but we had an

 3   ongoing relationship and discussion about education

 4   process and issues related to this case.

 5        Q     Okay.  And that ongoing discussion, was that

 6   primarily about claims being brought against other

 7   for-profit colleges?

 8        A     That was involved in our discussions, yes.

 9        Q     So these are cases that were being filed across

10   the country against other for-profit colleges?

11        A     Yes.

12        Q     And your attorney was sending information about

13   this to you?

14        A     Yes.

15        Q     And was he sending you Complaints -- the

16   Complaints that were filed in court against other

17   for-profit colleges?

18        A     No.

19        Q     Was he sending you news reports about -- about

20   other for-profit colleges?

21        A     Yes, how to get information about things that he

22   wanted me to be aware of.

23        Q     How to be -- what --

24        A     Links, yeah.

25        Q     Sorry.  You can finish.
```

 1      A    Links to information.

 2      Q    And what was that information that he wanted you

 3  to be aware of?

 4      A    I thought I explained that to you.  About

 5  colleges and profit schools and educational process.

 6      Q    And how they were compensating ad reps and

 7  directors of admission?

 8      A    That was some of the information, yeah.

 9      Q    And so he was sending you info -- links to

10  information about how other schools were compensating ad

11  reps and DOAs?

12      A    Yes.

13      Q    And these included news reports?

14      A    Yes.

15      Q    And those included news reports about lawsuits

16  that were being brought against these other for-profit

17  colleges?

18      A    Yes.

19      Q    And this information was sent to you before

20  March 26, 2007 --

21      A    Yes.

22      Q    -- when you filed your first Complaint in this

23  action?

24      A    Yes.

25      Q    Did he say why he was sending this to you?

1     A     He wanted me to be aware of what was going on.

2     Q     So before you reviewed this information, were you

3   aware about what was going on?

4     A     Yes.

5     Q     But did you learn more about what was going on by

6   reviewing this information?

7     A     Yes, I did.

8     Q     Were you aware that these -- that -- what --

9   strike that.

10          Was the information in the materials that Mr. Lee

11   sent to you, was it -- did it involve allegations similar

12   to the allegations brought in this case?

13     A     Sometimes, yes.

14     Q     And before you saw that information, did you know

15   about these kinds of -- these kinds of frauds being

16   committed against schools --

17     A     Yes.

18   MR. LEVY:  Objection to form.

19   MR. PHADKE:  You can strike that question -- last

20   question.

21     Q     And other than this -- these Internet links that

22   we've been talking about, did you review any other

23   documents to pre- -- to prepare for this deposition today?

24     A     I generally did research on my own, too, in terms

25   of this type of situation.

```
 1       Q     And what's "this type of situation"?

 2       A     About what's happening with this case.

 3       Q     Well, what is happening with this case?

 4     MR. LEVY:  He wants to know what you reviewed for this

 5   deposition, not for the last five years; what you reviewed

 6   today.

 7     MR. PHADKE:  Counsel, I would ask that you stop

 8   interrupting with these kind of instructions.  I'm asking

 9   questions.  They're reasonable questions.  And if he's

10   answering them, then those are his answers.

11       Q     So let's -- what you just said, you researched

12   "this situation."  So what is "this" -- what do you mean

13   by "this situation"?

14       A     Documents related to this case.

15       Q     So did you research documents for the claims that

16   you could bring against for-profit colleges?

17       A     Yes.

18       Q     And did you research that on the Internet?

19       A     And information that my attorney sent me.

20       Q     Okay.

21       A     Internet, as well.

22       Q     Now, I'm talking about information other than the

23   links your attorney sent you about other for-profit

24   colleges that we've already discussed, okay.

25             So putting -- putting that aside, did your
```

```
 1   attorney send you other documents?

 2       A    Yes.

 3       Q    And what kinds of documents were those?

 4       A    About things similar to this case.

 5       Q    About -- what kinds of things were those?

 6       A    Could you break that down --

 7       Q    So --

 8       A    -- a little bit better?  What do you mean?

 9       Q    So you -- you answered your attorney sent you

10   about things similar to this case.

11       A    Information similar to this case.

12       Q    What -- what was that information?

13       A    I just said, things similar to what's happening

14   with this case.

15       Q    Okay.  Did he send you Complaints filed in

16   court --

17       A    No.

18       Q    -- other than this -- other than the news

19   articles --

20       A    The news --

21       Q    -- that refer --

22       A    Yeah.

23       Q    -- that refer to Complaints?

24       A    Yes.

25       Q    And did that information that he sent you, did
```

```
 1   some of it not relate to Corinthian at all?

 2       A    Yes.

 3       Q    And what was the information that didn't relate

 4   to Corinthian?

 5       A    About other colleges.

 6       Q    So he sent you other information --

 7       A    Yes.

 8       Q    -- about other colleges as well?

 9            And this was prior to March 2007?

10       A    Yes.

11       Q    And that helped you inform -- it helped inform

12   you about the -- the allegations you're bringing in this

13   case?

14       A    Yes.  That's correct.

15       Q    And other than what your attorney sent you, you

16   said you conducted research yourself.  Yes?

17       A    Yes.

18       Q    And what was that research?

19       A    About colleges -- prof- -- for-profit colleges,

20   because I'm involved in education, so I like to keep

21   abreast of what's going on in the field.

22       Q    Okay.  And that research about for-profit

23   colleges, did that pertain to allegations that other

24   for-profit colleges had paid ad reps incentive

25   compensation?
```

```
 1        A     Some of it.

 2        Q     And did it pertain to allegations that other DOAs

 3   had -- that other colleges had paid DOAs incentive

 4   compensation?

 5        A     Some of it.

 6        Q     And did you do that research before filing

 7   this -- your Complaint in this action?

 8        A     Yes.

 9        Q     And did you do the research on the -- on those

10   issues after filing your original Complaint in this action

11   in March 2007 --

12        A     Yes.

13        Q     -- and before filing that Complaint in -- your

14   second Complaint in December 2011?

15        A     Yes.

16        Q     So you did research before your original

17   Complaint and -- yes?  You did research before your

18   original Complaint?

19        A     Yes.

20        Q     And then, again, research before your second

21   Complaint?

22        A     Yes.

23        Q     What caused you to do this research?

24              What caused you to do this research?

25        A     'Cause I'm an educator myself, and more
```

```
 1   BY MR. PHADKE:
 2       Q    And what did Ms. Newman tell you that caused you
 3   to do more research on this?
 4       MR. LEVY:  Objection to form.
 5       THE WITNESS:  Discussions that we had about this case
 6   and what was going on in the schools.
 7   BY MR. PHADKE:
 8       Q    Now, you talked to Ms. Newman before this
 9   Complaint was filed; right?
10       A    Yes.
11       Q    So were discussions with Ms. Newman actually just
12   about what was going on with the schools?
13       A    She was -- she worked as an admin rep at IBT,
14   where we worked, and we had conversations about it.
15       Q    And were the discussions with New -- Ms. Newman
16   about what was going on at other for-profit colleges?
17       A    Only the school that we worked at at the time.
18       Q    So you didn't talk with Ms. Newman about other
19   for-profit colleges?
20       A    No.
21       Q    And Ms. Newman didn't mention that she was a
22   relator in other cases against for-profit colleges?
23       A    No.  I found -- found that out later.
24       Q    You found that out later?
25       A    Yeah.
```

1      Q     When did you find that out?

2      A     After our first initial meeting.

3      Q     At that dinner in San Mateo?

4      A     Dinner in San Jose.

5      Q     The dinner in San Jose?

6      A     Yeah, before San -- San Mateo.

7      Q     So between the dinner in San Jose and the dinner

8   in San Mateo, you found out --

9        MR. LEVY:   Compound.

10   BY MR. PHADKE:

11     Q     -- that Ms. Newman had brought suits against

12   other for-profit colleges?

13     A     Yes.

14     Q     And did that make you do further research into

15   this issue of compensation of ad reps and directors of

16   admission?

17     A     Yes, it did.

18     Q     And you learned more -- more information about

19   these issues?

20     A     Yes, I did.

21     Q     And did talking to Mr. Levy cause you to do

22   more -- more independent research on the compensation of

23   directors of admission and ad reps?

24     A     Yes.

25     Q     And other allegations that you bring in this

1   Complaint?

2       A    Yes.

3       Q    And did you do that research before you filed

4   your -- did you do that research before you filed your

5   original Complaint in March 2007?

6       MR. LEVY:  Asked and answered.  Objection.  Asked and

7   answered.

8   BY MR. PHADKE:

9       Q    The research that you did after -- because of

10  talking to Mr. Levy, did you do that research before

11  filing your original Complaint in March of 2007?

12      A    Some of it, yes.

13      Q    And did you do that research before filing your

14  original Complaint -- your second Complaint in December of

15  2011?

16      A    Yes.

17      Q    Have you done any other research on this besides

18  what you did based on talking to Mr. Newman and -- talking

19  to Ms. Newman or Mr. Levy?  I'll strike that.

20          Can you describe any other research you've done

21  to prepare for this deposition?

22      A    I think I've described that to you already.  I'm

23  not sure what you mean.

24      Q    So the research you did was primarily research

25  about other for-profit schools?

1    A    Yes.

2    Q    And about lawsuits that are being brought against

3  other for-profit schools?

4    A    Yes.

5    Q    That was primarily what you researched?

6    A    Yes.

7    Q    And what schools were those?

8    A    University of Phoenix.

9    Q    Any other schools besides University of Phoenix?

10    A    Corinthian Colleges.

11    Q    So you researched other lawsuits that have been

12  brought against Corinthian Colleges?

13    A    Yes.

14    Q    Do you remember what lawsuits those were?

15    A    I think the year 2007 there was a -- a judgment

16  against Corinthian Colleges, in support of students, for

17  8.6 million.

18    Q    And that -- that judgment against Corinthian of

19  8.6 million, did that spur you on to do more research in

20  this case?

21    A    I just wanted to keep abreast of what was going

22  on.

23    Q    Did it spur you on to do more research?

24    MR. LEVY:  Objection to form.  Asked and answered.

25    THE WITNESS:  Yes.

1  BY MR. PHADKE:

2      Q    Did it spur you on to pursue this case?

3      A    Yes.

4      Q    And did the University of Phoenix lawsuit spur

5  you on to pursue this case?

6      A    Yes.

7      Q    And that lawsuit happened before you filed this

8  Complaint; right?

9      A    Yes.

10     Q    And were you aware of a fine that the University

11  of Phoenix had paid in 2004 for incentive-compensation

12  violations?

13     A    Yes.

14     Q    And did that -- did your information -- did

15  your -- sorry.  Did your knowledge of that fine spur you

16  on to pursue this case?

17     A    Yes.

18     Q    Were you aware of any other lawsuits against

19  for-profit colleges?

20     A    Not to my knowledge, that I can remember now.

21  Since I worked in education, I was always -- had the time

22  to do research about educational process and schools and

23  how things function.  I spent a lot of time doing that.

24     Q    And after you filed your original Complaint in

25  2007, did you continue researching lawsuits against other

```
 1   for-profit colleges?

 2        A    Yes, at every opportunity.

 3        Q    And you did that at every opportunity before you

 4   filed your original Complaint, as well?

 5        A    Yes.

 6        Q    Okay.  And after you filed your original

 7   Complaint, did you learn about more lawsuits against

 8   for-profit colleges besides the one against University of

 9   Phoenix?

10        A    Yeah, everything that came up.

11        Q    So you learned about every -- pretty much --

12        A    Yes.

13        Q    -- every lawsuit that came up after -- after you

14   filed your original Complaint?

15        A    Yes.

16        Q    Did you know about pretty much every lawsuit that

17   came up before you filed your original Complaint, as well?

18        A    I'm not sure if I knew about everything, but

19   pretty much, because I just pretty much stayed on top of

20   it.

21        Q    So you knew about a lot of lawsuits before you

22   filed your original Complaint, even though you can't

23   remember any of them besides University of Phoenix?

24        A    That's correct.

25        Q    And how many were there, if you can estimate?
```

```
 1      A    Three, maybe four, five, I'm not sure.

 2      Q    So you knew --

 3      A    Yeah.

 4      Q    -- about around five --

 5      A    Uh-huh, yeah.

 6      Q    -- other lawsuits that brought the same

 7   allegations in this case, of schools violating

 8   incentive-compensation bans --

 9      A    Yes.

10      Q    -- before you filed your original Complaint?

11      A    Yes.

12      Q    Did you review any other documents to prepare for

13   this deposition?

14      A    Could you be more specific?

15      Q    To prepare for this deposition, did you review

16   any other documents, besides what we've already talked

17   about?

18      A    As many that I had available to review.

19      Q    How many were those?

20      A    There's quite a few of 'em.  It's a big stack of

21   stuff.  I leaf through it, you know, focus in on some

22   aspects.

23           Could I get a tissue, please?

24           Thank you.

25      Q    And where did you get these materials?
```

```
 1        A    Yes.

 2        Q    And in the break that you just had that was

 3   longer than a half an hour with your -- how long did you

 4   talk about the deposition with your counsel?

 5        A    How long?

 6        MR. LEVY:  The whole time.

 7   BY MR. PHADKE:

 8        Q    The whole time?

 9        A    Yes.

10        Q    About your testimony going forward?

11        A    Yes.

12        Q    The whole time you talked about your testimony

13   going forward in this deposition?

14        A    Yes.

15        Q    Now, earlier you had testified that you reviewed

16   materials that Mr. Levy has sent to you about Corinthian,

17   in order to prepare for this deposition, and that you had

18   reviewed those same materials before you filed the

19   original Complaint; is that correct?

20        A    Yes.

21        Q    And those materials that Mr. Levy sent to you,

22   you had never seen those before?  Yes?

23        A    No.

24        Q    So they came from your attorney and you'd never

25   seen them before?
```

```
 1        A    Yes.

 2        Q    And other than those materials that Mr. Levy sent

 3   to you that you had never seen before, and materials based

 4   on your Internet research, did you base your knowledge of

 5   the Complaint on anything else?

 6        A    No.

 7        Q    So that was the basis of the knowledge -- that

 8   was the basis of your knowledge of your allegations of the

 9   Complaint?

10        A    Yes.

11        Q    Those two pieces of information?

12        A    Yes.

13        Q    Materials that Mr. Levy sent you about

14   Corinthian --

15        A    Uh-huh.

16        Q    -- that you had never seen before, and then

17   Internet research you had done?

18        A    That's true.

19        Q    And those are materials -- those materials are

20   ones you reviewed prior to March 2007 when you filed the

21   original Complaint?

22        A    Yes.

23        Q    I'd like to give you an exhibit that we used

24   yesterday at Ms. Lee's deposition.

25        MR. PHADKE:  This was marked Exhibit 17 yesterday.
```

```
 1            (Exhibit 17 was previously marked for

 2    identification and is attached hereto.)

 3    BY MR. PHADKE:

 4        Q    Do you recognize this document?

 5        A    Yes.

 6        Q    Could you turn to Page 3 of this document.

 7        MR. PHADKE:  Just for the record, this is the First

 8    Amended Complaint in this case.

 9        Q    So Page 2, Paragraph 3.

10        A    You said 3?

11        Q    I'm sorry, let me clarify.  Could you turn to

12    Page 2, Paragraph 3, where --

13        A    Okay.

14        Q    -- the paragraph starting, "Relator Talala

15    Mshuja."

16            Do you see where it says, "Mshuja was employed as

17    an independent test proctor at Corinthian San Francisco

18    campus from August 2000 until February 2003, and then at

19    the San Jose campus from January 2004 until July 2005.

20    Mshuja -- Mshuja worked at Corinthian's Fremont campus

21    from 2006 to 2009"?

22            Do you see that?

23        A    2007, I think -- late 2006 to 2009, yes.

24        Q    Okay.  So that's late 2006 to 2009?

25        A    Yeah.
```

```
 1      Q    So with that correction that your time at your --
 2 at the Fremont campus started in late 2006 to 2009, is
 3 this an accurate summary of your work for Corinthian?
 4      A    Yes.
 5      Q    All your work at Corinthian?
 6      A    Uh-huh.
 7      Q    And there's a period missing here and -- there's
 8 two -- there's two periods missing here.  The first
 9 period, like where there's a gap between your work at
10 Corinthian, working backwards, is from July 2005 till late
11 2006.  What -- what did you do at that period?
12      A    I think that was Institute for Business &
13 Technology.
14      Q    So that's when you were a test proctor --
15      A    Yeah, uh-huh --
16      Q    -- at IBT?
17      A    Yes.
18      Q    Did you do anything else at that point?
19      A    No.
20      Q    So you worked as a test proctor at IBT between
21 July 2005 and approx- -- and sometime in late 2006?
22      A    Yes.
23      Q    At that point, did you stop working as a test
24 proctor at IBT --
25      A    Yes.
```

```
 1      Q    -- when you returned to Corinthian in Fremont?

 2      A    Yes.

 3      Q    And then there's another gap between February of

 4  2003 and January of 2004.

 5           Do you see that?

 6      A    Yes.

 7      Q    What were you doing then?

 8      A    Looking for a job.  Look for employment.

 9      Q    You were looking for employment?

10      A    Yes.

11      Q    So you were not employed --

12      A    No.

13      Q    -- between February 2003 and January of 2004?

14           And other than your work for Corinthian and your

15  work for IBT, you didn't do anything else between 2000 and

16  2009?

17      A    No, I didn't.

18      Q    And you didn't work for any other for-profit --

19      A    No.

20      Q    -- colleges during that period, and you haven't

21  worked for any for-profit colleges since then?

22      A    No, I haven't.

23      Q    So based on the summary, the only position you've

24  ever had with Corinthian is as an independent test

25  proctor?
```

1     A    That's correct.

2     Q    Right?

3          And you never worked in any other capacity?

4     A    No.

5     MR. LEVY:  Objection to form.

6     THE WITNESS:  No.

7  BY MR. PHADKE:

8     Q    And all the work you did with Corinthian was as

9  an independent contractor; right?

10    A    That's correct.

11    Q    So you were never a salaried employee at

12 Corinthian?

13    A    No.

14    Q    And just to clarify the campuses that you worked

15 at, your only work at Corinthian was at Bryman College in

16 San Jo- -- in San Francisco from 2000 to 2003, Bryman in

17 San Jose from 2004 to 2005, and WyoTech in Fremont from

18 late 2006 to 2009; is that correct?

19    A    Yes.

20    Q    And you were paid an hourly wage the whole time?

21    A    That's correct.

22    Q    And so you're paid dependent only on how many

23 hours you worked as a test proctor for that -- for any

24 given pay period; correct?

25    A    That's correct.

```
 1      Q     And you were never paid a salary?

 2            Were you never paid a salary?

 3      A     That's the second time you asked me that.  No.

 4      Q     And you were never paid a performance bonus;

 5   right?

 6      A     No.

 7      Q     And you were never paid a commission; right?

 8      A     No.

 9      Q     And your pay never depended on how many students

10   Corinthian recruited?

11      A     No.  How many hours I worked.

12      Q     And your work as a test proctor, was that covered

13   by independent written contracts with Corinthian?

14      A     That's correct.

15      Q     And that was for the entire time you worked for

16   Corinthian, it was covered by independent written

17   contracts?

18      A     That's correct.

19      Q     And did these contracts describe completely the

20   work you did with Corinthian?

21      A     That's correct.

22   MR. LEVY:  Okay.  You were going to make a copy of

23   those exhibits during the break.

24   MR. PHADKE:  I apologize.  I've sent an e-mail to

25   the -- to the paralegal, but she hasn't come down yet.
```

```
 1       MR. LEVY:  We -- we gave you plenty of time earlier to

 2   make copies.

 3       MR. PHADKE:  Can we go off the record?

 4       THE VIDEOGRAPHER:  Agree to go off the record?

 5       MR. LEVY:  I don't see any reason to go off the

 6   record.

 7       MR. PHADKE:  Well, you're just chewing up record time

 8   on this debate.

 9       MR. LEVY:  So just get us a copy of --

10       MR. PHADKE:  We'll make you a copy.  Why don't we hold

11   onto it and we'll get a copy made.  Here.

12           I should have you mark these once it's done.

13           This is 36.  This is 37.

14           (Exhibit 36 was marked for identification and

15   is attached hereto.)

16           (Exhibit 37 was marked for identification and

17   is attached hereto.)

18   BY MR. PHADKE:

19       Q    Mr. Mshuja, do you recognize these documents?

20       A    Yes, I do.  Are they marked the same?

21       Q    You'll see one is dated 12 of April 2007, the

22   other is dated 12 of April 2008.

23       A    Okay.

24       Q    And are these contracts you signed in 2007 and

25   2008 relating to your work with Corinthian as an
```

```
 1   independent test proctor?

 2       A    Yes.

 3       Q    And that's your signature on both contracts?

 4       A    Yes.

 5       Q    Did you read these contracts before signing them?

 6       A    As far as -- as far as I know, yes.

 7       Q    So there's no reason to think you didn't read

 8   these contracts before signing them?

 9       MR. LEVY:  Objection to form.

10       THE WITNESS:  I think I read them.

11   BY MR. PHADKE:

12       Q    And when you read them -- when you signed them,

13   did you agree with what the contract said?

14       A    Yes.

15       Q    Did you understand -- did you understand that

16   signing would express your agreement with what the

17   contract said?

18       A    Yes.

19       Q    Would you turn to both contracts, to Exhibit A.

20   It's the fourth page in each document.

21       MR. PHADKE:  These con- -- just for the record, these

22   contracts have exhibits that are attached to them that

23   appear to be part of the contract.

24       Q    Were these exhibits part of the contract?

25       MR. LEVY:  Objection to form.
```

```
 1   BY MR. PHADKE:

 2        Q    Were these -- were these exhibits part of the

 3   contract?

 4        A    As far as I know.

 5        Q    And do you see where it says, in the 2008

 6   contract, "Services described as proctoring of ability to

 7   benefit CPAT entrance test for prospective WyoTech

 8   candidate students.  Proctor will provide up to 30 hours a

 9   week, not to exceed, to avail himself to testers on an

10   as-needed basis"?

11        A    Yes.

12        Q    Is that an accurate description of the work you

13   did with Corinthian?

14        A    Yes.

15        Q    Did you do anything else?

16        A    No.

17        Q    And that's your whole time at Corinthian, from

18   2000 to 2009; this is an accurate description of the work

19   you did?

20        A    Yes.

21        Q    And you didn't do anything else?

22        A    No.

23        Q    The whole time?

24        A    No.

25        Q    Did you have a desk or office at any Corinthian
```

1    campus?

2        A    Yes, I did.

3        Q    Where did you have a desk?

4        A    In the proctoring room.

5        Q    In the proctoring room?

6        A    Fremont, I had a desk in the library.

7        Q    And was that a desk that was assigned to you or

8    was it one that was available to proctors in general?

9        A    It was my desk.

10        Q    Did you have a desk in San -- in San Francisco?

11        A    Yes, I did.

12        Q    And that -- where was that?

13        A    In the proctoring room.

14        Q    Proctoring room.

15            Did you ever have a Corinthian e-mail address?

16        A    No.

17        Q    Did you ever have a computer given to you by

18    Corinthian?

19        A    Yes.

20        Q    Was it a computer that was assigned to you?

21        A    Yes, for my proctoring.

22        Q    When was that given to you?

23        A    I had a computer in San Francisco.  I had a

24    computer in San Jose.

25        Q    Okay.

```
 1        A     And I had one at WyoTech.

 2        Q     And when you said that was for your proctoring,

 3   what did you do on the computer?

 4        A     I notated my testing job, what I did.

 5        Q     So you notated tests that you had proctored?

 6        A     Yes.

 7        Q     Did you do anything else?

 8        A     No.  In my free time I might have just looked at

 9   some of my artwork.

10        Q     Okay.  So you notated tests that you proctored,

11   and in your free time you looked at your artwork?

12        A     Yes.

13        Q     And there was nothing else --

14        A     No.

15        Q     -- that you did on the computers?

16        A     No.

17        Q     And that was during your whole time at

18   Corinthian, the only thing you did on the computers was

19   notate your tests and look at artwork?

20        A     Yes.  Paperwork --

21        Q     What kind of --

22        A     -- that I'd written.

23        Q     And what was the paperwork that you had written?

24        A     About my art.

25        Q     About your art?
```

```
 1        A    Yes.

 2        Q    But that was not related to Corinthian?

 3        A    No.

 4        Q    So the only work you did on computers -- on

 5   Corinthian computers was to notate your tests?

 6        A    Yeah.  I managed my testing.

 7        Q    Managed testing?

 8        A    With the computer.

 9        Q    And did you have a account that gave you access

10   to the Corinthian system -- the Corinthian data system?

11        A    No.

12        Q    So sort of Corinthian corporate documents, did

13   you have an access to that?

14        A    No.  No, I didn't.

15        Q    So the only -- so what did you have access to?

16   The Internet?

17        A    Yes, I did.

18        Q    And you had access to Word?

19        A    Yes, I -- in San Francisco, I didn't have access

20   to Internet.

21        Q    Okay.

22        A    I just had a desktop computer, and that was it.

23        Q    And --

24        A    In San Jose, I did have access to the Internet.

25        Q    And what did you have access to on your computer?
```

```
 1      A    Just Microsoft Word.

 2      Q    Just Microsoft Word?

 3      A    Yeah.

 4      Q    Anything else?

 5      A    No.

 6      Q    And so you -- and so you annotated your tests on

 7  Microsoft Word?

 8      A    Yes, I documented my activities.

 9      Q    You documented your test-proctoring activities?

10      A    Yes.

11      Q    And you did nothing else on those computers?

12      A    No.

13      Q    And just to get the record clear, you didn't have

14  access to any sort of Corinthian database or set of

15  corporate documents?

16      A    No.

17      MR. LEVY:  Objection to form.

18      THE WITNESS:  No.

19  BY MR. PHADKE:

20      Q    You were never an admissions representative;

21  right?

22      A    No.

23      Q    And you were never director of admissions; right?

24      A    No.

25      Q    So you were never responsible for admitting or
```

```
 1   recruiting students; right?

 2       A    No.

 3       Q    And your pay was never based on any compensation

 4   policies that covered ad reps; right?

 5       A    No.

 6       Q    And it was never based on any compensation

 7   policies that covered directors of admission; right?

 8       A    No.

 9       Q    And you never gave any ad rep a performance

10   evaluation; right?

11       A    Could you state that question again?

12       Q    As a test proctor -- I mean, as a test proctor,

13   you never gave any ad rep a performance evaluation;

14   correct?

15       A    No.

16       Q    And you never gave a DOA a performance

17   evaluation?

18       A    No.

19       Q    Right?

20            As a test proctor, had you ever seen the forms

21   which DOAs used to give performance evaluations?

22       A    No.

23       Q    As a test proctor, had you ever seen the forms

24   which DOAs gave to -- DOAs looked at in considering

25   promotional criteria?
```

```
 1        A    Yes.

 2        Q    When did you see those?

 3        A    When?  I don't remember exactly when.

 4        Q    You don't remember when?

 5        A    No.

 6        Q    Do you know who showed them to you?

 7        A    Who showed 'em to me?

 8        Q    Do you know who showed 'em to you?

 9        A    Yes.

10        Q    Who?

11        A    Nyoka.

12        Q    Nyoka showed them to you.  Aside from what Nyoka

13   showed you, had you ever seen the forms that were used to

14   determine whether ad reps got -- got compensation bonuses

15   or incentive pay?

16        A    I said Nyoka ... I think -- I'm not sure.

17        Q    So you have no recollection of seeing any -- any

18   documents that discuss ad rep compensation besides what

19   Nyoka showed you?

20        MR. LEVY:  Objection to form.

21        THE WITNESS:  I think I saw documents that John Chacon

22   and Susan Newman ....

23   BY MR. PHADKE:

24        Q    So in your work as a test proctor, you never saw

25   documents that -- that covered ad rep compensation?
```

```
 1        MR. LEVY:  Objection to form.

 2        THE WITNESS:  No.

 3   BY MR. PHADKE:

 4        Q    And you only ever saw those based on what Nyoka

 5   Lee, Susan Newman or John Chacon showed you?

 6        A    No.

 7        Q    Let me clarify.  You only ever saw documents

 8   covering ad rep compensation based on what Nyoka Lee,

 9   Susan Newman or John Chacon showed you; right?

10        MR. LEVY:  Objection to form.

11   BY MR. PHADKE:

12        Q    I need an audible, verbal response.

13        A    That's the only way I saw it.

14        Q    That's the only way you saw it?

15        A    Yeah.

16        Q    And you never got -- reviewed yourself -- based

17   on any ad rep performance review; right?

18        A    No.

19        Q    And you were also never a financial aid officer;

20   right?

21        A    No.

22        Q    You were never involved in making decisions about

23   whether a student was eligible for financial aid?

24        A    No.  I was only the test proctor.

25        Q    And as part of your work as a test proctor, no
```

1    DOA ever sent you any spreadsheets showing DOA or ad rep

2    enrollment numbers; right?

3        A    No.

4        Q    Now, for your compensation, you submitted

5    invoices to Corinthian for each pay period; right?

6        A    That's correct.

7        Q    Those invoices covered the money you were owed

8    for a pay period based on your hourly rate?

9        A    Yes.

10    MR. PHADKE:  Okay.  I'd like to introduce two

11    exhibits.

12        (Exhibit 38 was marked for identification and

13    is attached hereto.)

14        (Exhibit 39 was marked for identification and

15    is attached hereto.)

16    MR. PHADKE:  There -- there's a copy for you.  I

17    apologize.

18    MS. YOUNG:  Here you go.

19    MR. LEVY:  Okay.  Thank you.  So this is going to be

20    Exhibit 38.

21    MS. YOUNG:  Oh, are there two different documents?

22    MR. CALHOUN:  Yeah.

23    MS. YOUNG:  Scott, for you.

24    MR. LEVY:  No, I gave them the other --

25    MS. YOUNG:  Oh, you did?

```
 1      Q    And after you stopped working for Corinthian, did
 2  you get other employment?
 3      A    Since 2009?
 4      Q    Yeah, after January 2009.
 5      A    No.
 6      Q    So you left Corinthian because they weren't (sic)
 7  paying you late and then you didn't seek other employment?
 8      A    No.  I did look for work, but I didn't find any.
 9      Q    And there was -- there were no other reasons for
10  your leaving Corinthian?
11      A    No.
12      Q    So earlier today we talked about Susan Newman and
13  John Chacon; right?
14      A    Yes.
15      Q    And you said that you had two dinners with Susan
16  Newman and a meeting at her house at the -- when you first
17  started thinking about this case; right?
18      A    Yes.
19      Q    What was the first of those meetings?
20      A    The one in San Jose.
21      Q    That was the dinner in San Jose?
22      A    Yeah.
23      Q    Who was at that dinner?
24      A    Myself, Susan, John Chacon, Mr. Levy and Mr. Mark
25  Labaton.
```

```
 1        Q    Do you remember when that dinner was?

 2        A    What year?

 3        Q    Was it in 2006?

 4        A    I think so.  I'm not positive.

 5        Q    So you think the dinner was in 2006.  And Ms. Lee

 6   was not there?

 7        A    No.

 8        MR. LEVY:  Objection to form.

 9        THE WITNESS:  No.

10   BY MR. PHADKE:

11        Q    And the list of people you recited was a complete

12   list of who was there?

13        A    Yes, correct.  Yeah.

14        Q    And what did you talk about at that dinner?

15        A    What did we talk about?  Problems with how

16   Corinthian Schools and -- no, IBT -- both of those schools

17   were operating.

18        MS. YOUNG:  Can I have that read back?  I didn't hear.

19   I'm sorry.

20        (Record read as follows:

21            "Q   What did we talk about?  Problems  with how

22         Corinthian Schools and -- no, IBT -- both of those

23         schools were operating.")

24   BY MR. PHADKE:

25        Q    Did Ms. Newman set up that dinner?
```

```
 1      A     I'm not sure who set that up.

 2      Q     Did you set up that dinner?

 3      A     No, they called me in to the meeting.

 4      Q     Who called you?

 5      A     I think that was Susan that called me.

 6      Q     And what did Susan say?

 7      A     She would like for me to come to this meeting.

 8      Q     Did she say why she wanted you to come to the

 9 meeting?

10      A     Yes.

11      Q     What did she say?

12      A     She would like to -- for me to be involved and

13 take a look at what was going on.

14      Q     And what was going on?  Did she say what was

15 going on?

16      A     Yes.

17      Q     What did she say was going on?

18      A     The practices of both those schools.

19      Q     Before you discussed the practices of IBT and

20 Corinthian, had you ever thought about Corinthian

21 committing a fraud against the federal government?

22      A     I was aware of -- aware of how they treated their

23 students.

24      Q     But before you talked about IBT and Corinthian at

25 that dinner in 2006, had you ever thought about how
```

1    Corinthian was committing a fraud against the federal

2    government?

3        MR. LEVY:  Objection to form.

4        THE WITNESS:  I thought about how they were committing

5    a fraud against their students.

6    BY MR. PHADKE:

7        Q    And what was the fraud against their students

8    that you thought about?

9        A    Enrolling students and then not able to get them

10   jobs and charging 'em money.

11       Q    Okay.  So you thought that Corinthian was

12   committing a fraud by enrolling students who had no job

13   prospects after they completed their graduation?

14       A    That's correct, yeah.

15       Q    And you thought that was a fraud against the

16   Government?

17       A    If that's how they got their money, yes.

18       Q    And was that the -- was that the only fraud you

19   had thought about that Corinthian was committing against

20   the federal government?

21       A    As far as that they were committing against their

22   students?

23       Q    Yes.  The one you just described.

24       A    Yes.

25       Q    And you didn't think of any other sort of bad

1    actions being taken by Corinthian before that dinner?

2        A    Yeah, actions they took against me and other

3    people that worked there.

4        Q    What were those actions?

5        A    It's hard to describe how they -- in the normal

6    politics of a company, some people are favorites and

7    others aren't; and some people are treated differently

8    than others.  You know, that type of thing.

9        Q    So did you feel you were disfavored at

10   Corinthian?

11       A    If -- I had conflict with admissions rep because

12   of their practices.  I was in charge of what I was doing

13   and sometimes there was conflict with admission reps.

14       Q    But that didn't constitute a fraud against the

15   federal government; right?

16       MR. LEVY:  Objection.  Form.

17   BY MR. PHADKE:

18       Q    Did you think that constituted a fraud against

19   the federal government at the time?

20       MR. LEVY:  Objection.  Form.

21       THE WITNESS:  It was a fraud against the people

22   involved.

23   BY MR. PHADKE:

24       Q    So before that dinner, you thought that

25   Corinthian was committing a fraud against the federal

```
 1    objection is appropriate for the communications you had

 2    before --

 3       MR. LEVY:  I absolutely -- I absolutely think it's

 4    appropriate.  All communications with counsel,

 5    anticipation of hiring counsel, are covered by the

 6    privilege.

 7            I instruct the witness not to answer.

 8    BY MR. PHADKE:

 9       Q    Were you looking for legal advice from Mr. Levy

10    when you came to that dinner?

11       A    Oh, I was just advised to come and see what was

12    going on.

13       Q    So you weren't looking for -- for legal advice

14    from Mr. Levy at the start of the dinner?

15       A    I didn't know what was going on at the start of

16    the dinner.

17       Q    Okay.  And were -- there were, at that dinner,

18    present, Mr. Chacon and Ms. Newman; correct?

19       A    Yes.

20       Q    And they were there for the whole dinner;

21    correct?

22       A    Yes.

23       Q    And they heard everything that was said at that

24    dinner; correct?

25       A    Yes, uh-huh.
```

```
 1        Q    And are Mr. Chacon or Ms. Newman your co-relators

 2   in this action?

 3        A    Now?

 4        Q    Yes.

 5        A    No.

 6        Q    Were they ever your co-relators in this action?

 7        A    In the -- in the beginning.

 8        Q    In the beginning?

 9        A    Yes.

10        Q    Were they your co-relators -- how long were they

11   your co-relators in this action?

12        A    I don't remember the specific time.

13        Q    Were they your co-relators in this action when

14   you filed the Complaint in 2007?

15        A    I'm not sure.

16        Q    So you -- you just remember them being your

17   co- -- co-relators in this action at some point?

18        A    Yeah.

19        Q    And you don't know when that point was?

20        A    In the beginning.

21        Q    In the beginning of this case?

22        A    Yeah.

23        Q    But when you came to that dinner --

24        A    I think.

25        Q    -- you were not looking for legal advice?
```

```
 1      A    No.
 2      Q    What was said at the start of the dinner, if you
 3   remember?
 4      A    I don't remember.
 5      Q    Do you remember who started talking?
 6      A    No.
 7      Q    Did you start talking?
 8      A    I just welcome -- welcome -- we talked and, you
 9   know, "How you doing," you know, general conversation, at
10   the start of the meeting, yeah.
11      Q    Did someone else bring up Corinthian?
12      A    Yes.
13      Q    Who brought up Corinthian?
14      A    I don't remember who exactly brought it up, what
15   individual brought it up.
16      Q    But it was --
17      A    It was Susan or --
18      Q    That's all right.
19      A    Yeah.
20      Q    You can finish.
21      A    It could have been Susan, more than -- more than
22   likely.
23      Q    It was more than likely Susan --
24      A    Yeah, uh-huh.
25      Q    -- who brought up Corinthian?
```

```
 1          And what did Susan say about Corinthian, if you
 2   remember?
 3       A   It was about the practices and admissions.
 4       Q   So did Susan bring up the practice of paying ad
 5   reps incentive compensation?
 6       A   Not that -- you know, I don't remember if there
 7   was a -- one thing in particular that she said, you know.
 8       Q   But she brought up the problems with -- with ad
 9   reps?
10       A   Yeah.
11       Q   And do you remember the problems that she brought
12   up?
13       A   No.
14       Q   And did Mr. Levy or Labaton say anything about ad
15   reps?
16       A   I don't remember exactly what the conversation
17   was, but possibly.
18       Q   Okay.  Before you decided to retain counsel at
19   that dinner, did anybody bring up lawsuits that had been
20   brought against for-profit colleges about ad reps?
21       A   Not that I can remember.
22       Q   Was that discussed at that dinner?
23       A   Not that I can remember.
24       Q   Do you remember anything that was discussed at
25   that dinner?
```

```
 1      A    No, it's been some time ago, I don't -- I can't
 2  recall.
 3      Q    So you can't remember anything then?
 4      A    No.  Vaguely.
 5      Q    What do you remember?
 6      MR. LEVY:  Objection.  Asked and answered.
 7      THE WITNESS:  I don't remember, you know -- you know,
 8  my memory's vague on -- on all of that.
 9  BY MR. PHADKE:
10      Q    Did Ms. Newman discuss lawsuits she was
11  bringing -- she was bringing as a relator against other
12  for-profit colleges?
13      A    No.
14      Q    But you said you learned about that later on?
15      A    Yes.
16      Q    And that -- and you learned about that before you
17  filed the Complaint in this case in March 2007?
18      A    Yes.
19      Q    And you don't remember anything about that dinner
20  besides what you've testified to at this point?
21      A    No.
22      Q    Did somebody suggest that you contact Ms. Lee?
23      A    No.
24      Q    Did you contact Ms. Lee after that dinner?
25      A    I suggested her.
```

1       Q     So you suggested --

2       A     Yes.

3       Q     -- that Ms. Lee --

4       A     Yes.

5       Q     -- be contacted in connection with this case?

6    Let me get the record clear.

7             You suggested at that dinner that Ms. Lee be

8    contacted?

9       A     Yes.

10      Q     Why did you suggest that?

11      A     Because she worked at the Corinthian Schools.

12      Q     And was it because she worked as an admissions

13   rep at Corinthian?

14      A     As well as admissions director.

15      Q     Was she working with Corinthian at the time?

16      A     I don't think she was.

17      Q     So this is after she had left Corinthian in --

18      A     I think so.

19      Q     -- May 2005?

20      A     Yes.

21      Q     And then did you then get in touch with Ms. Lee

22   after that dinner?

23      A     Yes.

24      Q     And what did you say to Ms. Lee?

25      A     I told her that she should come to the meeting.

```
 1       Q    Had you and the other members of -- other people

 2  who were at the dinner in San Jose discussed a follow-up

 3  meeting?

 4       A    I'm not sure.

 5       Q    So when you called Ms. Lee and you said, "You

 6  should come to the meeting," what meeting were you talking

 7  about?

 8       A    The one in San Mateo.

 9       Q    So when --

10       A    The second meeting.

11       Q    How was the second meeting set up?

12       A    How?

13       Q    Who suggested the second meeting?

14       A    We all talked about it.

15       Q    Everybody at the dinner in San Jose --

16       A    Yes.

17       Q    -- talked about the second meeting?

18       A    Uh-huh.

19       Q    Let me just get the record clear.

20            Everybody at the dinner in San Jose talked about

21  a second meeting?

22       A    Yes.

23       Q    And you suggested bringing Ms. Lee to that second

24  meeting?

25       A    Yes.
```

```
 1       Q    Because she was an ad rep at Corinthian?

 2       A    Yes.

 3       Q    And at that first meeting you had discussed the

 4   possibility of suing Corinthian?

 5       A    Yes.

 6       Q    And that possibility was suggested by either

 7   Ms. Newman or Mr. Levy or Mr. Labaton?

 8       MR. LEVY:  Objection.  You're asking for

 9   attorney-client communications.  You know that.

10            I instruct the witness not to answer.

11       THE WITNESS:  No, can't answer.

12       MR. LEVY:  Meaning you're not answering on the advice

13   of counsel; correct?

14       THE WITNESS:  In advice of counsel.

15   BY MR. PHADKE:

16       Q    So you said that during that first meeting in San

17   Jose, at some point during the meeting, you -- you made a

18   decision that you might retain counsel; correct?

19       A    I made a decision then?

20       Q    Did you?

21       A    I thought about it.  I mean I was thinking about

22   it.  I didn't make the decision.

23       Q    So you started thinking about whether you were

24   going to retain counsel at that first dinner in San -- in

25   San Jose?
```

1    A    Yes.

2    Q    And before you started thinking about that, if

3  you can remember, did somebody, either Ms. Newman or

4  Mr. Levy or Mr. Labaton, bring up the possibility of suing

5  Corinthian Colleges?

6    A    No.

7    Q    So you started thinking about retaining counsel

8  just -- just -- just because?

9    A    After that meeting.

10   Q    So you started thinking of retaining counsel

11  after the meeting?

12   A    If there was any way to do that, you know.  I --

13  I -- I wasn't sure if there was any way to do that or if

14  there was going to be a true follow-up, you know.  I was

15  just introduced to her.

16   Q    What -- what made you think about retaining

17  counsel?  What happened before you started thinking about

18  retaining counsel?

19   A    The meeting.

20   Q    So you didn't think about retaining counsel at

21  the meeting?

22   A    No.

23   Q    Did you say anything to Counsel about the

24  possibility of retaining counsel at that meeting?

25   A    No.

1      Q    So you didn't say anything to Mr. Levy

2  or Mister --

3      A    I was just as an observer.

4      Q    So you didn't say anything to Mr. Levy or

5  Mr. Labaton about the possibility of retaining counsel at

6  that first meeting --

7      A    No.

8      Q    -- in San Jose?

9           Let me just get the record clear.  You didn't say

10  anything to Mr. Levy or Mr. Labaton about the possibility

11  of retaining counsel at that first meeting?

12     A    No.

13     Q    And you started thinking about retaining counsel

14  after the -- after that first meeting?

15     A    Yeah, after listening to the input of everybody

16  involved.

17     Q    And when did you first discuss the possibility of

18  retaining counsel?

19     A    I think maybe after the second meeting.

20     Q    After the second meeting --

21     A    Yes.

22     Q    -- you first discussed the possibility of

23  retaining counsel with Mr. Levy and Mr. Labaton?

24     A    Yes.

25           MR. PHADKE:  Counsel, I don't see any basis for the

```
 1    privilege.

 2         MR. LEVY:  Yeah, I think all communications in

 3    anticipation of litigation are clearly covered by the

 4    privilege.  We've given you a lot of latitude on this.

 5              It -- it's privileged and I'm instructing him not

 6    to answer.

 7         MR. PHADKE:  Counsel, there's case law that says the

 8    initial attorney-initiated contact before there's a --

 9    before there's an intent to --

10         MR. LEVY:  And --

11         MR. PHADKE:  -- initiate attorney-client relationship

12    is not privileged.

13         MR. LEVY:  And he didn't say this is

14    attorney-initiated contact.  You're saying that.

15         MR. PHADKE:  Well, it was initiated by a third party

16    named Susan Newman.

17         MR. LEVY:  Is she an attorney?

18         MR. PHADKE:  Well, she was a relator in two cases that

19    you brought against other for-profit colleges.

20         MR. LEVY:  And -- and she's not an attorney, and there

21    is no -- he's not testified about attorney-initiated

22    contact.

23         MR. PHADKE:  No, but he has testified that he didn't

24    think about retaining counsel until after the second --

25         MR. LEVY:  The objection stands.
```

1        MR. PHADKE:  And there were third parties present at

2    the meeting.

3        MR. LEVY:  And --

4        MR. PHADKE:  I don't see how that's a confidential

5    communication.

6        MR. LEVY:  -- and -- and -- and they were co-relators.

7    The objection stands.

8    BY MR. PHADKE:

9        Q    At that meeting, did you think that Ms. Newman or

10   Mr. Chacon were your -- were going to be in a lawsuit with

11   you?

12       A    Did I think at --

13       Q    At --

14       A    -- after the first meeting?

15       Q    -- at -- at that meeting -- at that first one.

16       A    Which one?

17       Q    At that first one.

18       A    No.

19       Q    You didn't?

20       A    Huh-uh.

21       Q    At that first -- at that -- at the second dinner,

22   did you think that Ms. Newman or Mr. Chacon were going to

23   be in a lawsuit with you?

24       A    No, I thought maybe there might be something, a

25   possibility or whatever, no, I don't ....

```
 1      Q    Had you agreed to getting into a law -- to
 2  bringing a lawsuit with Ms. Newman or Mr. Chacon at the
 3  first dinner?
 4      A    No.
 5      Q    Did you agree at the second dinner?
 6      A    No.
 7      Q    Were there -- those discussions happened after
 8  the second dinner; right?
 9      A    Yes.
10      MR. CALHOUN:  I'll get copies for you.
11      MR. LEVY:  Thank you.
12  BY MR. PHADKE:
13      Q    Now, you said you contacted Ms. -- Ms. Lee after
14  the first dinner in San Jose?
15      A    Yes.
16      Q    What did you -- what did you tell Ms. Lee?
17      A    I thought that she should be involved in this
18  meeting.
19      Q    In the second meeting in --
20      A    Yes.
21      Q    -- San Mateo?
22      A    Uh-huh.
23      Q    Why did you think that?
24      A    Because she worked at Bry- -- or for Corinthian.
25      Q    And what was the amount of time that took place
```

```
 1   between the first meeting in San Jose and the second
 2   meeting in San Mateo?
 3       A    I'm not sure.  I think it was a few days.
 4       Q    And did you ask anyone else to come to the second
 5   meeting besides Ms. Lee?
 6       A    No.
 7       Q    Did any --
 8       A    Excuse me.  No.
 9       Q    Did anyone else come?
10       A    No.
11       Q    So at that second meeting, who was present?
12       A    Mr. Levy, Mr. Labaton, John Chacon, Susan Newman
13   and Nyoka Lee and myself.
14       Q    And at that second meeting you still hadn't
15   made -- thought about a second -- strike that.
16           At that second meeting, you still thought -- you
17   still had not thought about obtaining counsel to bring a
18   suit against Corinthian; right?
19       A    I hadn't finalized any thoughts about that, no.
20       Q    Had you discussed it with anybody?
21       A    Yeah, we talked about it.
22       Q    At the second meeting, you talked about?
23       A    Yes.
24       Q    But you had not talked about it at the first
25   meeting; correct?
```

```
 1      A    We talked about it at the first meeting too, but
 2   we didn't finalize it.
 3      Q    So you hadn't finalized anything at the second
 4   meeting?
 5      A    No, it was in formulation.
 6      Q    Okay.  And you formu- -- you formulated the
 7   retainer agreement after the second meeting; correct?
 8      A    Yes.  I didn't formulate it, no.
 9      Q    Who formulated it?
10      A    The attorneys did.
11      Q    So Mr. Levy and Mr. Labaton formulated the
12   retainer agreement?
13      A    Yes.
14      Q    And before that first dinner, you hadn't -- you
15   hadn't thought about the possibility of suing Corinthian;
16   correct?
17      A    No.
18      Q    And you only made your decision about suing -- to
19   sue Corinthian after the second dinner; correct?
20      A    Yeah.
21      Q    And did you have any other communications besides
22   these two dinners with Mr. Levy, Mr. Labaton, Susan Newman
23   and John Chacon, where you talked about suing Corinthian?
24      A    After that?
25      Q    No --
```

```
 1    whatever.

 2         Q    In the second meeting, did you eat dinner there?

 3         A    Yes.

 4         Q    And was that a nice place?

 5         A    Yes, a very nice place.

 6         Q    The place in San Mateo?

 7         A    Yeah.

 8         Q    Do you remember what place it was?

 9         A    I think in hearing discussion about that -- I

10    think it was called "Van."

11         Q    Could you spell that?

12         A    V-A-N.  I'm not even sure --

13         Q    Okay.

14         A    -- if that's correct, so ....

15         Q    So you remember it being called "Van," in San

16    Mateo?

17         A    After hearing it discussed yesterday.  I don't

18    remember the name of the restaurant.

19         Q    And --

20         A    It was the first time I'd ever been to it.

21         Q    And did you pay -- pay for that dinner?

22         A    Did I pay for it?

23         Q    Yes.

24         A    No.

25         Q    Did one of the attorneys pay for it?
```

**0272**

```
 1        A    I think we pitched in.  I'm not sure.  I don't

 2   know exactly -- know what went down.

 3        Q    But you didn't pay for it?

 4        A    No.

 5        Q    Did people drink wine at that dinner?  If you

 6   remember.

 7        A    I don't remember.

 8        Q    Just asking.

 9             Do you eat dinners with lawyers a lot?

10        A    No.

11        Q    So that was a pretty unique experience, that

12   dinner?

13        A    I mean, I've dealt with attorneys before, but I

14   haven't been out to dinner with them.

15        Q    And you haven't been out to dinner where you

16   talked about a potential lawsuit?

17        A    No.

18        Q    Was that first dinner in the -- the one in San

19   Jose -- was that the first time you've ever met or

20   communicated with Mr. Levy or Mr. Labaton?

21        A    Yes.

22        Q    And at that dinner, Ms. Newman didn't tell you

23   that she had been a client of Mr. Levy in

24   another for-profit -- in another suit against a for-profit

25   college?
```

```
 1      A    No.
 2      Q    And you were still working at Corinthian at the
 3  time; correct?
 4      A    I think I was working at IBT.
 5      Q    Okay.  You were working at IBT?
 6      A    Yeah.
 7      MR. LEVY:  We'd like to take a break.
 8      MR. PHADKE:  Okay.  Let me just finish up a couple
 9  questions and then we can.
10      Q    And before that dinner with Mr. Levy and
11  Mr. Labaton, did you have any idea that Corinthian was
12  violating the ban on incentive compensation?
13      A    I'm not sure if I was aware or not.  I'm not
14  sure.
15      Q    You're not sure?
16      A    No.
17      Q    You have no recollection?
18      A    No.
19      Q    And how long after the second dinner did you
20  retain Mr. Levy and Mr. Labaton as counsel?
21      A    I don't know.  I have -- I have to check the
22  documents and the dates to give you that answer.
23      Q    Do you have an estimate?
24      A    No.
25      Q    But it was after the second dinner?
```

**0274**

```
 1   Mr. Chicone's potential involvement in this case?

 2       A    Yes, at that dinner.

 3       Q    The first dinner in San Jose?

 4       A    Yes.

 5       Q    Do you know what a Program Participation

 6   Agreement is?

 7       A    No.  Could you explain that to me?

 8       Q    Do you know what a PPA is?

 9       A    No.

10       Q    So sitting here right now, without explanation

11   from somebody else, you don't have any understanding of

12   what a PPA is?

13       A    I'm not familiar with that type of document,

14   haven't had any need -- need to.

15       Q    So you've never had to prepare a PPA for anybody

16   before?

17       A    As far as I know, no.

18       Q    You've never reviewed a Program Participation

19   Agreement, or PPA, at any point?

20       A    Program Participation Agreement?  No.

21       Q    And you've never submitted a Program

22   Participation Agreement to anybody?

23       A    No.

24       Q    Because you have no idea what it is?

25       A    Until you mentioned it.
```

```
 1       Q    So you've heard me mention Program Participation

 2   Agreement?

 3       A    Just now.

 4       Q    And that's the first time you've --

 5       A    Yes.

 6       Q    -- ever heard of it?

 7       A    Uh-huh.

 8       Q    So the first time you -- just to get the record

 9   clear, the first time you've ever heard of a Program

10   Participation Agreement was today when I asked you about

11   it?

12       A    That's correct.

13       Q    Are you aware of any legal or regulatory

14   requirements relating to recruiting or compensating

15   recruiters?

16       A    Aware of what?

17       Q    Are you aware of any legal or regulatory

18   requirements relating to the compensation of recruiters?

19       A    No.

20       Q    So you're not aware of any legal or regulatory

21   requirements relating to the compensation of recruiters

22   for for-profit schools?

23       A    Legal or regulatory compensation, is that what --

24       Q    No.

25       A    -- you said?
```

```
 1      Q    No.
 2      MR. LEVY:  Objection to form.
 3   BY MR. PHADKE:
 4      Q    Are you aware of any legal requirements that
 5   govern the compensation of recruiters at for-profit
 6   schools?
 7      A    I'm not sure.  You know, I may be aware of it,
 8   but not the way you're presenting it.
 9      Q    Okay.  Are you aware of any restrictions that
10   limit how a for-profit school can pay its ad reps or
11   recruiters?
12      A    Vaguely.
13      Q    You're vaguely familiar?
14      A    Yeah.
15      Q    But you have -- you don't have any clear
16   understanding of legal restrictions that govern how a
17   for-profit school can pay its ad reps or recruiters?
18      MR. LEVY:   Objection to form.
19      MR. PHADKE:  Can you repeat the question?
20      (Record read as follows:
21          "Q    But you don't have any clear
22   understanding of any legal restrictions that govern of how
23   a for-profit school can pay its ad reps or
24   recruiters?")
25      THE WITNESS:  Vaguely.
```

```
 1   BY MR. PHADKE:

 2       Q    What are those restrictions?

 3       A    I don't know.  I can't name 'em off to you.

 4       Q    Can you generally describe what they do?

 5       A    Who?

 6       Q    What the restrictions restrict?  Can you

 7   generally describe what those restrictions do?

 8       A    No.

 9       Q    So do you have any specific understanding of any

10   legal requirements or restrictions on how for-profit

11   schools can pay their ad reps or recruiting staff?

12       A    Legal restrictions on how they pay 'em?

13       Q    Yeah.

14       A    Not to my knowledge.

15       Q    Do you know what Title IV of the Higher Education

16   Act is?

17       A    Vaguely.

18       Q    What is it?

19       A    Title IV of the education program, I guess it has

20   something legally to do with how they operate.

21       Q    Do you have anything more specific to say about

22   Title IV besides that?

23       A    No.  I would have to look at it again.  I've

24   looked at it before, but I don't remember what exactly it

25   said.
```

```
 1       Q    When did you look at it?

 2       A    I don't remember.

 3       Q    Did you look at it after filing this lawsuit?

 4       A    I may have saw a copy of it before, because I've

 5  been involved in education for a number of years, so I --

 6  I can't exactly say when or -- it does kind of ring a

 7  bell.

 8       Q    Are you aware of any requirements under Title IV

 9  that pertain to this case?

10       A    Yes, somewhat.

11       Q    Which requirements are those?

12       A    I can't name 'em.

13       Q    So you're aware of requirements under Title IV

14  that pertain to this case --

15       A    Yes.

16       Q    -- but you can't name any of them?

17       A    No.

18       Q    And when did you become aware of requirements

19  under Title IV that pertain to this case?

20       A    I don't know exactly when.

21       Q    Did you -- were you aware of the requirements

22  that pertain to Title IV that pertain to this case, before

23  that dinner in San Jose in 2006?

24       A    No.

25       Q    So it's only after the dinner in San Jose in 2006
```

1    that you became aware of any requirements under Title IV

2    that pertain to this case?

3        A    Like I mentioned before, I -- I was maybe aware

4    of Title IV, but not in any real essence of all the parts

5    about it.

6        Q    So none of this was provisions that could apply

7    to this case -- you became -- you weren't aware of any of

8    those before that dinner?

9        A    I was aware of Title IV, but not in any real

10   detail.

11       Q    Okay.  And not -- and you weren't aware of any of

12   the specific provisions that apply to this case prior to

13   that dinner?

14       A    Could have, yeah.

15       Q    But you don't know?

16       A    I don't know.

17       MR. LEVY:  Objection.  Argument.

18   BY MR. PHADKE:

19       Q    And you don't recall any requirements that apply

20   to this case?

21       MR. LEVY:  Objection.  Argument.

22   BY MR. PHADKE:

23       Q    You can answer.

24       A    I'm aware of any -- can you --

25       Q    And you're not aware of any legal requirements

```
 1   Title IV that govern this case?

 2       MR. LEVY:  Objection to form.

 3       THE WITNESS:  Am I -- no.  Not -- you know, not that I

 4   can ....

 5   BY MR. PHADKE:

 6       Q    And you've never communicated with the federal

 7   government on behalf of Corinthian; correct?

 8       A    Yes.

 9       Q    When did you communicate with the federal

10   government on behalf of Corinthian?

11       A    Oh, on behalf of Corinthian?

12       Q    Yes.

13       A    No.

14       Q    So you've never communicated on behalf of

15   Corinthian with the federal government?

16       A    No.

17       Q    And have you ever seen or heard any

18   communications between somebody who represents Corinthian

19   and the federal government?

20       A    Say that again.

21       Q    Have you ever seen anybody who's representing

22   Corinthian communicate with the federal government or have

23   you ever observed such communications?

24       A    In what -- in what capacity would they

25   communicate with the federal government?
```

```
 1      Q    You have to answer the question.
 2    MR. LEVY:  Can you repeat the question, please?
 3    (Record read as follows:
 4         "Q   Have you ever seen anybody who's
 5      representing Corinthian communicate with the federal
 6      government or have you ever observed such
 7      communications?")
 8    MR. LEVY:  I mean, that's confusing.  Object.
 9    MR. PHADKE:  All right.  I'll -- I'll restate.
10      Q    Did you ever see or hear any communications
11    between anyone representing Corinthian and someone at the
12    federal government?
13      A    At what capacity at the federal government?  I --
14    you know, it's not very clear, the question you're asking
15    me.  At the federal government?  What do you mean?
16      Q    It could be anybody at the federal government.
17    So let me rephrase, get the full question out.
18         Did you ever see or hear any communications
19    between anyone representing Corinthian and anybody at the
20    federal government?
21      A    Federal government is a -- one big entity, you
22    know.
23      Q    Do you need the question repeated?
24      A    Yeah.
25    MR. LEVY:  I thought he gave an answer.  Go ahead.
```

1    (Record read as follows:

2        "Q   It could be anybody at the federal

3     government.  So let me rephrase, get the full

4     question out.

5        "Did you ever see or hear any communications

6     between anyone representing Corinthian and anybody at

7     the federal government?")

8    MR. LEVY:  And his response.

9    (Record read as follows:

10       "A   Federal government is one big

11    entity, you know.")

12   MR. PHADKE:  Strike his response as nonresponsive.

13   MR. LEVY:  I mean, I object to the argument with him.

14   I think he's telling you the question is overbroad.  Ask

15   him another way.

16   MR. PHADKE:  The question is perfectly clear.

17   THE WITNESS:  At the federal government, that's too

18   vague of a question for me to answer.  Pinpoint it.  What

19   department in the federal government?

20   BY MR. PHADKE:

21      Q   Have you ever seen any communications at all

22   between anybody at Corinthian and anybody in any

23   department of the federal government?

24      A   Have I seen them do it, talk to somebody?

25      Q   In any department of the federal government.

```
 1        A    Possibly.  I'm not sure.

 2        Q    So you have no recollection of any

 3   communications --

 4        MR. LEVY:  Objection.  He just said he's not sure; he

 5   didn't say he had no recollection.

 6        THE WITNESS:  I'm not sure.

 7   BY MR. PHADKE:

 8        Q    And have you ever submitted any claim for payment

 9   to the federal government on behalf of Corinthian?

10        A    Have I submitted any payment of -- or claim?

11   What -- what was that?

12        MR. PHADKE:  Could you repeat the question?

13             (Record read as follows:

14             "Q    And have you ever submitted any claim for

15        payment to the federal government on behalf of

16        Corinthian?")

17        THE WITNESS:  Your questions are, you know, kind of

18   far-reached.  I don't -- you know, I can't answer that.

19   BY MR. PHADKE:

20        Q    Do you know that Corinthian makes claims for

21   payment to the federal government?

22        A    In their daily operations?  I'm quite sure they

23   must.

24        Q    Have you ever submitted any claims --

25        A    No, I haven't.
```

# CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: January 6, 2014

*/s/ Blanca F. Young*
Blanca F. Young